# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3172

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff – Appellee, | * |
| | * |
| v. | * |
| | * |
| Michael L. Dale, | * |
| | * |
| Defendant – Appellant. | * |

_____

No. 08-3246

_____

Appeals from the United States
District Court for the
Western District of Missouri.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff – Appellee, | * |
| | * |
| v. | * |
| | * |
| Dyshawn Johnson, | * |
| | * |
| Defendant – Appellant. | * |

_____

Submitted: September 24, 2009
Filed: July 30, 2010

_____

Before BYE, ARNOLD and SMITH, Circuit Judges.

_____

BYE, Circuit Judge.

Appellants Michael L. Dale and Dyshawn Johnson were convicted at a joint trial of two counts of first-degree murder and conspiracy to distribute cocaine. Dale and Johnson raise numerous arguments on appeal challenging their convictions. We affirm.

I

On December 21, 2002, Anthony Rios and Olivia Raya were found murdered in their Kansas City, Missouri, home, both victims of multiple gunshot wounds. On December 21, 2002, at about 7:57 p.m., Francisco Rios, the grandfather of Anthony Rios, went to the home of Anthony Rios and Olivia Raya at 5115 Hardesty, Kansas City, Missouri, to check on them because neither he nor his wife had seen Rios or Raya all day. Francisco Rios, who lived next door, went through the back door, which was unlocked, and found both victims shot to death. Raya was sitting on a living room couch where she had been writing out thank-you cards for graduation gifts, with a pen still in her left hand. Anthony Rios, who was also known as "Snap" or "Snapper," was found on his back on the kitchen floor. Police found several bricks of marijuana and cocaine in Rios's home. Rios's phone records revealed that the last call made or received by Rios was to Dyshawn Johnson at 7:21 p.m. on December 20, 2002.

The last witness to see or speak to the victims, Paul Lupercio, visited Rios's home on Friday evening, December 20, 2002, at about 7:30 p.m. At that time, Lupercio stopped by the victims' home to arrange a drug deal with Rios. Lupercio testified that he always called before going to Rios's house to conduct a drug deal. Lupercio testified that Raya was sitting on the couch at the time, writing out graduation thank-you cards, and that she gave him a card while he was at the house. Lupercio gave Rios $20,000 cash for a kilogram of cocaine, which, Lupercio testified, he was going to stop by to pick up later that evening. However, Rios never answered

-2-

his phone later that night or called him back, which Lupercio testified was unusual for Rios.

On February 12, 2003, North Kansas City police officers stopped Johnson for speeding while he was driving a Yukon Denali. He was then found to be driving with a revoked license, at which time he was arrested. Police searched Johnson and his Yukon Denali incident to arrest, and recovered: $2,355 in United States currency from Johnson's pants pocket; $3,500 in United States currency from his left shoe; a Cartier watch valued at $6,000 by Johnson; a diamond ring valued at $4,500 by Johnson; a silver cross with a chain valued at $10,000 by Johnson; a diamond earring valued at $4,000 by Johnson; a small amount of marijuana; several money order receipts totaling $14,700; and a Southwest Airlines travel receipt in Johnson's name purchased December 20, 2002, with $595.00 cash, for travel from Kansas City to Los Angeles on December 21, 2002.

On April 23, 2003, police executed a search warrant for Johnson's home. Police recovered scales, kilo wrappers and tape with cocaine residue, and ammunition. Investigators began to focus on the theory that Dale and Johnson had murdered Rios and Raya in a drug deal gone bad.

A series of witnesses called to testify by the prosecution helped to explain the government's theory of the case.

* Anthony Smith testified he had known Dale for eighteen years. Smith testified that while he and Dale were in prison together in 2003, Dale admitted to murdering "the Mexicans." Smith also testified that he had accompanied Dale to a drug deal with Johnson.

* Terry Taylor is currently serving a ten-year sentence for selling cocaine. He testified that Johnson introduced him to Dale in 2002 for the purpose of purchasing cocaine. Taylor further testified that he bought two ounces of crack cocaine twice a

-3-

week from Dale for eight to nine months, and that Dale's source was Johnson. Finally, Taylor testified that Dale admitted to him that he shot the Mexican and the woman who was messing with some cards.

* Charles Levington testified that he purchased cocaine from Dale in 2002, and that the drugs were supplied by Johnson. Levington further testified that Dale admitted to shooting Rios and Raya.

* Mitchell Powell testified that he dealt drugs with Dale and purchased drugs from Johnson. Powell further testified that Dale admitted to shooting Rios and Raya.

* Bryant Burton was originally a codefendant with Dale and Johnson, but testified pursuant to a cooperation agreement with the Government after pleading guilty to conspiracy to distribute cocaine. Burton testified that he bought drugs from Rios, dealt drugs with Johnson, and that Johnson and Dale sold drugs together.

Burton also testified that in the spring of 2004, he ran into Dale at a club and they had a conversation about "the Mexicans." Dale told Burton that "the Mexican was slippin'." Dale also told Burton that "That's how the game go. No different from me and you. Somebody catch you slippin', that's how they gonna do you." Burton also testified that he called Johnson and asked him about the Rios/Raya murders. Johnson told Burton that he took somebody over to Snapper's house to purchase some cocaine, and "about the time he looked up, the m*therf*cker went crazy and got to shootin'."

* Eric Noel testified that he bought ten kilograms of cocaine a month from Johnson.

* Henry Abrought testified that he bought cocaine from Johnson weekly.

-4-

\* Jonni Curry testified that Johnson stored drugs, weapons, cash, and other equipment at her house. She further testified that Johnson would weigh cocaine at her house and package it into bags, and that she would buy supplies on behalf of Johnson.

In 2005–before an indictment was handed down in the present case–Dale was in jail awaiting trial on unrelated criminal charges of conspiracy, distribution of cocaine, and unlawful possession of a firearm. Law enforcement officials persuaded Anthony Smith, who was incarcerated in the same facility as Dale, to wear a wire and probe Dale for information relating to the Rios/Raya murders. Investigators arranged for Dale and Smith to be placed in a prison vehicle together while Smith wore a wire. While in the vehicle with Smith, Dale incriminated himself and Johnson, admitting involvement in the murders.

On February 28, 2006, a federal grand jury in the Western District of Missouri returned a four-count indictment charging Dale and Johnson in three counts: conspiracy to distribute five kilograms of cocaine and fifty grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; and two counts each of use of a firearm in furtherance of drug trafficking and in so doing, committing first-degree murder, in violation of 18 U.S.C. §§ 2, 924(c)(1), (j)(1), and (2).[1]

At a pretrial hearing, Dale moved to suppress the recorded statement obtained through Smith's cooperation, arguing that the statement was acquired in violation of his Fifth Amendment right to due process and his Sixth Amendment right to counsel.

---

[1]As previously discussed, a co-defendant, Bryant Burton, was charged in Count One with Dale and Johnson, and additionally in Count Four with possession of a firearm by a convicted felon. Burton pleaded guilty before trial pursuant to a cooperation agreement and testified for the government at trial.

-5-

In a report and recommendation, a magistrate judge[2] found that Dale's statement to Smith had been voluntary, and that there was no violation of Dale's Sixth Amendment rights, because he was represented on a separate case. Although the magistrate judge found there was a violation of the detention order that prisoners awaiting trial be kept separate, to the extent practicable, from sentenced prisoners, she recommended the denial of Dale's motion to suppress. The district court[3] adopted her report and recommendation.

Dale and Johnson asked the court to sever the proceedings, allowing each defendant to proceed to a separate trial. The district court denied the motion.

During the trial, the district court, over Johnson's objection, placed a limitation on Johnson's cross-examination of witnesses Terry Taylor and Mitchell Powell. The district court prohibited Johnson from questioning Taylor and Powell about Dale's involvement in an unrelated murder charge in state court, the Torrez Rodriguez murder case, reasoning that such testimony would be unduly prejudicial to Dale.

At the time of trial in the present case, Powell was a co-defendant with Dale in the Torrez Rodriguez murder case. Although Johnson was not able to elicit testimony from Powell that Powell hoped testifying would result in leniency in the state murder proceedings, Powell did state during cross-examination that he did hope to receive leniency on yet another unrelated charge. Specifically, Powell testified three times during cross-examination that he had pleaded guilty in a federal drug conspiracy case, in which he faced a minimum twenty-year sentence, and that he was hoping for a downward departure on that case.

---

[2]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

[3]The Honorable Dean Whipple, United States Senior District Judge for the Western District of Missouri.

-6-

Taylor was not a defendant in the ongoing Torrez Rodriguez murder case, but he was a potential witness. At trial, Johnson was prohibited from eliciting testimony from Taylor showing Taylor gave inconsistent statements to police when Taylor was questioned about the Torrez Rodriguez murder. However, the district court required the prosecution to make the detective to whom Taylor allegedly lied available as a defense witness for Johnson. Johnson called this witness, Detective Babcock. Babcock testified that when he interviewed Taylor, Taylor gave inconsistent answers and changed his story several times.

On the morning of the second day of trial, a juror asked to speak with the district court judge:

> THE COURT: What's your concern, Mr. [JUROR]?
> JUROR: I feel I can't be impartial.
> THE COURT: Why would you say that?
> JUROR: I–I just went home and thought about this for a long time, and I don't think I can be an impartial juror.
> THE COURT: Well, that's not a good enough answer. You're going to have to stay and sit and hear the evidence. I'll ask you again at the end of the trial.
> JUROR: Okay.
> THE COURT: But I would ask you, again, to keep an open mind and listen to the evidence, and then we'll discuss this later, but I don't want to excuse you at this point. Now, because the evidence may be hard and it may be disturbing to you, it shouldn't necessarily take away your impartiality, but I am not going to lecture any further, I'm going to ask you to stay, please.
> JUROR: Okay.

The defense requested the juror be dismissed from the jury panel based on his comments. The court denied the request and the juror remained on the jury. After the voir dire examination, the court indicated that it did not believe the juror was being sincere with the court, implying the juror was actually motivated by a desire to avoid his duty to serve. After closing arguments, before deliberation, the district court

-7-

called the same juror back and questioned him. The following exchange took place in the courtroom, in the presence of the single juror being questioned, the judge, counsel, and defendants:

> THE COURT: You had stated that you didn't feel you could be fair. What's your feeling now?
> JUROR: I'm very impartial.
> THE COURT: Very impartial?
> JUROR: I can be fair to both sides.
> THE COURT: You think you can be fair?
> JUROR: Absolutely.
> THE COURT: So you have no concern about retiring and deliberating?
> JUROR: No.
> THE COURT: Does either side have any concern about that?
> PROSECUTOR: Nothing from the government, Your Honor.
> THE COURT: Thank you, Mr. [JUROR]. I thought you were giving it more thought. You looked like you were paying attention, and so I'll let you continue to deliberate. Thank you very much.

There was no additional questioning of the juror by any party or the court.

During the course of the government's case-in-chief, counsel for Dale and Johnson made six motions for a mistrial, each of which was denied by the district court. Because appellants argue on appeal the district court erred in failing to grant a mistrial, we must briefly explore the testimony to which they object.

On the third day of trial, at the beginning of his testimony, FBI Special Agent Robert Plant was asked where he worked, and he replied, "I'm a special agent assigned to squad one, which is the squad 50 gang task force." At the next bench conference, the prosecutor stated she had anticipated that Agent Plant would have said "narcotics unit." Dale's counsel asked for a mistrial based upon the gang reference made by Agent Plant, a request in which Johnson subsequently joined. The district court took the mistrial motion under advisement. The remaining testimony by Agent Plant and other officers focused solely on the drug conspiracy and two charged

-8-

murders, with no further mention of the word "gang" or gang activity. The district court eventually denied defense counsels' motion for a mistrial.

During the presentation of the recording of Dale's conversation with Smith, the conversation briefly touched on criminal gangs. The exchange was as follows:

> DALE: What they bringin' up Fuzzy's name for man? What, what they bringing up all those names for?
>
> SMITH: Shhhh, cuz, I don't even know man. Fifty First to Four Tre to Deuce Tre to 12th Street. . . Bloods to Crips. . . I said man I don't. . . I said man I've been gone man. I don't. . . I don't know these niggers man. Man I only hung with one nigger man, my bro."

Defense counsel objected to the reference to Bloods and Crips. The district court again denied counsels' motion for a mistrial.

Later in the Dale-Smith recording, Smith and Dale discuss the large number of unsolved homicides in Kansas City (55:37) and that police were pressing Smith for information (56:24). At the (56:54) mark, Dale says the name "Deshawn" followed by an unintelligible statement referred to in the transcript as "[UI]." The following day, the fourth day of trial, Johnson's counsel requested a mistrial because the name "DeShawn" appeared in the transcript that was displayed to the jury. The district court denied the motion. At the close of trial, the district court instructed the jury: "You have heard a tape recording of a conversation between Anthony Smith and defendant Michael Dale. During the recording a reference was made to a 'DeShawn.' This reference to an individual named 'DeShawn' is not the defendant Dyshawn Johnson."

During the testimony of Henry Abrought, the prosecution asked Abrought how often he purchased powder cocaine from Johnson. Abrought answered that the purchases had occurred once a week from 2002 to 2005. Johnson's counsel requested

Appellate Case: 08-3172     Page: 9     Date Filed: 07/30/2010 Entry ID: 3688583

a mistrial on the grounds that the charged conspiracy extended from January 1, 2002, until August 31, 2004, and, therefore, Abrought's drug purchases outside of the period of the conspiracy were irrelevant and prejudicial. The district court again declined to grant a mistrial.

During Jonni Curry's testimony, Curry testified how she first met Johnson in 1999. Curry was subsequently asked what she thought Johnson did for a living. Based upon previous statements, government counsel expected her answer to be that Johnson was in real estate, or that he rehabilitated houses. Instead, Curry responded that Johnson was a drug dealer. Johnson's counsel asked for a mistrial on the grounds that Curry's statement implied Johnson engaged in illegal activity before the period of the charged conspiracy. The district court denied the motion for a mistrial.

During the testimony of Brad Evans, a Kansas City police officer, the prosecutor asked the officer to describe physical evidence that had been recovered in a search warrant from Johnson's residence in Kansas City, Missouri. Officer Evans described a bag which contained about fifty rounds of ammunition. Officer Evans identified some of the ammunition as .40- caliber Hydroshock rounds, which he said, "are a certain type of bullet that was actually outlawed for a while because of the damage it's done if it enters the body parts. . . ." At this point Johnson's counsel objected, the district court sustained the objection, and the jury was instructed to disregard the portion of Officer Evans's testimony pertaining to the legality of the ammunition.

In closing argument on behalf of Johnson, defense counsel said, "Now, . . . let's talk about Count 1 [the drug conspiracy count] . . . there is not one piece of evidence that has been introduced in this case that establishes or proves Count 1." In response, the prosecution argued in rebuttal: "And I have been waiting to hear why Dyshawn Johnson is not a drug dealer, how he is not guilty of Count 1. It is absolutely false that there is no physical evidence." At the conclusion of the rebuttal argument, counsel

-10-

for Johnson approached the court and asked for a mistrial alleging that the prosecution had shifted the burden to the defendant. The district court did not grant a mistrial.

Following the government's case, Johnson made a motion for judgment of acquittal, arguing the evidence was legally insufficient to support his convictions for conspiracy to distribute cocaine, and for knowingly using a firearm in furtherance of a drug trafficking crime, and in so doing, committing first-degree murder. The district court denied the motion.

After a six-day jury trial in which the government presented thirty-five witnesses, the jury convicted Dale and Johnson on all three counts as charged. On September 9, 2008, the district court sentenced Dale and Johnson each to three consecutive life sentences.

Johnson filed a timely notice of appeal on September 17, 2008. Dale filed a timely notice of appeal on September 18, 2008.

## II

On appeal, Dale renews the arguments he made in support of his motion to suppress. Dale contends the statement he made, surreptitiously recorded by law enforcement officers and Smith, violated his Sixth Amendment right to counsel and right to due process. We confront these arguments in turn.

## A

This court will affirm a district court's order denying a defendant's motion to suppress "'unless the decision is unsupported by substantial evidence, is based on an erroneous view of the applicable law, or in light of the entire record, this court is left with a firm and definite conviction that a mistake has been made.'" United States v. Welerford, 356 F.3d 932, 935 (8th Cir. 2004) (quoting United States v. Vanhorn, 296

-11-

F.3d 713, 717 (8th Cir. 2002)).  This court reviews the district court's factual findings for clear error and reviews de novo the ultimate question of whether there was a Fourth Amendment violation.  United States v. White, 356 F.3d 865, 868 (8th Cir. 2004).

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."  U.S. Const. amend. VI.

Dale argues that because he was in jail awaiting trial on another criminal matter, he was entitled to the presence of counsel before the government could interrogate him.  The government responds by arguing that because Dale had not yet been indicted or charged with crimes at issue in this appeal, his Sixth Amendment right to counsel was not implicated.

In McNeil v. Wisconsin, 501 U.S. 171, 175 (1991), the Supreme Court stated that "[t]he Sixth Amendment right . . . is offense specific.  It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, 'at or after the initiation of adversary judicial criminal proceedings–whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'"  Id. (quoting United States v. Gouveia, 467 U.S. 180, 188 (1984)).

In this case, prosecution of Dale for the present offenses had not yet commenced when he made his incriminating statements to Smith.  Therefore, we conclude that Dale's Sixth Amendment protections had not yet attached, and the admission of the out-of-court statements he made to Smith did not violate Dale's Sixth Amendment right to counsel.

-12-

B

Dale argues that the executive conduct in this case–placing him in a vehicle with Smith for the purpose of tricking Dale into incriminating himself and violating the district court's detention order[4]–violated his right to due process.

The Fifth Amendment provides in relevant part that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Convictions based on evidence obtained by methods that are "so brutal and so offensive to human dignity" that they "shoc[k] the conscience" violate the Due Process Clause. Rochin v. California, 342 U.S. 165, 172, 174 (1952) (overturning conviction based on evidence obtained by involuntary stomach pumping). See also Breithaupt v. Abram, 352 U.S. 432, 435 (1957) (reiterating that evidence obtained through conduct that "shock[s] the conscience" may not be used to support a criminal conviction).

On the other hand, government agents are permitted to use subterfuge in the investigation of crimes. United States v. Wright, 641 F.2d 602, 604-05 (8th Cir. 1981). In addition, the Supreme Court has held that mere deception will not violate a person's due process rights. Moran v. Burbine, 475 U.S. 412, 423 (1986). Further, there is little support for the argument that the government's violation of the detention order rose to the level of egregiousness required for a due process violation. See, e.g., Anderson v. Larson, 327 F.3d 762, 770 (8th Cir. 2003) (holding that an officer's violation of Iowa's solicitation statute did not by itself amount to a due process violation, and, therefore, suppression was not an appropriate remedy); United States v. Clarke, 110 F.3d 612, 615 (8th Cir. 1997) (holding that failing to bring a defendant

---

[4]The district court had earlier issued an order stating that sentenced prisoner (such as Smith) should be kept separated from those awaiting trial (such as Dale) "to the extent practicable."

-13-

before a magistrate as required by the Rules of Criminal Procedure did not amount to a due process violation triggering suppression).

In this case, we agree with the district court's conclusion that the conduct on the part of the government–using a prisoner to record incriminating statements and placing a pretrial detainee in the same vehicle as a prisoner in violation of a valid detention order–did not rise to the level required to implicate Dale's due process rights. Therefore, Dale's constitutional rights were not violated by the admission of Smith's statement.[5]

## II

Next, we must confront Johnson's argument that the admission as evidence of Dale's recorded incriminating statements violated Johnson's right to cross-examine Dale at trial, in violation of the Sixth Amendment.

At the joint trial, Dale did not testify. As a result, Johnson argued to the district court that the admission of the tape-recorded conversation between Dale and Smith–including statements incriminating Johnson–violated Johnson's Sixth Amendment right to confront Dale at trial. The district court, in light of Johnson's concerns, ordered the prosecution to redact all references to Johnson in the transcript. In addition, the district court instructed the jury that the tape-recorded conversation was not admissible against Johnson.

---

[5]The government spends a good portion of its brief discussing the applicability of the exclusionary rule in light of the government's failure to follow the district court's detention order. We need not confront this issue because Dale is not arguing that the violation of the detention order should, by itself, trigger suppression. Rather, Dale argues that the violation of the detention order, together with other factors, amounted to a violation of due process, which requires suppression.

-14-

This court reviews Confrontation Clause objections to the admission of evidence de novo.  United States v. Davis, 449 F.3d 842, 847 (8th Cir. 2006).  A violation of the Confrontation Clause is also subject to harmless error analysis.  Barrett v. Acevedo, 169 F.3d 1155, 1164 (8th Cir. 1999).

Bruton v. United States, 391 U.S. 123 (1968), provides a useful starting point to our analysis.  The facts in Bruton are similar–though not identical–to the facts of this case.  In Bruton, one of the defendants, Evans, confessed during an interrogation that he and an accomplice had committed armed robbery.  Id. at 124.  The government believed Evans's accomplice was a man named Bruton.  Id.  Evans and Bruton were tried together, and the district court accepted testimony describing Evans's confession.  Id.  Evans did not testify at trial.  Id.  The district court cautioned the jury that Evans's admission was inadmissible hearsay as applied to Bruton, and should not be considered in determining Bruton's guilt or innocence.  Id. at 125.  Bruton challenged his conviction, arguing the admission of Evans's confession violated his Sixth Amendment right to confront Evans at trial and challenge the statements Evans made in his confession.  Id. at 126.

The Supreme Court reversed Bruton's conviction, holding that the admission at a joint trial of a nontestifying defendant's statement inculpating a co-defendant violates the co-defendant's Confrontation Clause rights, notwithstanding a curative instruction.  Id. at 135-36.

In this case, the government makes three arguments distinguishing Bruton.  The government contends:  (1) that Bruton does not apply in the context of this case because Dale's statements to Smith were non-testimonial, (2) that, assuming Dale's statements were testimonial, the district court complied with Bruton by omitting Johnson's name from the recording and transcript, and, (3) assuming Bruton was violated, Johnson was not prejudiced by the error.  Because we agree Dale's statements were non-testimonial, we address only the first of the government's arguments.

-15-

In the landmark case of <u>Crawford v. Washington</u>, the Supreme Court held that the Confrontation Clause prohibits the admission of evidence of out-of-court "testimonial" statements against a criminal defendant, unless the defendant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. 541 U.S. 36, 53-54 (2004). It is now clear that the Confrontation Clause does not apply to non-testimonial statements by an out-of-court declarant. See <u>Davis v. Washington</u>, 547 U.S. 813, 821-22 (2006); <u>Whorton v. Bockting</u>, 549 U.S. 406, 412 (2007) ("[T]he Confrontation Clause has no application to [non-testimonial out-of-court statements]").

The Supreme Court has not defined the term testimonial, but stated in <u>Crawford</u>:

> Various formulations of this core class of "testimonial" statements exist: "ex parte in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"; "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," <u>White v. Illinois</u>, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.

<u>Crawford</u>, 541 U.S. at 51-52 (internal citations omitted).

Under any formulation of the rule, Dale's incriminating statements made to Smith were not testimonial. Indeed, it is clear enough that Dale had no idea Smith was wearing a wire, or that the incriminating statements he made to Smith would ultimately be used against him at trial. Had Dale known the authorities were listening

-16-

in, he likely would not have admitted to committing two unsolved murders. In this sense, we cannot say that Dale, in making the statements, "would reasonably expect [the statements] to be used prosecutorially." Id. Nor can we say that an objective witness, in these circumstances, would "reasonably . . . believe that the statement would be available for use at a later trial." Id. Thus, the critical distinction between Bruton and this case is the circumstances under which the out-of-court statement was made. Whereas in Bruton the incriminating statement was the product of a formal interrogation and therefore testimonial, the incriminating statements made by Dale here were made unwittingly, and not in anticipation by Dale of future use of the statements at trial. Under our present understanding of the confrontation right, governed by Crawford, the introduction of Dale's out of court statements did not violate Johnson's confrontation right.

In so holding, we join many of our sister circuits, which have similarly concluded that the out-of-court statement of a co-defendant made unknowingly to a government agent is not "testimonial" within the meaning of Crawford. See United States v. Udeozor, 515 F.3d 260, 269-70 (4th Cir. 2008); United States v. Watson, 525 F.3d 583, 589 (7th Cir. 2008); United States v. Underwood, 446 F.3d 1340, 1347-1348 (11th Cir. 2006); United States v. Hendricks, 395 F.3d 173, 182-184 (3d Cir. 2005); United States v. Saget, 377 F.3d 223, 229-230 (2d Cir. 2004).

IV

In his second point, Johnson claims the district court violated his Sixth Amendment right to confront witnesses by limiting his cross-examination of Terry Taylor and Mitchell Powell. The district court prohibited Johnson from questioning Taylor and Powell about Dale's involvement in an unrelated murder charge in state court, the Torrez Rodriguez murder case, reasoning that such testimony would be unduly prejudicial to Dale.

-17-

The Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses. United States v. Warfield, 97 F.3d 1014, 1024 (8th Cir. 1996). However, district courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). A Confrontation Clause violation is shown when a defendant demonstrates that a reasonable jury might have received a significantly different impression of a witness's credibility had counsel been permitted to pursue the proposed line of cross-examination. Harrington v. Iowa, 109 F.3d 1275, 1277 (8th Cir. 1997). A trial court's decision to limit cross-examination will not be reversed unless there has been a clear abuse of discretion and a showing of prejudice to the defendant. United States v. Brown, 110 F.3d 605, 611 (8th Cir. 1997).

Johnson correctly points out that prohibiting a criminal defendant from exploring a witness's motive to lie violates the Sixth Amendment. See Davis v. Alaska, 415 U.S. 308, 318 (1974) ("[D]efense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness."); Delaware v. Van Arsdall, 475 U.S. 673 (1986) (holding that where the trial court "prohibited *all* inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge . . . the court's ruling violated [the defendant]'s rights secured by the Confrontation Clause") (emphasis in original); Olden v. Kentucky, 488 U.S. 227, 232 (1988) (per curiam).

The touchstone of our inquiry, therefore, is whether Johnson was given an adequate opportunity to impeach the credibility of Powell and Taylor. In the case of Powell, although Johnson was prohibited from asking about the Torrez Rodriguez murder case, counsel for Johnson elicited testimony from Powell during cross-examination stating that Powell had pleaded guilty in a federal drug conspiracy case,

-18-

in which he faced a minimum twenty-year sentence, and that he was hoping for a downward departure on that case. Put another way, counsel for Johnson was allowed to put before the jury Powell's hope for leniency in another serious matter in exchange for testifying against Johnson. Because Johnson was permitted to impeach Powell's credibility in this way, we cannot say the district court abused its discretion in limiting Johnson's cross-examination of Powell. See United States v. Purkey, 428 F.3d 738, 753-54 (8th Cir. 2005) ("Here, Mr. Purkey's counsel conclusively demonstrated by other means that [the witness] was driven to testify by a desire for leniency."); United States v. Lightfoot, 483 F.3d 876, 882 (8th Cir. 2007).

We reach the same conclusion with respect to Taylor. Johnson wished to impeach Taylor by eliciting testimony that Taylor lied to police when questioned about the Torrez Rodriguez murder case. But we have held that where the defendant is given an alternative means of impeachment, there is no Confrontation Clause violation. Lightfoot, 483 F.3d at 882. Here, Johnson was permitted to elicit testimony from Detective Babcock. Babcock testified that when he interviewed Taylor about the Torrez Rodriguez case, Taylor gave inconsistent answers and changed his story several times. Therefore, Johnson was able to impeach Taylor's credibility through Detective Babcock without prejudicing Dale. We discern no abuse of discretion here. See United States v. Aldridge, 413 F.3d 829, 834 (8th Cir. 2005) (finding no Confrontation Clause violation where the defendant "could have called FBI Special Agent Richard Schoeberl, who assisted the investigation, to the stand to inquire about [another witness]'s statements regarding [the defendant]'s involvement").

V

We next confront the argument, made by both Dale and Johnson, that the district court erred in denying their motions to sever the joint trial.

A denial of a motion to sever will not be reversed "unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." United States v.

-19-

<u>Flores</u>, 362 F.3d 1030, 1039 (8th Cir. 2004) (citing <u>United States v. Pherigo</u>, 327 F.3d 690, 693 (8th Cir. 2003)). Because defendants who are jointly indicted on similar evidence from the same or related events should normally be tried together, to warrant severance a defendant must show "real prejudice," that is, something more than the mere fact that he would have had a better chance for acquittal had he been tried separately. <u>United States v. Mickelson</u>, 378 F.3d 810, 817-18 (8th Cir. 2004). The Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro v. United States</u>, 506 U.S. 534, 538 (1993). In general, a joint trial "gives the jury the best perspective on all of the evidence and therefore increases the likelihood of a correct outcome." <u>United States v. Darden</u>, 70 F.3d 1507, 1527-28 (8th Cir. 1995).

Dale and Johnson argue Confrontation Clause violations during trial support their position that the district court should have severed the trial. Johnson renews his argument that the introduction of Dale's tape recorded statement made to Smith ran afoul of <u>Bruton</u>. However, because we have already concluded the introduction of the recorded statement did not violate the Sixth Amendment, it follows that Johnson cannot show clear prejudice entitling him to severance as a result of the introduction of Dale's statement. <u>Flores</u>, 362 F.3d at 1039.

Both appellants, however, allege another <u>Bruton</u> violation[6] occurred at trial, which independently entitled them to severance. When Bryant Burton took the stand, pursuant to a cooperation agreement with the government, he testified that both Dale and Johnson implicated themselves and the other defendant in the murders of Rios and

---

[6]<u>Bruton</u>, as previously discussed, stands for the proposition that the admission at a joint trial of a nontestifying defendant's testimonial statement inculpating a co-defendant violates the co-defendant's Confrontation Clause rights, notwithstanding a curative instruction. <u>Bruton</u>, 391 U.S. at 135-36.

-20-

Raya. Specifically, Burton stated that he ran into Dale at a club in 2004, and at that time Dale made statements suggesting Dale's involvement in the murders. With respect to Johnson, Burton testified that he called Johnson on the phone, and that Johnson told Burton that he took somebody over to Snapper's house to purchase some cocaine, and "about the time he looked up, the m\*therf\*cker went crazy and got to shootin'." The district court rejected the government's argument that Dale and Johnson's statements to Burton were co-conspirator statements made in furtherance of a conspiracy pursuant to Fed. R. Evid. 801(d)(2)(E). Therefore, the district court instructed the jury that Burton's testimony inculpating Johnson was admissible only against Johnson, and Burton's testimony inculpating Dale was admissible only against Dale.

We conclude no Bruton violation occurred during Burton's testimony. Our reasoning parallels our analysis of Dale's recorded statement to Smith, see supra Part III. Reading Bruton in light of Crawford, we concluded that a Bruton violation must be predicated on a testimonial out-of-court statement implicating a co-defendant. And as we concluded with respect to Dale's statement to Smith, we conclude here that neither Dale nor Johnson's statements to Burton were testimonial statements within the meaning of Crawford. According to Burton, Dale implicated himself when the two men met in a club in 2004; Johnson implicated himself when Burton called him on the telephone. Again, we cannot say that Dale or Johnson, in making the statements to Burton, "would reasonably expect [the statements] to be used prosecutorially," Crawford, 541 U.S. at 51-52. Nor can we say that an objective witness, in these circumstances, would "reasonably to believe that the statement would be available for use at a later trial." Id. As Crawford instructed, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51.

In light of our holding that no Bruton violations occurred at trial, we have no difficulty concluding that the district court did not abuse its discretion in denying appellants' motion to sever because of a perceived Bruton violation.

-21-

Finally, Johnson argues the district court abused its discretion in denying a severance because of the limitations the district court placed on Johnson's cross-examination of witnesses Taylor and Powell. However, as we previously discussed, see supra Part IV, the limits on Johnson's cross-examination of Taylor and Powell did not violate the Confrontation Clause. It therefore follows that the district court did not abuse its discretion in denying a severance based on a perceived Sixth Amendment problem during Johnson's cross-examination of Taylor and Powell.

VI

Appellants next argue the district court erred when it declined to dismiss a juror who questioned his ability to be impartial.

The decision to replace a juror with an alternate juror is committed to the discretion of the trial court. United States v. Gianakos, 415 F.3d 912, 922 (8th Cir. 2005). If the record shows a legitimate basis for the district court's decision to retain the juror, there is no abuse of discretion. United States v. Wilcox, 50 F.3d 600, 604 (8th Cir. 1995). Absent a showing of actual bias on the part of a prospective juror, this court should defer to the discretion of the trial court on a motion for mistrial related to the composition of the jury. United States v. Lussier, 423 F.3d 838, 841 (8th Cir. 2005). Finally, a district court does not abuse its discretion by refusing to excuse a challenged juror after the juror affirmed their impartiality and the judge favorably evaluated their demeanor. United States v. Gonzalez, 272 Fed. Appx. 117 (2d Cir. 2008). The courts presume that a prospective juror is impartial, and a party seeking to strike a venire member for cause must show that the prospective juror is unable to lay aside his or her impressions or opinions and render a verdict based on the evidence presented in court. United States v. Wright, 340 F.3d 724, 733 (8th Cir. 2003). "Essentially, to fail this standard, a juror must profess his inability to be impartial and resist any attempt to rehabilitate his position." Moran v. Clarke, 443 F.3d 646, 650-51 (8th Cir. 2006).

Appellate Case: 08-3172     Page: 22     Date Filed: 07/30/2010 Entry ID: 3688583

Here, the juror in question met the threshold for actual bias–with unusual clarity–when he declared on the second day of trial: "I feel I can't be impartial." Therefore, we focus our analysis on whether the juror resisted the district court's attempt to rehabilitate his position.  Id.  After the close of argument, but before deliberation, the district court again questioned the juror.  The juror once again gave an unequivocal answer, this time asserting his impartiality:

> THE COURT:  You had stated that you didn't feel you could be fair. What's your feeling now?
> JUROR:  I'm very impartial.
> THE COURT:  Very impartial?
> JUROR:  I can be fair to both sides.

We are satisfied that the juror was sufficiently rehabilitated by the district court, and that the district court did not abuse its discretion in declining to dismiss the juror. In reaching this conclusion, however, we emphasize the unique facts of this case, especially the juror's clear repudiation of his earlier position.  The presence of a biased jury constitutes a fundamental, structural defect that affects the entire conduct of the trial.  Gray v. Mississippi, 481 U.S. 648, 668 (1987).  Although we find the juror's original statement problematic, the juror's total repudiation of his original position and promise to be "impartial" and "fair to both sides" convinces us no abuse of discretion occurred here.

VII

Dale and Johnson next argue the district court abused its discretion by denying several motions for a mistrial made during the course of the six-day trial.  A denial of a motion for mistrial is reviewed for abuse of discretion.  United States v. Smith, 487 F.3d 618, 622 (8th Cir. 2007).  "The prejudicial effect of any improper testimony [or evidence] is determined by examining the context of the error and the strength of the evidence of the defendant's guilt."  Id.

-23-

We first consider the contention, made by both Dale and Johnson, that the admission of two gang references–FBI Agent Plant's testimony that he worked in a gang task force, and Smith's offhanded comment about "Bloods to Crips"–in the course of the trial require reversal. Evidence of gang affiliation "is not admissible where it is meant merely to prejudice the defendant or prove his guilt by association with unsavory characters." United States v. McKay, 431 F.3d 1085, 1093 (8th Cir. 2005). For example, in United States v. Street, we found abuse of discretion and reversible error where a government witness was allowed to offer testimony concerning the "violent tendencies and criminal dispositions of gangs in general and of the Kansas City El Forasteros in particular. . . . including attitudes toward women, brutal hazing practices, outlaw tattoos and markings, and trafficking in stolen motorcycles." 548 F.3d 618, 631-32 (8th Cir. 2008). See also United States v. Roark, 924 F.2d 1426, 1434 (8th Cir. 1991) (finding error where the district court allowed testimony regarding the gang's "institutional criminality" and involvement in drug manufacturing and distribution).

Here, we are satisfied that the prejudicial effect of the two gang references was minimal. Plant's brief testimony about his job neither established Dale or Johnson's membership in a gang, nor offered the kind of inflammatory gang culture evidence we disapproved of in Street. Similarly, Smith's statement about Crips and Bloods did not relate to Dale or Johnson, and appeared in the context of an unrelated conversation about unsolved murders in Kansas City. We find no abuse of discretion in this case.

We similarly find no abuse of discretion in the district court's denial of Johnson's other motions for a new trial. The reference to the name "DeShawn" in the Dale-Smith recording was not prejudicial to Johnson because the district court instructed the jury that "DeShawn" did not refer to Johnson. The same holds true for Officer Evans's testimony. When Evans testified that some of the seized ammunition was illegal, the district court blunted the prejudicial effect of the statement by instructing the jury to disregard it. See United States v. Sherman, 440 F.3d 982, 987 (8th Cir. 2006) ("The exposure of a jury to improper testimony ordinarily is cured by

-24-

measures less drastic than a mistrial, such as an instruction to the jury to disregard the testimony . . . .").  In addition, the two fleeting references to Johnson's illegal activity outside the charged conspiracy–Abrought's testimony that he purchased drugs from Johnson into 2005, and Curry's testimony that Johnson was a drug dealer–did not warrant declaring a mistrial.  Given the wide ranging testimony implicating Johnson in the drug conspiracy, we cannot say the two statements amounted to prejudicial error.  Cf. Flores, 73 F.3d at 831-32 (holding that one statement from a witness referring to prior bad acts was not grounds for a mistrial when evaluated against the other evidence); United States v. Muza, 788 F.2d 1309, 1312-13 (8th Cir. 1986) (same).  Finally, with respect to Johnson's argument claiming prosecutorial misconduct during closing argument, we agree with the district court that the government did not impermissibly shift the burden of proof to the defendant.  Rather, in stating that "[i]t is absolutely false that there is no physical evidence" supporting the conspiracy charge, the prosecutor was merely rebutting defense counsel's assertion to the contrary.  In closing argument, a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the government's case.  See United States v. Ziesman, 409 F.3d 941, 954-955 (8th Cir. 2005).

For the foregoing reasons, the district court did not abuse its discretion in denying Dale and Johnson's motions for a mistrial.

VIII

Finally, we confront Johnson's argument that the evidence was legally insufficient to support his drug conspiracy and murder convictions.

The court reviews the sufficiency of the evidence de novo.  United States v. Pliego, 578 F.3d 938, 941 (8th Cir. 2009).  The evidence is viewed in the light most favorable to the verdict, conflicts are resolved in favor of the government, and all reasonable inferences from the jury's verdict are accepted.  United States v. Castro-Gaxiola, 479 F.3d 579, 581 (8th Cir. 2007) (citing United States v. Cruz, 285

-25-

F.3d 692, 697 (8th Cir. 2002)). The verdict is upheld if any interpretation of the evidence could lead a reasonable jury to find the defendant guilty beyond a reasonable doubt. Id.; United States v. Carter, 481 F.3d 601, 610 (8th Cir. 2007). Using this standard, we accept all reasonable inferences that support the verdict. United States v. Alyass, 569 F.3d 824, 828 (8th Cir. 2009).

A

To support a conspiracy conviction, the government must show that: (1) a conspiracy existed for an illegal purpose; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly joined in it. United States v. Becker, 534 F.3d 952, 957 (8th Cir. 2008). Direct or circumstantial evidence may provide the basis for a conspiracy conviction. United States v. Oleson, 310 F.3d 1085, 1089 (8th Cir. 2002); United States v. McCracken, 110 F.3d 535, 540 (8th Cir. 1997).

In this case, Taylor and Levington testified that they bought cocaine on a regular basis from Dale, and that Dale was supplied by Johnson. Powell testified that he operated a crack house with Dale, that Johnson supplied Dale, and that when he could not buy from his usual supplier, Dale would act as a go-between and assist Powell in purchasing cocaine from Johnson. Burton testified that Johnson and Dale were "hustling together," by which he meant selling drugs together, and that he (Burton) also sold drugs with Johnson. Curry testified that Burton assisted Johnson in counting and packaging drugs at her house. Abrought and Noel testified that they brought large quantities of cocaine from Johnson and Burton for years. Given this testimony, a reasonable jury could conclude Johnson joined a conspiracy to distribute cocaine.

B

The jury was presented with two theories of first-degree murder for each killing, pre-meditated murder and aiding and abetting premeditated murder.

-26-

"A person who, in the course of [using or carrying a firearm during and in relation to any crime of violence or drug trafficking crime], causes the death of a person through the use of a firearm, shall . . . if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 924(j)(1).

Section 1111, in turn, defines murder as:

> the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

18 U.S.C. § 1111(a).

Finally, 18 U.S.C. § 2 delineates the scope of accomplice liability under federal law: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

In this case, the district court correctly instructed the jury on the elements of both the principal and accomplice theory of use of a firearm in furtherance of drug trafficking and in so doing, committing premeditated first-degree murder. The district court instructed:

> The crime of Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime which Results in a First Degree Murder, as

-27-

charged in Count Three of the indictment, has five essential elements, which are:

One, the defendant committed the crime of Conspiracy to Distribute a Controlled Substance, as charged in Count One;

Two, during and in relation to the commission of that crime, the defendant knowingly used or carried a firearm;

Three, during and in relation to the commission of Conspiracy to Distribute Five Kilograms or More of Cocaine and while knowingly using or carrying a firearm, the defendant used the firearm to cause the death of [Rios or] Olivia Raya;

Four, the defendant did so with malice . . .; and

Five, the killing was premeditated . . . .

With respect to accomplice liability, the district court correctly instructed the jury as follows:

A person may also be found guilty of Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime which Results in a First Degree Murder, as charged in Count Three of indictment, even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime which Results in a First Degree Murder.

In order to have aided and abetted the commission of this crime, the defendant must:

(1) have known that the offense of Using or Carrying a Firearm During and in Relation to a Drug Trafficking Crime which Results in a First Degree Murder was being committed or going to be committed; and

(2) have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of Using or Carrying a Firearm

-28-

During and in Relation to a Drug Trafficking Crime which Results in the First Degree Murder of [Rios or] Olivia Raya; and

(3) have acted with malice aforethought, as defined in Instruction No. 41, and premeditation, as defined in Instruction No. 40, in relation to the death of [Rios or] Olivia Raya.

Thus, the district court's instruction on accomplice liability embodied the core principle that "to find one guilty as a principal on the ground that he was an aider and abettor, it must be proven that he shared in the criminal intent of the principal . . . ." Johnson v. United States, 195 F.2d 673, 675 (8th Cir. 1952).

Johnson argues on appeal that the government presented insufficient evidence to prove beyond a reasonable doubt that Johnson acted with premeditation, an essential element under both the principal and accomplice theories of first-degree murder. After a careful review of the record, we conclude the evidence was sufficient to support a conviction for first-degree murder of Rios and Raya.

The government concedes there is no direct evidence in the record showing premeditation by Johnson. Of course, the government is entitled to prove its case through circumstantial evidence. As we stated in United States v. Blue Thunder,

On the basis of events before and at the time of the killing, the trier of fact will sometimes be entitled to infer that the defendant actually premeditated and deliberated his intentional killing. Three categories of evidence are important for this purpose: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, Planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which Motive may be inferred; and (3) facts about the Nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

-29-

604 F.2d 550, 553 (8th Cir. 1979) (citing W. LaFave & A. Scott, Jr., Criminal Law § 73 at p. 564 (1972)).

We note at the outset that taking the circumstances proved in the light most favorable to the government, as we must, leads to two competing inferences drawn from the same evidence. Under one inference, Johnson and Dale planned to murder Rios and rob him, and murdered Raya in order to eliminate any witnesses. The circumstances proved, however, also support a second inference: that Dale and Johnson went Rios's house to consummate a drug transaction, and Dale shot Rios and Raya without any advance knowledge by Johnson.

We conclude that the inference the jury drew–that Johnson and Dale went to Rios's house to rob and murder him was supported by the record. Johnson had dealt drugs with Rios for a number of years, and had never before taken an accomplice. In this instance, Johnson took a conspirator, Dale, who was wearing gloves and who was armed. The physical evidence at the scene showed there was no sign of any struggle–indeed, while the victims were each shot multiple times, the only defense they offered was to raise their hands in front of the murder weapon. Raya had time to bleed significantly before being shot again. So while Johnson told Burton that the "m*therf*cker went crazy and started shooting," the shooting went on for some time, in two different rooms, and each victim was shot multiple times. Then the cash and drugs were removed from the house. Given these facts, we cannot say no reasonable jury would conclude that Johnson was guilty of aiding and abetting first-degree murder.

IX

Affirmed.

-30-

ARNOLD, Circuit Judge, concurring and dissenting.

I concur in all of the court's opinion except Part VIII(B), which upholds DyShawn Johnson's conviction for committing murder, because I think that the evidence was insufficient for a reasonable person to conclude that Mr. Johnson was guilty of that crime. A jury may draw any inference from the evidence that is reasonable, even if an opposite or different inference is more reasonable, *see United States v. Mack*, 343 F.3d 929, 934 (8th Cir. 2003), *cert. denied*, 540 U.S. 1226 (2004); but unless the inference that it chooses to draw is sufficiently strong to support a guilty verdict beyond a reasonable doubt (a standard to which the court does not advert), a guilty verdict based on that inference cannot stand, *see United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002). The evidence in this case that Mr. Johnson committed premeditated murder might well support an inference sufficient to carry the day under a preponderance-of-the-evidence standard, but I don't think that the inference is strong enough to allow a finding of guilt beyond a reasonable doubt. In particular, the case that Mr. Johnson intended to kill Mr. Rios and Ms. Raya when he and Mr. Dale went to their home, or formed that intent after he arrived there, is relatively weak and so any inference drawn from it is weak as well. In other words, even drawing every inference in favor of the government's view of the case, *see United States v. Foxx*, 544 F.3d 943, 949 (8th Cir. 2008), *cert. denied*, 130 S. Ct. 91 (2009), a reasonable person, I believe, would have to entertain a reasonable doubt that Mr. Johnson participated in the murder.

I therefore respectfully dissent.

_____

Appellate Case: 08-3172    Page: 31    Date Filed: 07/30/2010 Entry ID: 3688583