# SUMMARY OF CASE

Appellant Dale was found guilty after a jury trial of conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and two counts of knowingly using a firearm during and in relation to a drug trafficking offense, and in so doing, committing murder, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1) and 2.

The primary issue in this appeal concerns the admissibility of a statement made by Appellant that was surreptitiously recorded by another inmate while both were in federal custody. The court below ruled that the statement violated a detention order in Appellant's 2005 federal case and involved the deliberate falsification of prisoner transport documents. Although the court expressed serious concerns about the conduct of the agents in obtaining the recording, the statement was not suppressed due to the lack of applicable precedence in the court's view.

Appellant has also raised issues concerning the redaction of a *Bruton* statement, references to gangs, and issues with a juror who expressed concerns about being impartial during trial. Due to the complexity of the issues and because this case involves three consecutive life sentences, it is respectfully submitted that twenty minutes of oral argument will be beneficial to the Court in analyzing the issues raised in this appeal.

i

# TABLE OF CONTENTS

Summary of Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Jurisdictional Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Issues Presented for Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      I. The Murder Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      II. The Alleged Drug Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      III. Tape Recorded Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

      IV. Other Procedural Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    I.     The Trial Court Erred in Admitting Into Evidence a Statement
          of the Defendant Tape-Recorded by Another Inmate While Both
          Were in Federal Custody, in That the Statement Was Obtained in
          Violation of the Lower Court's Detention Order and Was Obtained
          Through the Deliberate Falsification of Court Records, Which
          Constitutes Violations of the Due Process Clause of the Fifth
          Amendment and the Sixth Amendment Right to Counsel . . . . . . . . 31

          A. Introduction and Standard of Review . . . . . . . . . . . . . . . . . . . . 31

Appellate Case: 08-3172    Page: 2    Date Filed: 03/23/2009 Entry ID: 3530381

B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    1. Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

    2. Sixth Amendment Right to Counsel . . . . . . . . . . . . . . . . 39

D. Harmless Error . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

II.    The Trial Court Erred in Denying the Motion to Sever Parties
and by Admitting the Testimony of Bryant Burton in a Redacted
Format, in That the Redacted Format of This Testimony Did Not
Resolve to the Jury That the Defendant Was the Party Implicated
in the Non-Testifying Codefendant's Statement, in Violation of
the Sixth Amendment Right to Confrontation . . . . . . . . . . . . . . . . . 43

A. Introduction and Standard of Review . . . . . . . . . . . . . . . . . . . . . 43

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

III.   The Trial Court Erred in Overruling Defense Objections and a
Motion for Mistrial in Permitting Testimony and Evidence
Regarding Gangs, All in Violation of the Fifth Amendment to
the United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

A. Introduction and Standard of Review . . . . . . . . . . . . . . . . . . . . . 50

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

IV.   The Trial Court Erred in Failing to Dismiss Juror Messner on
the Second Day of Trial and Again at the End of the Evidence, in
That the Juror Reported on the Second Day of Trial That he Did
Not Believe He Could be Impartial, But Was Kept on the Jury
and Was Not Replaced at the End of Trial, All in Violation of
the Sixth Amendment Right to Trial by a Fair and Impartial
Fact Finder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Appellate Case: 08-3172    Page: 3    Date Filed: 03/23/2009  Entry ID: 3530381

A. Introduction and Standard of Review . . . . . . . . . . . . . . . . . . . . . . 55

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

iv

Appellate Case: 08-3172    Page: 4    Date Filed: 03/23/2009 Entry ID: 3530381

# TABLE OF AUTHORITIES

## Federal Decisions

*Arizona v. Fulminante*, 499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Bruton v. United States*, 391 U.S. 123 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . 43-45

*Collins v. Harker Heights*, 503 U.S. 115 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 35

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . 34, 35

*Daniels v. Williams*, 474 U.S. 474 U.S. 327 (1996) . . . . . . . . . . . . . . . . . . . . . . . 35

*Davis v. Alaska*, 415 U.S. 308 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Dowling v. United States*, 493 U.S. 342 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Edwards v. Balisok*, 520 U.S. 641 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Gray v. Maryland*, 523 U.S. 185 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

*Gray v. Mississippi*, 481 U.S. 648 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Johnson v. Armontrout*, 961 F.2d 748 (8th Cir. 1992) . . . . . . . . . . . . . . . 56-57, 60

*Lisenba v. California*, 314 U.S. 219 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mapp v. Ohio*, 367 U.S. 643 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Massiah v. United States*, 377 U.S. 201 (1964) . . . . . . . . . . . . . . . . . . . . . . . 36, 40

*Moran v. Burbine*, 475 U.S. 412 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Pointer v. Texas*, 380 U.S. 400 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Richardson v. Marsh*, 481 U.S. 200 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 45-46

Appellate Case: 08-3172    Page: 5    Date Filed: 03/23/2009 Entry ID: 3530381

*Rochin v. California*, 342 U.S. 165 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34-35

*Smith v. Phillips*, 455 U.S. 209 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Spencer v. Texas*, 385 U.S. 554 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Thompson v. Altheimer & Gray*, 248 F.3d 621 (7th Cir. 2001) . . . . . . . . . . . 57-58

*United States v. Bradford*, 246 F.3d 1107 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 51

*United States v. Boone*, 437 F.3d 829 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . 32, 35

*United States v. Campbell*, 845 F.2d 782 (8th Cir. 1988),
    *cert. denied*, 488 U.S. 965 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-57

*United States v. Clarke*, 110 F.3d 612 (8th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 38

*United States v. Davis*, 534 F.3d 767 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 46

*United States v. Diaz*, 296 F.3d 680 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Duke*, 255 F.3d 656 (8th Cir. 2001),
    *cert. denied*, 534 U.S. 1022 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Evans*, 272 F.3d 1069 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 58-59

*United States v. Gianakos*, 415 F.3d 912 (8th Cir. 2005),
    *cert. denied*, 546 U.S. 1045 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56-58

*United States v. Gonzalez*, 214 F.3d 1109 (9th Cir. 2000) . . . . . . . . . . . . . . . . . 57

*United States v. Gustafson*, 528 F.3d 587 (8th Cir. 2008) . . . . . . . . . . . . . . . . . 51

*United States v. Hays*, 231 F.3d 663 (9th Cir. 1999), *cert. denied*,
    532 U.S. 935 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Johnson*, 28 F.3d 1487 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . 52

vi

*United States v. Jones*, 101 F.3d 1263 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Long*, 900 F.2d 1270 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Love*, 329 F.3d 981 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . 44

*United States v. McKay*, 431 F.3d 1085 (8th Cir. 2005) . . . . . . . . . . . . . . . . 52-53

*United States v. Roark*, 924 F.2d 1426 (8th Cir. 1991) . . . . . . . . . . . . . . . . 51-53

*United States v. Rowell*, 512 F.2d 766 (8th Cir. 1975),
    *cert. denied*, 423 U.S. 844 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57-59

*United States v. Sparks*, 949 F.2d 1023 (8th Cir. 1991) . . . . . . . . . . . . . . . . . . . 52

*United States v. Street*, 548 F.3d 618 (8th Cir. 2008) . . . . . . . . . . . 32, 51, 53-54

*United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982) . . . . . . . . . . . . . . . . . 34

*United States v. Williams*, 429 F.3d 767 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . 48

## Federal Statutes

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

18 U.S.C. § 924(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

18 U.S.C. § 924(j)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

18 U.S.C. § 3142(i)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3142(i)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. § 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

Appellate Case: 08-3172    Page: 7    Date Filed: 03/23/2009 Entry ID: 3530381

21 U.S.C. § 841(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

21 U.S.C. § 846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i, 1, 4

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Appellate Case: 08-3172   Page: 8   Date Filed: 03/23/2009 Entry ID: 3530381

# JURISDICTIONAL STATEMENT

Appellant was charged with conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846, and two counts of knowingly using and carrying a firearm during and in relation to a drug trafficking offense, and in so doing, committing murder, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1) and 2. The alleged offenses were "offenses against the laws of the United States." Accordingly, the jurisdiction of the district court was proper under 18 U.S.C. § 3231, which provides that the district courts shall have original jurisdiction of all offenses against the laws of the United States.

The defendant was found guilty on each count. Tr. at 1013-15.[1] On September 9, 2008, the court entered written judgment imposing consecutive sentences of life imprisonment on each count. Add. at A1-A6. The imposition of sentence is a final judgment of the district court. A notice of appeal was filed on September 18, 2008.

This Court's jurisdiction is proper pursuant to 28 U.S.C. § 1291, which provides for jurisdiction of the courts of appeals over appeals from final judgments of the district courts of the United States, except where a direct review may be had in the Supreme Court of the United States.

---

[1] Citations made herein to the trial transcript will be "Tr. at ___," to the addendum included with the brief will be "Add. at ___," and to the Appendix filed separately with the brief will be "Appx. at ___."

1

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

I.    THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE A STATEMENT OF THE DEFENDANT TAPE-RECORDED BY ANOTHER INMATE WHILE BOTH WERE IN FEDERAL CUSTODY, IN THAT THE STATEMENT WAS OBTAINED IN VIOLATION OF THE LOWER COURT'S DETENTION ORDER AND WAS OBTAINED THROUGH THE DELIBERATE FALSIFICATION OF COURT RECORDS, WHICH CONSTITUTES VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT AND THE SIXTH AMENDMENT RIGHT TO COUNSEL

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998)

*Massiah v. United States,* 377 U.S. 201 (1964)

U.S. Const., amend V

II.    THE TRIAL COURT ERRED IN DENYING THE MOTION TO SEVER PARTIES AND BY ADMITTING THE TESTIMONY OF BRYANT BURTON IN A REDACTED FORMAT, IN THAT THE REDACTED FORMAT OF THIS TESTIMONY DID NOT RESOLVE CONFRONTATION CLAUSE ISSUES AND CLEARLY SUGGESTED TO THE JURY THAT THE DEFENDANT WAS THE PARTY IMPLICATED IN THE NON-TESTIFYING CODEFENDANT'S STATEMENT, IN VIOLATION OF THE SIXTH AMENDMENT RIGHT TO CONFRONTATION

*Bruton v. United States,* 391 U.S. 123 (1968)

*Gray v. Maryland,* 523 U.S. 185, 196 (1998)

2

III.   THE TRIAL COURT ERRED IN OVERRULING DEFENSE OBJECTIONS
       AND A MOTION FOR MISTRIAL IN PERMITTING TESTIMONY AND
       EVIDENCE REGARDING GANGS, ALL IN VIOLATION OF THE FIFTH
       AMENDMENT TO THE UNITED STATES CONSTITUTION

       *United States v. Street,* 548 F.3d 618 (8th Cir. 2008)

       *United States v. Bradford,* 246 F.3d 1107 (8th Cir. 2001)

IV.    THE TRIAL COURT ERRED IN FAILING TO DISMISS JUROR MESSNER
       ON THE SECOND DAY OF TRIAL AND AGAIN AT THE END OF THE
       EVIDENCE, IN THAT THE JUROR REPORTED ON THE SECOND DAY
       OF TRIAL THAT HE DID NOT BELIEVE HE COULD BE IMPARTIAL,
       BUT WAS KEPT ON THE JURY AND WAS NOT REPLACED AT THE
       END OF TRIAL, ALL IN VIOLATION OF THE SIXTH AMENDMENT
       RIGHT TO TRIAL BY A FAIR AND IMPARTIAL FACT FINDER

       *United States v. Campbell,* 845 F.2d 782 (8th Cir. 1988)

       *United States v. Gianakos,* 415 F.3d 912 (8th Cir. 2005)

       *Johnson v. Armontrout,* 961 F.2d 748 (8th Cir. 1992)

       *Untied States v. Rowell,* 512 F.2d 766 (8th Cir. 1975)

Appellate Case: 08-3172     Page: 11     Date Filed: 03/23/2009 Entry ID: 3530381

## STATEMENT OF THE CASE

Appellant was charged with one count of conspiracy to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846 and two counts of knowingly using a firearm during and in relation to a drug trafficking offense, and in so doing, committing murder, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1), and 2.

Before trial, Appellant filed pretrial motions, including a motion to suppress a statement of Appellant that was surreptitiously recorded by another inmate while both were in federal custody.  Appx. at 1-15, 27-39.  The Report and Recommendation concerning suppression was filed on November 7, 2007.  Add. at A7-A21.  Objections were filed on November 16, 2007.  Appx. at 264.

A jury trial commenced on November 26, 2007.  The jury returned verdicts of guilty on Counts One, Two and Three.  Tr. at 1013-15.  A motion for new trial was filed on January 7, 2008.  Appx. at 323.  The written judgment was entered on September 9, 2008, imposing consecutive life sentences.  Add. at A1-A6.  Appellant timely filed a notice of appeal on September 18, 2008.

4

## I.   THE MURDER INVESTIGATION

### A.   Crime Scene

Anthony Rios and Olivia Raya resided at 5115 Hardesty in Kansas City.  Tr. at 35.  The grandparents of Rios, Francisco and Lupe Rios, lived next door.  Tr. at 35.  The grandparents saw Rios and/or Raya during breakfast on almost a daily basis.  Tr. at 42.

On the morning of December 21, 2002, Lupe telephoned the home of Rios and Raya to indicate that breakfast was either on the table or in the refrigerator.  Tr. at 42.  Francisco and Lupe then left their house and did not return until 7:00 pm.  Tr. at 58-59.  When they arrived home, they discovered that some of the breakfast had been eaten while they were gone.  Tr. at 59.

Since the grandparents had not heard from Rios or Raya, Francisco checked on them around 7:45 pm.  Tr. at 38.  Francisco discovered the body of Rios on the kitchen floor.  Tr. at 38.  He discovered the body of Raya on a sofa in the living room.  Tr. at 38-39.  There was blood around both bodies.  Tr. at 38-39.

Officer Maxfield was the first responder who secured the scene.  Tr. at 49-51.  He observed a burning candle and lit Christmas lights inside the residence.  Tr. at 56-57.  Soon thereafter, crime scene technicians processed the scene.  Tr. at 64.  CST

Appellate Case: 08-3172    Page: 13    Date Filed: 03/23/2009 Entry ID: 3530381

Van Ryn and his partner observed lividity in the bodies of both victims, but did not observe rigor mortis in either body. Tr. at 76-77. Later that evening, an investigator from the medical examiner observed fixed lividity and receding rigor mortis in both victims. Tr. at 119. During autopsies performed on December 22, the medical examiner observed rigor mortis as "well-developed" and generalized with respect to Rios and "weakly developed to absent" with respect to Raya. Tr. at 147-48. The Government's theory was that the shootings occurred on the evening of December 20 and that the bodies were not discovered until the evening of December 21. Tr. at 119-20.

A murder weapon was never identified. Tr. at 71, 270. Bullets, jackets and fragments were recovered from the bodies of the victims during autopsy examinations and from the crime scene. Tr. at 127, 136, 140. Lab analysis revealed that all bullets and jackets capable of examination were fired from the same weapon. Tr. at 344. Although the weapon was either a .38 caliber or .357 magnum revolver, the analysis did not identify a murder weapon. Tr. at 351, 363-64.

Photographs of a partial shoe print were taken from the kitchen floor. Tr. at 100. The pattern was consistent with Diesel-brand shoes. Tr. at 358. Three pairs of Diesel shoes taken from codefendant Johnson were analyzed. Tr. at 179. There was no DNA found on Johnson's shoes that matched either victim. Tr. at 180. Although

6

the partial shoe print from the scene was consistent with the same brand of shoes from Johnson, the examiner could not indicate that Johnson's shoes, or any other shoes, left the impression at the scene.  Tr. at 359-64.

Several latent fingerprints were identified at the scene and analyzed.  Tr. at 111-12.  The only "matches" of known prints were to victim Rios.  Tr. at 111-12. None of the other fingerprints were matched to Dale, Johnson or other suspects.  Tr. at 113.  The two additional prints of possible value were never matched to any known individual.  Tr. at 115-16, 270.

Investigators took hinge lifts at the scene for possible trace evidence.  Tr. at 173.  The lifts from victim Rios identified a chemically processed, Caucasian hair that did not match either victim.  Tr. at 173.  The hair was not matched to any other known hair samples.  Tr. at 182.

The cause of death for Rios was gunshot wounds and the manner of death was ruled a homicide.  Tr. at 131.  The cause of death for Raya was gunshot wounds and the manner of death was ruled a homicide.  Tr. at 142.

**B.** **Drug Evidence**

Large amounts of marijuana were found in the Rios home.  Tr. at 69.  Bags and bricks of cocaine and marijuana were found throughout the kitchen.  Tr. at 73-74. Other items related to drug distribution were found, including digital scales and a

7

bottle of powder typically used as a cutting agent. Tr. at 74-75. $1,800.00 was found

on Rios. Tr. at 79. The marijuana found in the basement weighed 2,240 grams and

880 grams. Tr. at 368. The cocaine found throughout the kitchen weighed 413.40

grams, 17.71 grams, and 996.15 grams. Tr. at 368-69. The marijuana found in the

kitchen weighed 299.42 grams and 3,260 grams. Tr. at 369.

### C.    Other Scene Witnesses

During 2002, Desi Arnau dated Raya's sister, Sara. Tr. at 186. He was also

involved in drugs with Rios. Tr. at 187. Arnau called Rios on December 20 to drop

off $4,025 for seven pounds of marijuana he had previously picked up. Tr. at 188-89.

Arnau called around 5:45 and then around 6:15 to tell Rios he was outside the house.

Tr. at 189. Raya was not present. Tr. at 190. Arnau went inside and paid the money

to Rios. Tr. at 190. Rios placed the money with another large bundle of cash in the

freezer that appeared to be at least $20,000. Tr. at 190. Arnau asked about

purchasing more marijuana, but Rios indicated he was "waiting on his boy to get

ahold of him." Tr. at 191. Arnau left and tried to call Rios later that evening, but

Rios did not answer. Tr. at 192.

Paul Lupercio bought large amounts of drugs from Rios. Tr. at 204-05.

Lupercio went to the Rios house around 7:30 on the evening of December 20 to

purchase a kilogram of cocaine  Tr. at 205, 208. Lupercio previously purchased

Appellate Case: 08-3172    Page: 16    Date Filed: 03/23/2009 Entry ID: 3530381

kilogram quantities of cocaine from Rios every other week to monthly. Tr. at 218, 221-22. Lupercio observed Raya in the living room signing cards. Tr. at 206. Lupercio arrived with approximately $20,000 for the purchase. Tr. at 208. Although Lupercio left the money, he did not take the cocaine with him, but instead said he would stop by later to pick up the drugs. Tr. at 208-09. Lupercio tried calling Rios later on December 20, but Rios never answered. Tr. at 209.

## II.    THE ALLEGED DRUG CONSPIRACY

There was no physical evidence of cocaine or cocaine base adduced at trial regarding the alleged conspiracy. Tr. at 848. There were no searches of any residences related to Dale. Tr. at 848. There was no evidence obtained from searches of any vehicles with any connection to Dale. Tr. at 848. There was no evidence regarding any searches of the person of Dale. Tr. at 848.

### A.    <u>North Kansas City</u>

Officers Masterson, Grimes, and Freeman were involved in a traffic stop of Johnson on February 12, 2003. Officer Masterson issued traffic citations that required an arrest. Tr. at 235-36. Masterson seized a small amount of marijuana and a number of money orders from the vehicle. Tr. at 237. Grimes seized a total of $5,855 from Johnson and some jewelry. Tr. at 243. Freeman took photographs of the money orders and three packages of marijuana seized from the vehicle. Tr. at 250,

9

255. Although the authorities sought forfeiture of the Johnson property, Johnson prevailed in court and the items were returned to him. Tr. at 257-58. The officers verified that Dale was not involved to any degree with this vehicle or this traffic stop. Tr. at 237-38.

## B. 2415 East 75th Street

A search was conducted at 2415 E. 75th Street on April 22, 2003. Tr. at 304. The residence was related to Johnson. Tr. at 306. Officer Evans testified about items seized, including paperwork regarding two firearms, a gun box, significant amounts of ammunition, various drug pipes, plastic bags with residue, wrapping tape with residue, and two sets of scales. Tr. at 310-14, 317-18. Evans' search did not identify any items related to Dale and his investigation did not have any connection to Dale. Tr. at 338. Detective Svboda confirmed that the residence had no connection to Dale. Tr. at 860.

## C. Traffic Stop Near 5817 Chestnut

Officer Rizzo testified about a traffic stop near a house on Chestnut related to Bryant Burton. Tr. at 732. The officers arrested several people for traffic warrants who were leaving the house. Tr. at 734-35. $2,500 in cash and 25 grams of marijuana were seized from Jabar Tanner, and approximately $21,000 was seized from the vehicle. Tr. at 735. Dale had no connection to this investigation. Tr. at 736.

Appellate Case: 08-3172    Page: 18    Date Filed: 03/23/2009 Entry ID: 3530381

### D.  Jonni Curry

Curry met Johnson in 1999.  Tr. at 806.  In 2002, Johnson indicated he would help her with her finances if she let him store items at her house, which included marijuana, cocaine and ecstasy pills.  Tr. at 809-10.  There were also weapons and cash.  Tr. at 810-11.  Curry observed Johnson packaging drugs.  Tr. at 811-12.  Curry met Bryant Burton through Johnson.  Tr. at 816.  Burton was at her house on occasion.  Tr. at 816.  Curry never met Dale.  Tr. at 823.  Dale was never at her house. Tr. at 823.

### E.  Cooperating Witnesses

#### 1.  Mike Matthews

Matthews was familiar with Rios.  Tr. at 501.  He also met Johnson and Burton through Rios.  Tr. at 502, 506.  When Matthews was first approached by agents concerning this case, he refused to talk due to his own drug activities.  Tr. at 504. Matthews purchased large amounts of marijuana and cocaine from Rios.  Tr. at 510. Matthews knew that Rios sold drugs to other people, including Burton and Johnson. Tr. at 511, 513.  Matthews did not know Dale and had never met him.  Tr. at 520.

#### 2.  Terry Taylor

Taylor testified under a cooperation agreement.  Taylor was serving a 120 month sentence for a federal drug offense.  He had a prior conviction for possession

Appellate Case: 08-3172     Page: 19     Date Filed: 03/23/2009 Entry ID: 3530381

of cocaine. Tr. at 542. Taylor was informed he would possibly receive a sentence reduction for his testimony. Tr. at 542. His plea agreement required him to testify whenever asked by the Government. Tr. at 561. Taylor did not like being in prison and hoped to receive a sentence reduction. Tr. at 560, 565.

Taylor had a long history of using and selling drugs. Tr. at 544-45. Taylor claimed to know both defendants. Tr. at 540. According to Taylor, he bought marijuana from Johnson and was introduced to Dale by Johnson to purchase cocaine. Tr. at 546. Taylor claimed to buy crack from Dale twice per week and that Dale would sometimes give the money to Johnson. Tr. at 548, 552.

Taylor also claimed that Dale had confessed to the robbery of the Mexican couple. Tr. at 557. Taylor claimed that Dale indicated that he shot the male and the female. Tr. at 558-59. Detective Babcock, however, confirmed that he had interviewed Taylor in the past regarding another crime and that Taylor provided inconsistent information. Tr. at 795. When the detective confronted Taylor with inconsistencies, he attempted to reverse part of his statement. Tr. at 796.

### 3.    <u>Charles Levingston</u>

Levingston was a cooperating witness who was previously convicted for distribution of marijuana and received a sentence reduction for his cooperation in this case. Tr. at 616. Levingston had state convictions for assault and trafficking in PCP.

Appellate Case: 08-3172   Page: 20   Date Filed: 03/23/2009 Entry ID: 3530381

Tr. at 593. Levingston's plea agreement required him to cooperate with the Government whenever requested. Tr. at 614.

Levingston claimed that from 2002 to early 2005, he purchased nine ounces of cocaine every two weeks from Dale. Tr. at 594, 596. Levingston also claimed that he observed Johnson deliver drugs to Dale. Tr. at 600. Levingston also testified about a purported conversation he had with Dale while attending church service in jail. Tr. at 608. According to Levingston, Dale told him that he had robbed a Mexican male and female with another individual. Tr. at 610. Levingston indicated that a "particular name" came up and Dale said that he should have deadened that person, in that Dale and that person were involved in a robbery. Tr. at 609-10. Levingston was referring to codefendant Johnson, but was instructed by the Government to use "another person" to avoid *Bruton* problems. Tr. at 588-89.

Dale apparently told Levingston that he shot the male in the kitchen. Tr. at 612. Levingston testified that Dale then told him that the "other individual" said to "kill the bitch." Tr. at 611. Levingston was certain the conversation with Dale occurred at a church service in either June or July 2005. Tr. at 617. However, the defense produced the sign-in sheets for all church services at the jail for the June-July 2005 period. Tr. at 899. Although Levingston attended several church sessions, the records demonstrated that Dale had not attended any church services. Tr. at 900.

Appellate Case: 08-3172    Page: 21    Date Filed: 03/23/2009 Entry ID: 3530381

### 4.    **Mitchell Powell**

Powell was a cooperating witness with felony convictions for possession of a controlled substance and drug trafficking.  Tr. at 649.  He plead guilty to a federal conspiracy to distribute 50 grams or more of cocaine base.  Tr. at 649.  He was facing a statutory minimum of 20 years.  Tr. at 649.  His plea agreement required him to cooperate when the Government made a request.  Tr. at 661-62.  He was hopeful his testimony would result in a sentence below the 20 year minimum and below the guideline range.  Tr. at 662.

Powell knew Rios and dealt drugs with him.  Tr. at 650.  According to Powell, he also operated a crack house with Dale.  Tr. at 651.  Powell indicated that they sold an ounce per day in the 2003 to 2004 time frame.  Tr. at 653.  Powell admitted that he had not advised law enforcement officers of a crack house during his prior interview.  Tr. at 664.

Dale purportedly admitted to Powell that he shot Rios.  Tr. at 657.  According to Powell, Dale told him that he went to the Rios house with a friend, that he had gloves on, that he shot Rios and then later shot a female.  Tr. at 658.  According to Powell, the friend screamed to shoot the girl.  Tr. at 658.

### 5.    **Henry Abrought**

Abrought knew Johnson.  Tr. at 676.  He did not know Dale.  Tr. at 676.

Appellate Case: 08-3172    Page: 22    Date Filed: 03/23/2009 Entry ID: 3530381

Abrought had a felony charge for conspiracy to distribute cocaine and possession of a firearm during a drug trafficking offense. Tr. at 677. Abrought also knew Rios. Tr. at 680. According to Abrought, his sources for cocaine in 2002 to 2004 were Johnson and Bryant Burton. Tr. at 682.

### 6. **Eric Noel**

Noel knew Johnson and Burton. Tr. at 698. Although he may have known Dale, he did not have any dealings with him. Tr. at 699. Noel was previously convicted of conspiracy to distribute drugs and received an 80 month sentence. Tr. at 700. Noel acknowledged that he was hoping his trial testimony would result in a sentence reduction. Tr. at 701.

According to Noel, Johnson supplied powder cocaine from 2002 to 2004. Tr. at 703. He purchased one half to one kilogram of cocaine approximately 10 to 20 times monthly. Tr. at 703. He also acquired marijuana from Johnson. Tr. at 704. Noel also purchased drugs from Rios. Tr. at 705. Noel testified that Dale had nothing to do with these transactions. Tr. at 711.

### 7. **Bryant Burton**

Prior to Burton's testimony, the parties discussed potential *Bruton* problems in that, according to Burton, both Dale and Johnson had confessed their involvement in the shootings and implicated the other defendant. Tr. at 741-42. The Government

15

proposed that Burton not implicate the non-testifying codefendant by name, but instead to refer to them as "another person." Tr. at 742-43. Defense counsel renewed a motion to sever based on *Bruton* and argued that the proposed "redaction" would not cure *Bruton* prejudice. Tr. at 743-44. The court granted a continuing objection. Tr. at 745, 749.

Burton plead guilty to the drug conspiracy in this case and faced a minimum of 20 years. Tr. at 753. As part of his plea, he agreed to provide testimony in the Johnson and Dale trials. Tr. at 753. The Government agreed to possibly file a motion to reduce his sentence based on his trial testimony. Tr. at 753-54. Burton had a number of prior convictions, including cocaine distribution, possession of a firearm, possession of five kilograms of cocaine, and felony possession of cocaine. Tr. at 755-56.

Burton knew Johnson for nearly 20 years. Tr. at 750. He also knew Dale. Tr. at 751. Burton admitted that he sold cocaine and marijuana. Tr. at 754. In 2002, Burton received two to three kilograms of cocaine from Rios. Tr. at 760. According to Burton, Dale and Johnson sold cocaine together. Tr. at 761-62.

Burton testified about a conversation with Dale wherein he referenced that the "mexican was slippin'" and "that's how the game go . . . Somebody catch you slippin, that's how they gonna do you." Tr. at 766. Immediately after this testimony, Burton

16

testified about another conversation with Johnson in which he said that he took "somebody over to Snapper's [Rios] house to purchase some cocaine" and that the person "went crazy and got to shootin." Tr. at 767-68.

Burton told agents during a November 2006 interview that he did not know who was responsible for the shootings. Tr. at 772. He was interviewed in February 2003 and again advised that he did not know who had killed Rios. Tr. at 772. When he first started cooperating in November 2006, Burton again advised the agents that he did not know who killed Rios. Tr. at 780.

### F.     Cell Phone Records

The Government presented cell phone records which established that a phone found at the scene received six calls from a phone in the name of Johnson on December 20, and made five calls to the phone in Johnson's name. Tr. at 875. There were also calls between the Johnson phone and a phone under Dale's name. Tr. at 878. The Dale phone made two calls to the Johnson phone, while the Johnson phone made five calls to the Dale phone. Tr. at 878. No cell phones were actually seized from Johnson or Dale. Tr. at 884. The phone records did not establish who actually possessed the phones or placed the calls in question. Tr. at 884.

## III.    TAPE RECORDED STATEMENT

### A.     Anthony Smith

Appellate Case: 08-3172     Page: 25     Date Filed: 03/23/2009 Entry ID: 3530381

Law enforcement interviewed inmate Kevin Hilke. Tr. at 300-01. Anthony Smith had told Hilke that he and his brother killed the hispanic couple. Tr. at 301. Another inmate, DeAndre Scroggins, was told by Smith that he could not talk about Rios because it involved him, his brother and his family. Tr. at 471. After Scroggins reported this information, Smith's brother, Andre, was placed in administrative segregation in jail and agents contacted Smith. Tr. at 266, 472.

When approached, Smith was first interested in discussing a deal on his federal sentence. Tr. at 272. After a possible deal was discussed, Smith implicated Dale in the murders. Tr. at 272-73. This was the first time during the entire investigation that Dale's name had been brought up. Tr. at 275. Smith confirmed that his brother Andre had gotten into trouble because Smith had said that his brother was responsible for the shootings. Tr. at 273. Smith said that he did not want his brother to get into more trouble. Tr. at 274. When Smith implicated Dale, he thought he could get him to talk about the case and agreed to wear a wire. Tr. at 395-96.

Smith was convicted in federal court for felon in possession of a firearm. Tr. at 437. He had prior convictions for two sales of controlled substances, first degree drug trafficking, and possession of a controlled substance. Tr. at 437.

### B.     Smith Trial Testimony

Smith claimed that Dale had confessed his involvement in the shootings. Tr.

Appellate Case: 08-3172     Page: 26     Date Filed: 03/23/2009 Entry ID: 3530381

at 440.  Smith also testified that Dale was involved in a drug transaction with Johnson in 2003.  Tr. at 442-43.  Smith indicated that he really did not see anything as he went inside a house.  Tr. at 443.  Although Smith knew witness Mitchell Powell, he testified that he never saw Dale or Powell involved in any drug transactions.  Tr. at 446.  Smith claimed to have overheard some conversations between Dale and Powell about drug activities, but testified that Dale and Powell never sold drugs together.  Tr. at 446.

Smith testified about a recorded statement he had with Dale while in custody.  Tr. at 448.[2]  Smith indicated that Dale had told him during the recording that there were no fingerprints because he wore gloves, there would be no shell casings because a revolver was used, they were looking for the gun in the wrong neighborhood, and that he did not have any connection to the victims.  Tr. at 448-50.  Smith indicated that Dale had said that there were no witnesses to the crime and that the female was killed.  Tr. at 451.  The person who accompanied Dale said "shoot the bitch."  Tr. at 455.

Smith's 94 month sentence was reduced to 44 months for his cooperation in this case.  Tr. at 459-69.  He was paid approximately $20,000 from a tips hotline.  Tr.

---

[2] A transcript of this statement is contained in the appendix at pages 51 to 126.

19

at 459-60.  Smith confirmed he was required to cooperate with the Government even after his sentence had been served.  Tr. at 465.  He confirmed that the Government could void his plea agreement if it was determined that he did not provide cooperation.  Tr. at 466.

Smith acknowledged that inmates frequently lie to each other in prison about their own cases and other cases.  Tr. at 468.  Smith also confessed that he had a dirty patch while on federal supervised release for the presence of PCP.  Tr. at 478-79.  Smith admitted that he was present at a location where PCP was being used.  Tr. at 479.

### C.    Suppression Hearing

Dale was arrested on April 21, 2005, on federal drug and firearms charges and was detained in federal custody.[3]  Appx. at 129.  The court issued a detention order.  Appx. at 348-51.  At the time the recorded statement was obtained in August 2005, Dale remained in federal custody and was actively represented by counsel.  Appx. at 130.

On August 16, 2005, the Government sent to defense counsel a *Kastigar* letter proposing rules for a proffer interview of Dale, along with a plea agreement.  Appx.

---

[3] The transcripts from the suppression hearings held on September 11, 2007, and September 27, 2007, are included in the Appendix at 127-263.  Citations to these transcripts will be to the page number of the appendix.

Appellate Case: 08-3172     Page: 28     Date Filed: 03/23/2009 Entry ID: 3530381

at 130. No proffer interview occurred, and Dale ultimately pleaded guilty on the 2005 charges prior to the indictment in this case. Appx. at 130-31.

Smith was brought back to this district to cooperate against Dale. Appx. at 140. Smith believed he could get Dale to make admissions while being recorded. Appx. at 133, 191-92. Agent Plant arranged for Smith to be transported to federal court with Dale on August 30, 2005, to obtain the recording. Appx. at 133. Prior to that, Agent Plant met with Mark Schnieders of the marshal's office about the recording. Appx. at 191. The parties did not obtain the permission of the court to make the recording. Appx. at 193.

On August 30, a van transported Smith and Dale to and from federal court. Appx. at 167. Only Smith and Dale were transported in the van. Appx. at 169. Dale could not have refused to ride in the van. Appx. at 170. Both inmates were handcuffed and restrained during the transport. Appx. at 170. The trip between the local jail and the federal courthouse lasted approximately one hour. Appx. at 171.

The marshals prepare certain reports for the transport of inmates. One report is a call-up sheet, which lists the inmates being transported to court from jail facilities and the reason for the transport. Appx. at 203 . The reason listed for Dale's transport noted "MA" which meant meeting with attorney. Appx. at 203. Although some records contained indications that Dale may have been taken to an interview room to

Appellate Case: 08-3172     Page: 29     Date Filed: 03/23/2009 Entry ID: 3530381

meet with an attorney, Appx. at 205-06, other records, including attorney sign-in sheets for the interview rooms, did not reflect that an attorney had signed in that day for any such meeting. Appx. at 212-13, 34.

The marshal's prisoner transport records also falsely indicated that Smith had an initial appearance in court on August 30. Appx. at 218-19. Smith confirmed that he did not have a court appearance nor did he appear in any courtroom that day. Appx. at 242. Agent Plant described the fact that Smith did not have court as a "ruse." Appx. at 198.

Schnieders was familiar with the Bail Reform Act and the provisions in all detention orders which require inmates detained before trial to be housed in a corrections facility separate "to the extent practicable" from persons awaiting or serving sentences or being held in custody pending appeal. Appx. at 223, 230. Schnieders knew that Smith was a sentenced prisoner who was brought back to the district to place him in contact with Dale. Appx. at 231. Smith was housed at the same facility as Dale when he was brought back to the district. Appx. at 231-32.

The Court took judicial notice of the court file in Dale's 2005 case, which included the detention order. Appx. at 181. The detention order contained the provisions concerning housing pre-trial detainees separately from persons awaiting or serving sentences or being held in custody pending appeal "to the extent

practicable."  Appx. at 351.

### D.    <u>Report and Recommendation</u>

The court issued a Report and Recommendation recommending that the motion to suppress be denied.  Add. at A7-A21.  The court held the recording did not violate the Sixth Amendment right to counsel because he had not been charged with the murders when the recording was made.  Add. at A13-A15.  The Sixth Amendment right to counsel is "offense specific" and cannot be invoked for future prosecutions. Add. at A14.  The court rejected the argument that this case was distinguishable because the Government was in active dialogue with defense counsel regarding a proffer interview and a potential plea agreement.  Add. at A15.

With respect to due process, the court agreed that the government's conduct in placing Dale with Smith violated the detention order that Dale be confined separately from persons serving sentences.  Add. at A16-A17.  The court recognized that the "to the extent practicable" language was intended to allow flexibility in light of prison space constraints, and not to accommodate government investigations.  Add. at A16. The court concluded there was no valid reason to transport Dale and Smith together. Add. at A17.

The court concluded that the second provision of the detention order, which allows a defendant to be delivered from a corrections facility to the United States

Appellate Case: 08-3172     Page: 31     Date Filed: 03/23/2009 Entry ID: 3530381

Marshal for the purpose of an appearance in connection with court proceedings, may have been violated. Add. at A17-A18. Dale did not have a court appearance on August 30. Add. at A17. Although the government attempted to adduce evidence that Dale may have met with his attorney, the court found this evidence was "far from clear." Add. at A17. The court expressed concerns about the marshal's records because some of the records did not reveal the attorney visit, while others perhaps did. Add. at A17-A18.

The court concluded that the reliability and accuracy of all marshal's records were undermined when it was shown that the call-up sheets falsely indicated that Smith was being transported to court for a first appearance, when Smith did not have any court appearance. Add. at A17-A18. The court was troubled by the agents' conduct:

> A court's failure to suppress evidence or impose any penalty once it has been made aware of the violation of one of its orders and the deliberate falsification of records pertaining to federal prisoners, creates the appearance that the court has abdicated its position as a neutral and detached officer of the judicial branch of government, and improperly aligned itself with the investigative arm of law enforcement, a part of the executive branch of government. This appearance of impropriety can only undermine the public's confidence in the fairness and impartiality of the judicial process. Not surprisingly, the undersigned could find no case where an issue was raised as to the admissibility of evidence gained through similar investigative techniques. Thus, the Court is left to apply the reasoning advanced by the Eighth Circuit in Clarke, which the undersigned does not believe provides sufficient precedent on which to recommend the suppression of evidence at issue in this case.

24

Add. at A19.

## IV.   OTHER PROCEDURAL MATTERS

### A.   Motion in Limine Regarding Gangs

The defense filed a motion in limine to exclude gang references.  Appx. at 279-83.  During a pretrial conference, the government indicated it would not adduce gang evidence.  Tr. at 15.  The court accepted the government's representations and noted that it would need to caution its witnesses accordingly.  Tr. at 17.  Case agent Robert Plant answered a question on direct examination that he was assigned to the "squad 50 gang task force."  Tr. at 391.  Counsel moved for a mistrial based on the court's prior rulings regarding gang evidence.  Tr. at 400.  The court ultimately overruled the request for a mistrial.  Tr. at 1012.

Counsel also objected to a reference at the six minute, 24 second mark on the recorded statement where Smith is talking about Mitchell Powell ("Fuzzy") and says "Fifty First to Four Tre to Deuce Tre to 12th Street. . . Blood to Crips."  Appx. at 56. The objection was based on clear references to gangs.  Tr. at 493-94.  The court overruled the objection and the request to redact that portion of the tape recorded statement.  Tr. at 494.

### B.   Juror Concerned about Being Impartial

On the second day of trial, Juror Messner advised the court that "I feel I can't

25

be impartial." Tr. at 94. He continued that "I–I just went home and thought about this for a long time, and I don't think I can be an impartial juror." Tr. at 94-95. The court responded as follows:

> Well, that's not a good enough answer. You're going to have to stay and sit and hear the evidence. I'll ask you again at the end of the trial. . . . But I would ask you, again, to keep an open mind and listen to the evidence, and then we'll discuss this later, but I don't want to excuse you at this point. Now, because the evidence may be hard and it may be disturbing to you, it shouldn't necessarily take away your impartiality, but I'm not going to lecture any further. I'm going to ask you to stay please. . . . All right, because we only have two alternates, and I'll visit with you later . . . at the end of the trial. Thank you.

Tr. at 95. Mr. Messner had not voiced any concerns about impartiality during the general voir dire examination. *See* Voir Dire Tr. at 1-138. The only responses he gave during the voir dire was when he was asked to state personal information. Voir Dire Tr. at 65-66. The court assured the parties that the matter would be revisited when all the evidence is in. Tr. at 96. Counsel requested that the juror be removed based on his comments. Tr. at 97. The court denied the request and the juror remained on the jury. Tr. at 97.

At the end of trial, the court again questioned the juror. On this occasion, the juror indicated that he was "very impartial" and that he thought he could be fair to both sides. Tr. at 1001-02. He indicated that he absolutely thought he could be fair and that he had no concern about retiring to deliberate. Tr. at 1002. The Court

26

Appellate Case: 08-3172    Page: 34    Date Filed: 03/23/2009 Entry ID: 3530381

allowed the juror to deliberate over defense objection.  Tr. at 1007-08.

Appellate Case: 08-3172   Page: 35   Date Filed: 03/23/2009 Entry ID: 3530381

## SUMMARY OF ARGUMENT

The government's case was centered around the statement made by Dale while he was in pretrial federal custody on another matter and was represented by counsel. The surreptitious recording was obtained by Anthony Smith, who was already serving a federal sentence. The recording was obtained as both inmates were being transported from a local jail facility to the courthouse.

After the suppression hearing, the court found the government's conduct in placing Smith with Dale violated the Bail Reform Act and the detention order entered in Dale's 2005 case, which directed that the defendant be confined in a corrections facility "separate, to the extent practicable, from persons awaiting or serving sentences." The court also found that another provision of the detention order was likely violated, as the records and evidence did not clearly establish that Dale was transported to the courthouse in connection with a court proceeding on the day in question. The court observed that prisoner transport records had been deliberately falsified by indicating that Smith was to appear in court that day, when in fact he had no court appearance.

The government conduct in obtaining the recorded statement violates notions of fair play, justice and decency that are required under the Due Process Clause. An exclusionary rule should be used to prevent evidence from being adduced at trial that

28

is secured in a manner that shocks the conscience of the court. Further, the recorded statement was obtained in violation of the defendant's Sixth Amendment right to counsel, as the government counsel and defense counsel were in active dialogue and communications concerning a potential proffer interview and a potential plea agreement on the 2005 case.

Another issue in this appeal concerns *Bruton* statements. A cooperating witness claimed that non-testifying codefendant Johnson made a statement that incriminated himself and Dale in the shootings. In an attempt to avoid *Bruton,* the government instructed the witness to refer to Dale as "another individual" or "somebody else." This testimony with the obvious redaction did not comply with *Gray v. Maryland* and violated Dale's right to confront and cross examine witnesses in violation of the Sixth Amendment.

Another issue concerns references to gangs during trial. Although the government before trial indicated that it would not adduce gang evidence, its lead case agent indicated that he was assigned to a special gang task force. Further, the tape recorded statement between Smith and Dale contained clear references to gangs. It is respectfully submitted that these references to gangs could have been easily avoided at trial and prejudiced the defendant.

The last issue raised in this appeal concerns a juror who reported on day two

29

of trial that he did not think he could be impartial. The trial court refused to remove the juror for cause and essentially admonished the juror that his answers were "not good enough" and that he would have to remain on the jury. The trial court did not solicit any responses from the juror that would indicate he could set aside his personal opinions or issues and be fair to both sides. At the end of trial, the juror indicated that he could be fair and impartial. Although an alternate juror was available, the juror was allowed to deliberate over defense objection. The trial court abused its discretion in failing to remove the juror on day two of trial, which resulted in this juror serving on the jury for some period of time with concerns about impartiality. The failure to remove the jury resulted in a violation of the Sixth Amendment right to trial by an impartial fact-finder. This error is also a structural error that is not subject to any type of harmless error analysis.

Appellate Case: 08-3172    Page: 38    Date Filed: 03/23/2009 Entry ID: 3530381

**ARGUMENT**

I.    **THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE A STATEMENT OF THE DEFENDANT TAPE-RECORDED BY ANOTHER INMATE WHILE BOTH WERE IN FEDERAL CUSTODY, IN THAT THE STATEMENT WAS OBTAINED IN VIOLATION OF THE LOWER COURT'S DETENTION ORDER AND WAS OBTAINED THROUGH THE DELIBERATE FALSIFICATION OF COURT RECORDS, WHICH CONSTITUTES VIOLATIONS OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT AND THE SIXTH AMENDMENT RIGHT TO COUNSEL**

    **A.**    <u>**Introduction and Standard of Review**</u>

At trial, the government introduced a tape-recorded statement of Dale which was surreptitiously recorded by another federal inmate, Anthony Smith, who was a cooperating witness. The recording was made while both inmates were being transported from a county jail facility to the federal courthouse.

The tape recording was the subject of extensive briefing and suppression hearings before trial. During trial, counsel renewed the suppression motion and objections to the tape prior to opening statement, Tr. at 28, prior to the tape being played before the jury, Tr. at 488, and in the motion for new trial. Appx. at 323. Over repeated objection, the court allowed the tape to be played to the jury along with a written transcript that was synced to the audio portion.[4]

It is respectfully submitted that the trial court erred in allowing the tape

---

[4] The written transcript is included in the Appendix at pages 51 to 126.

31

Appellate Case: 08-3172    Page: 39    Date Filed: 03/23/2009 Entry ID: 3530381

recorded statement as evidence at trial. This Court reviews a district court's evidentiary rulings under an abuse of discretion standard. *See, e.g., United States v. Street,* 548 F.3d 618, 624 (8th Cir. 2008). However, whether government conduct meets the due process "shocks the conscience" test is a question of law reviewed *de novo. United States v. Boone,* 437 F.3d 829, 841-42 (8th Cir. 2006).

### B. Factual Background

Smith was in federal custody serving a sentence. Appx. at 139-40. He was brought back to this district to cooperate against Dale. Appx. at 140. After Smith implicated Dale during interviews with agents, he advised that he thought he could get Dale to talk about the murders while wearing a wire. Appx. at 133, 191-92.

Dale was in pretrial federal custody on 2005 charges when the tape recording was obtained. He was detained pursuant to a detention order. Appx. at 348-51. The detention order specifically provided that Dale be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Appx. at 351.

Since Smith had already been sentenced, the placement of Smith with Dale clearly violated the court's detention order and the Bail Reform Act. Add. at A16. Further, the "extent practicable" language was intended to allow flexibility in light

Appellate Case: 08-3172    Page: 40    Date Filed: 03/23/2009 Entry ID: 3530381

of prison space constraints, and not to accommodate investigations. Add. at A16. The court below concluded that there was no valid reason to transport Dale and Smith together in the same van. Add. at A17.

The detention order also provided for the delivery of the defendant to the marshal service, upon court order or at the request of government counsel, in connection with court proceedings. Appx. at 351. Mr. Dale did not have court on August 30, 2005. Add. at A17. The court found the evidence that Dale may have met with an attorney "far from clear." Add. at A17. Because the records were inconsistent, and because other records had been deliberately falsified,[5] the court did not rely on any transport records. Add. at A18.

The government conduct in placing Dale together with Smith violated the detention order and involved the deliberate falsification of records. Add. at A15-A19. The court stated:

> A court's failure to suppress evidence or impose any penalty once it has been made aware of the violation of one of its orders and the deliberate falsification of records pertaining to federal prisoners, creates the appearance that the court has abdicated its position as a neutral and detached officer of the judicial branch of government, and improperly

---

[5] It was shown at the suppression hearing that a marshal's "call-up" sheet had been deliberately falsified when it indicated that Smith was being transported for a first appearance before a court. Add. at A18. Smith testified at the suppression hearing that he did not appear in any court on the day in question. Appx. at 242.

Appellate Case: 08-3172    Page: 41    Date Filed: 03/23/2009 Entry ID: 3530381

aligned itself with the investigative arm of law enforcement, a part of the executive branch of government. This appearance of impropriety can only undermine the public's confidence in the fairness and impartiality of the judicial process. Not surprisingly, the undersigned could find no case where an issue was raised as to the admissibility of evidence gained through similar investigative techniques. Thus, the Court is left to apply the reasoning advanced by the Eighth Circuit in <u>Clarke</u>, which the undersigned does not believe provides sufficient precedent on which to recommend the suppression of evidence at issue in this case.

Add. at A19. Although the court was troubled by the government's actions in this case, it did not suppress the statement due to a lack of legal precedence.

## C. <u>Discussion</u>

### 1. **Due Process**

The Due Process Clause guarantees fundamental elements of fairness in a criminal trial. *Spencer v. Texas,* 385 U.S. 554, 563-64 (1967). A denial of due process is the failure to observe that fundamental fairness that is essential to the very concept of justice. *Lisenba v. California,* 314 U.S. 219, 236 (1941); *United States v. Valenzuela-Bernal,* 458 U.S. 858, 872 (1982). The touchstone of due process is protection of the individual against arbitrary action of the government. *County of Sacramento v. Lewis,* 523 U.S. 833, 845 (1998). Due process requires a court to exercise its judgment upon the whole course of the proceeding resulting in a conviction in order to ascertain whether the proceedings offend those canons of decency and fairness. *See Rochin v. California,* 342 U.S. 165, 169 (1952), *overruled*

34

*on other grounds in Mapp v. Ohio,* 367 U.S. 643 (1961).

Substantive due process protects against government power arbitrarily and oppressively exercised. *See Daniels v. Williams,* 474 U.S. 327, 331 (1996). The Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression. *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992). The Supreme Court has adopted a "shocks the conscience" test to be employed when evaluating an executive abuse of power. *See Lewis,* 523 U.S. at 846-47. The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Lewis,* 523 U.S. at 847; *see also Harker Heights,* 503 U.S. at 128. This Court has recognized that outrageous government conduct may meet the "shocks the conscience" test if the conduct falls within the "narrow band" of the most "intolerable government conduct." *Boone,* 437 F.3d at 841-42.

The government's conduct of deliberately violating the court's detention order and deliberately falsifying prisoner transport records to facilitate the recording is conduct that lacks in fundamental fairness and is offensive to the universal sense of fair play. It is respectfully submitted that this conduct meets the "shocks the conscience" standards of substantive due process.

Appellate Case: 08-3172    Page: 43    Date Filed: 03/23/2009 Entry ID: 3530381

The court below observed that there is no precedence involving the specific circumstances of this case. This does not mean, however, that the evidence should have been allowed. The evidence could have been precluded under a substantive due process analysis. It must also be noted that the Supreme Court has adopted exclusionary rules for the preclusion of evidence obtained through violations of other constitutional provisions, including the Fourth Amendment, *Mapp v. Ohio,* 367 U.S. 643 (1961), and the Sixth Amendment. *See, e.g., Massiah v. United States,* 377 U.S. 201, 206-07 (1964). Evidence that is so "extremely unfair" may violate the fundamental conceptions of justice. *See Dowling v. United States,* 493 U.S. 342, 352 (1990).

In light of substantive due process standards and the use of exclusionary rules, the taped statement should have been precluded. Mr. Dale's rights should not be infringed or violated simply because there is no reported case that involves these particular facts. If the statement is not precluded, Mr. Dale is left without any meaningful remedy for the government's deliberate violations of his detention order and the deliberate conduct of falsifying prisoner transport records.

It is clear that the agents deliberately violated the court's detention order and the Bail Reform Act. Both required that Dale "be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent

practicable, from persons awaiting or serving sentences or being held in custody pending appeal." 18 U.S.C. § 3142(i)(2); Appx. at 351. As recognized by the court below, there was absolutely no reason for Smith to be housed or transported with Dale. Add. at A17. Although the agents knew that Smith had been sentenced and was brought back to this district from the Bureau of Prisons to cooperate, they did not discuss or seek permission from the court to place Smith with Dale. Appx. at 140, 193.

In essence, the government abused the court's prisoner transport system to acquire a recording in circumstances where the two inmates should have never been placed together. To allow the recording in this case sends a message that deliberate governmental misconduct will not be remedied. This message violates the most fundamental notions of fairness and decency that are the touchstones of the Due Process Clause.

The court below also found that a second directive of the detention order was also likely violated. Add. at A16-A19. The Bail Reform Act requires a detention order to provide that "on order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the person is confined deliver the person to a United States marshal for the purpose of an appearance in connection with a court proceeding." 18 U.S.C. § 3142(i)(4).

37

Dale's detention order contained this provision. Appx. at 351. The court found that this provision was likely violated. Add. at A17-A18. Although the agents testified that Dale was brought to court that day for an attorney visit, and some of the documents suggested that an attorney visit occurred, other records suggested that no such visit occurred. Add. at A17-A18. The court specifically found that the marshal's records could not be trusted because some of those records had been falsified. Add. at A18. Because some of the records had been deliberately falsified, the court concluded that none of the records could be trusted. Add. at A17-A19.

The court below discussed *United States v. Clarke,* 110 F.3d 612, 615 (8th Cir. 1997). In *Clarke,* the defendant was not taken promptly before a magistrate judge as required by Rule 5(a) of the Federal Rules of Criminal Procedure, but instead was arrested on a "pick-up order" for violating federal law, detained for approximately twelve hours, questioned by Secret Service agents for approximately two hours, returned to the detention unit, and later released. *See Clarke,* 110 F.3d at 613-15. The defendant never appeared before a magistrate judge, but was indicted several months later. The defendant moved to suppress her statement claiming a violation of Rule 5(a). The court found that the technical violation of Rule 5(a) did not undermine the voluntariness of her statement and that the statement should not be suppressed.

38

The *Clarke* case is distinguishable in that the only alleged violation in *Clarke* involved a delay in presentment before a magistrate judge. Here, the court found that agents deliberately violated the detention order and deliberately falsified documents. Further, the *Clarke* court was skeptical as to whether a violation of Rule 5(a) had actually occurred. *Id.* And finally, *Clarke* did not involve an analysis of due process and fundamental fairness considerations, but instead focused solely on voluntariness issues. *Id.* *Clarke* cannot be reasonably relied on to suggest that the statement was permissible under notions of due process.

The agents abused their power and the court's prisoner transport system to obtain the statement in question. Court orders were deliberately violated and records were falsified. This conduct was arbitrary, oppressive, and violative of the fundamental notions of decency and fairness embodied in the Due Process Clause. In light of substantive due process standards, the only proper remedy is to reverse Dale's convictions on all counts and remand the matter for a new trial where the tape recording is not allowed into evidence. Any other result sends a message that it is permissible for government agents to violate court orders and falsify records. The agents' actions violated Mr. Dale's rights to due process of law as guaranteed by the Fifth Amendment to the United States Constitution.

## 2. Sixth Amendment Right to Counsel

Appellate Case: 08-3172    Page: 47    Date Filed: 03/23/2009 Entry ID: 3530381

Federal cases have established that the Sixth Amendment right to counsel does not attach until the initiation of formal criminal proceedings. *See, e.g., Massiah v. United States,* 377 U.S. 201 (1964); *United States v. Hayes,* 231 F.3d 663, 667 (9th Cir. 1999), *cert. denied,* 532 U.S. 935 (2001). For instance, in *Moran v. Burbine,* 475 U.S. 412, 428-30 (1986), the defendant sought to exclude statements made to the police after his family had retained an attorney but before formal charges were filed. The Court held that no Sixth Amendment violation had occurred, in that formal proceedings had not been initiated against the defendant at the time. *Moran,* 475 U.S. at 432.

The specific facts of this case are distinguishable from the *Massiah* cases. In particular, Mr. Dale was actively represented by counsel in connection with his pending 2005 drug charge. Appx. at 130. Merely two weeks before the taped statement, the government forwarded a letter to defense counsel inviting a proffer interview and a proposed plea agreement. Appx. at 130. The proffer session required a discussion of any and all activities, which would have necessarily included Mr. Dale's knowledge (or lack of knowledge) about this case. Appx. at 10-15.

These facts should be distinguishable from the traditional *Massiah* Sixth Amendment cases. The Sixth Amendment should govern a situation where a client is in federal custody and represented by counsel who is in active dialogue with the

Appellate Case: 08-3172    Page: 48    Date Filed: 03/23/2009 Entry ID: 3530381

government about a potential proffer interview and proposed plea agreement. The recorded statement was obtained in violation of Mr. Dale's right to counsel guaranteed by the Sixth Amendment.

### D.    Harmless Error

The remaining evidence is not reliable enough to justify harmless error treatment of this issue. The closeness of this case is demonstrated by the lack of scientific or physical evidence regarding the murders, and the lack of physical evidence of any kind with respect to Dale. There was no physical evidence related to cocaine or cocaine base as charged in Count One. Tr. at 848.

The remaining evidence adduced by the Government came primarily through cooperating witnesses, all of whom had credibility issues, including prior convictions, hopes of receiving a reduced sentence, other motives to fabricate, and prior inconsistent statements. While the government is entitled to adduce this type of evidence, the nature of this testimony renders the government's case weaker and elevates the significance of any trial errors that occurred. The entire theory of prosecution was built and centered around the taped statement. Without the statement, the strength of the government's case is far from strong.

Further, significant evidence was adduced at trial that involved only codefendant Johnson and did not involve Dale or the alleged conspiracy. For

Appellate Case: 08-3172    Page: 49    Date Filed: 03/23/2009 Entry ID: 3530381

example, it was established at trial that the North Kansas City traffic stop of Johnson, the search of 2415 E. 75th St., and the traffic stop near 5817 Chestnut had no connection with Michael Dale. Tr. at 237-38, 338, 736, 860. Witnesses Mike Matthews, Jonni Curry, Eric Noel and Henry Abrought all testified that they did not know Dale and that he was not involved in the drug activities of Johnson and Burton. Tr. at 520, 676, 699, 823. The only evidence against Dale related to the alleged drug conspiracy was again the testimony of cooperating witnesses with significant credibility issues.

It was an abuse of discretion and prejudicial error to allow the recorded statement into evidence. The use of the statement violated the Due Process Clause. This error is not a harmless error. This Court should reverse each of Dale's convictions and remand the matter for a new trial.

42

**II.** **THE TRIAL COURT ERRED IN DENYING THE MOTION TO SEVER PARTIES AND BY ADMITTING THE TESTIMONY OF BRYANT BURTON IN A REDACTED FORMAT, IN THAT THE REDACTED FORMAT OF THIS TESTIMONY DID NOT RESOLVE CONFRONTATION CLAUSE ISSUES AND CLEARLY SUGGESTED TO THE JURY THAT THE DEFENDANT WAS THE PARTY IMPLICATED IN THE NON-TESTIFYING CODEFENDANT'S STATEMENT, IN VIOLATION OF THE SIXTH AMENDMENT RIGHT TO CONFRONTATION**

**A.** **Introduction and Standard of Review**

The Government presented testimony of cooperating witness Bryant Burton that non-testifying codefendant Johnson made an incriminating statement about the murders which implicated Dale. Burton's testimony created concerns under *Bruton v. United States,* 391 U.S. 123 (1968). Prior to Burton's testimony, the government proposed that he not implicate the codefendant by name, but instead use phrases like "another person." Tr. at 743. Over continuing objection, Burton was allowed to testify in this fashion. Tr. at 745, 749.

Burton testified about a conversation with Dale wherein Dale made incriminating statements. Tr. at 766. Immediately thereafter, Burton testified about another conversation he had with Johnson, who stated that he took "somebody over to Snapper's [Rios] house to purchase some cocaine" and that "the motherfucker went crazy and got to shootin." Tr. at 767-68.

The *Bruton* concern is that a defendant's ability to confront and cross examine

Appellate Case: 08-3172     Page: 51     Date Filed: 03/23/2009 Entry ID: 3530381

a non-testifying codefendant about his statement is limited if the statement is introduced through another witness. Any limitation on the Sixth Amendment right of confrontation is reviewed on appeal for an abuse of discretion. *United States v. Love,* 329 F.3d 981, 984 (8th Cir. 2003).

**B.    Discussion**

The Sixth Amendment guarantees the right of an accused in a criminal prosecution to be confronted with witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 315 (1974). A primary interest secured by the right of confrontation is the right of cross examination. *Id.; see also Pointer v. Texas,* 380 U.S. 400, 404 (1965) ("[N]o one . . . would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."); *Bruton v. United States,* 391 U.S. 123, 126 (1968). Cross examination is the principal means by which the believability of a witness and the truth of his testimony are tested. *Davis,* 415 U.S. at 316.

Particular concerns under the Confrontation Clause arise when the government adduces a non-testifying codefendant's statement that implicates the defendant. The Supreme Court has recognized that the admission of a non-testifying codefendant's confession, which expressly implicates the defendant, presents a great risk that the jury would not follow the court's limiting instructions and therefore constitutes

44

prejudicial error which violates the defendant's Sixth Amendment rights of confrontation. *Bruton v. United States,* 391 U.S. 123 (1968). The Court observed these statements are not only devastating to a defendant, but their credibility is inevitably suspect. *Bruton,* 391 U.S. at 136. *Bruton* recognized that such statements can add substantial, if not critical, weight to the government's case in a form that is not subject to cross examination. *Id.* at 127.

The *Bruton* Court noted that one remedy is contained in Rule 14 of the Federal Rules of Criminal Procedure. The Advisory Committee notes provide in pertinent part:

> A defendant may be prejudiced by the admission of evidence against a co-defendant of a statement or confession made by the co-defendant. This prejudice cannot be dispelled by cross examination if the co-defendant does not take the stand. Limiting instructions to the jury may not in fact erase the prejudice. . . . The purpose of the amendment is to provide a procedure whereby the issue of possible prejudice can be resolved on a motion for severance.

Fed. R. Crim. P. 14, advisory committee notes.

Other courts have recognized that redacted statements may also remedy a *Bruton* issue if a non-testifying codefendant's confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence. *Richardson v. Marsh,* 481 U.S. 200, 211 (1987). However, *Bruton* is not confined to a statement that expressly names a defendant. *Gray v. Maryland,* 523 U.S. 185, 196 (1998). In

45

*Gray,* the admission of a non-testifying codefendant's confession, which replaced the defendant's name with "blank," violated the Sixth Amendment. *Id.* at 196. The redaction cannot be obvious, and an obvious redaction may still create *Bruton* prejudice. *See id.* at 192. Although the statement in *Gray* did not reference the defendant's name or identity, the statement remained protected under *Bruton* because it led the jury straight to the conclusion that the blanks in the codefendant's statements referred to defendant. *Gray,* 523 U.S. at 196-99. A statement that is redacted to leave a blank or some other similarly obvious alteration functions the same grammatically and is "directly accusatory."

Here, the statements adduced through Burton referred directly to "somebody" else and "the motherfucker." *Cf. Richardson,* 481 U.S. at 211 (Confrontation Clause not violated by admission of non-testifying codefendant confession that is redacted to eliminate not only defendant's name, but any reference to his or her existence); *United States v. Davis,* 534 F.3d 903, 915 (8th Cir. 2008) (statement of each defendant did not refer to other defendant or any other person directly). The government's method of having Burton refer to "somebody" does not comply with *Gray* because the redaction is obvious.

The use of "another person" or "somebody" was also obvious because the government repeatedly utilized this technique when it adduced testimony from other

witnesses who claimed Dale made incriminating statements implicating codefendant Johnson.[6] Charles Levingston[7] testified about a conversation he had at a jail church service wherein Dale purportedly confessed to the shootings. Tr. at 609-11. The government instructed Levingston to refer to Johnson as "another individual." Tr. at 609-12. Mitchell Powell testified that Dale went to the victim's house with "one of his friends," and that Dale and the "friend" robbed the victim, and that the "friend" screamed to shoot the girl. Tr. at 657-58. Anthony Smith testified that Dale told him that he and "another guy" went to the victims' house to purchase drugs and that Dale had shot the individual. Tr. at 440. The government instructed Smith to use "another person" when referring to Johnson. Tr. at 441.

In addition to testimony, the government introduced the recorded statement of Dale which contained blank spaces in the audio portion whenever a reference was made to Johnson, and used "another person" in the written portion. Appx. at 51-126. Throughout trial, the redactions by the Government were repeated and obviously

---

[6] Because Dale was the purported declarant, he did not lodge a *Bruton* objection with respect to these other witnesses.

[7] Levingston had serious credibility issues. Although he testified that he had the conversation with Dale in either June or July 2005 at a church service in jail, the jail's church records were introduced into evidence and clearly demonstrated that Dale had not attended any church services during the time frames. Tr. at 899-900.

Appellate Case: 08-3172    Page: 55    Date Filed: 03/23/2009 Entry ID: 3530381

referred to the defendants. The use of a neutral pronoun such as "someone" may lose its anonymity by sheer repetition. *United States v. Williams,* 429 F.3d 767, 774 (8th Cir. 2005).

To further compound prejudice, the government adduced statements made by codefendant Johnson directly after adducing testimony regarding a similar statement made by Dale. Burton was first asked about a conversation with Dale wherein incriminating statements were made. Tr. at 765-66. The next line of questioning involved a conversation between Burton and Johnson wherein Johnson made incriminating statements about himself and "somebody." Tr. at 768. In determining whether a statement implicates a codefendant, the court must look to the manner and context in which the prosecutor presented the statement. *United States v. Jones,* 101 F.3d 1263, 1270 n.5 (8th Cir. 1996). The use of the term "somebody" and "motherfucker" by Burton was an obvious reference to Dale and constitutes a violation of *Bruton*. The testimony was extremely prejudicial and not subject to cross examination in violation of the Confrontation Clause.

Violations of *Bruton* are subject to harmless error review. *See, e.g., United States v. Williams,* 429 F.3d 767, 773 n.2 (8th Cir. 2005); *United States v. Long,* 900 F.2d 1270, 1280 (8th Cir. 1990). The admissibility of the tape recorded statement has been challenged herein. Without the statement, the remaining evidence is not reliable

Appellate Case: 08-3172    Page: 56    Date Filed: 03/23/2009 Entry ID: 3530381

enough to justify harmless error treatment of the *Bruton* violation. The closeness of this case is demonstrated by the complete lack of scientific or physical evidence regarding the murders, and the lack of physical evidence of any kind concerning the drug conspiracy with respect to Dale. The remaining evidence adduced by the Government came primarily through cooperating witnesses, all of whom had credibility concerns, including prior convictions, hopes of receiving a reduced sentence, other motives to fabricate, and prior inconsistent statements. While the government is entitled to adduce this type of evidence, it makes the government's case weaker and elevates the significance of trial errors that occurred.

The use of the out-of-court statements of codefendant Johnson that implicated Dale violated the Sixth Amendment right to confront and cross examine witnesses. The government's attempt at "redacting" this testimony did not comply with *Gray v. Maryland*. For these reasons, this error is not a harmless error. This Court should reverse the convictions on all counts and remand the matter for a new trial.

49

**III. THE TRIAL COURT ERRED IN OVERRULING DEFENSE OBJECTIONS AND A MOTION FOR MISTRIAL IN PERMITTING TESTIMONY AND EVIDENCE REGARDING GANGS, ALL IN VIOLATION OF THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION**

### A.    Introduction and Standard of Review

Defendant Dale filed a motion in limine seeking to prevent the government from introducing gang evidence.  Appx. at 279-83.  The government indicated to the court that it would not adduce gang evidence.  Tr. at 15.  The court accepted the government's representations and specifically warned counsel that they would need to caution their witnesses regarding gang-related evidence.  Tr. at 17.

There were two references to gangs during trial.  The first occurred when the lead case agent, Robert Plant, answered that he was a special agent assigned to the "squad 50 gang task force."  Tr. at 391.  Counsel moved for a mistrial based on the court's prior rulings regarding gang evidence.  Tr. at 400.  The court overruled the request for a mistrial.  Tr. at 1012.

The second reference to gangs was on the taped statement of Smith and Dale. At the six minute, 24 second mark on the recording, Anthony Smith is talking about another trial witness Mitchell Powell ("Fuzzy") and references "Fifty First to Four Tre to Deuce Tre to 12th Street. . . Blood to Crips."  This portion of the statement was played to the jury over continuing objection.

50

A district court's evidentiary rulings are reviewed on appeal under an abuse of discretion standard. *See, e.g., United States v. Street,* 548 F.3d 618, 624 (8th Cir. 2008). Where an evidentiary ruling is improper, the conviction will be reversed if the ruling affected substantial rights or had more than a slight influence on the verdict. *See id.; United States v. Gustafson,* 528 F.3d 587, 590 (8th Cir. 2008). A district court's denial of a motion for mistrial is also reviewed under an abuse of discretion standard. *See Street,* 548 F.3d at 624-25.

**B.    Discussion**

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would without the evidence." Under Rule 403, relevant evidence may still be excluded to the extent that its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.

Evidence regarding gang membership or affiliations presents particularized concerns of unfair prejudice to the defendant. This court has observed that evidence regarding gangs carries a "great potential for prejudice." *See United States v. Bradford,* 246 F.3d 1107, 1117 (8th Cir. 2001), *overruled in part on other grounds by United States v. Diaz,* 296 F.3d 680, 684-85 (8th Cir. 2002); *see also United States v.*

51

*Roark,* 924 F.2d 1426, 1432-34 (8th Cir. 1991). While gang evidence may be admissible to a disputed issue, it is not admissible where it is meant merely to prejudice the defendant or to prove guilt by association. *United States v. McKay,* 431 F.3d 1085, 1093 (8th Cir. 2005), *cert. denied,* 549 U.S. 828 (2006); *Roark,* 924 F.2d at 1433-34.

There was no other evidence adduced at trial that the defendants were members of a gang or the alleged conduct was gang-related. This case is distinguishable from those cases where gang evidence is allowed because it is relevant to establish conspiracy or to rebut innocent explanations of relationships. *See Bradford,* 246 F.3d at 1117 (specific and circumscribed evidence of gang association may be necessary to show the nature and extent of the defendant's associations); *United States v. Johnson,* 28 F.3d 1487, 1497-98 (8th Cir. 1994), *cert. denied,* 513 U.S. 1098 (1995); *United States v. Sparks,* 949 F.2d 1023, 1026 (8th Cir. 1991) (gang evidence allowed to rebut the defendant's version of events).

Agent Plant's references to the "squad 50 gang task force" was avoidable. The court specifically warned the parties to caution their witnesses about the gang issue. Tr. at 17. Either Agent Plant was not cautioned as directed or he ignored warnings that were given. In either instance, his answer violated the court's ruling. He could have simply responded that he was an agent with the FBI without identifying a

Appellate Case: 08-3172     Page: 60     Date Filed: 03/23/2009 Entry ID: 3530381

special gang task force. His response was not necessary to explain police investigatory tactics. *See United States v. McKay,* 431 F.3d 1085, 1093 (8th Cir. 2005) (allowing passing reference to gang membership where it was relevant to explain police investigatory tactics). To further compound the prejudice, Agent Plant was one of the lead case agents at trial. He sat at government counsel's table during the trial. The court should have granted the defense's request for a mistrial.

The reference to gangs on the taped statement could have been easily redacted. Since the government's theory at trial was that Smith was long-time friends with Dale, and that Mitchell Powell was also friends with both, this reference indicates that gang issues are common with these individuals. It was improper for this reference to be played to the jury.

Some cases from the Eighth Circuit have reversed gang evidence that was extensive. *See, e.g., United States v. Street,* 548 F.3d 618, 631 (8th Cir. 2008); *United States v. Roark,* 924 F.2d 1426, 1432-34 (8th Cir. 1991). Although the gang references here were limited in duration, the references were irrelevant to the charged offenses and were unduly prejudicial because they suggested the defendant was affiliated with gangs. The court abused its discretion in allowing the gang references on the recorded statement and in failing to grant a mistrial for the agent's testimony.

This evidentiary ruling is not a harmless error. As raised herein, the tape

Appellate Case: 08-3172    Page: 61    Date Filed: 03/23/2009 Entry ID: 3530381

recorded statement of Dale should not have been admitted into evidence. The government did not have any physical or scientific evidence linking either defendant to the murders. The government also had no physical evidence of any kind related to drug distribution activities with respect to Michael Dale. The drug conspiracy evidence was built on the testimony of cooperating witnesses and jailhouse informants, all of whom had serious credibility issues. *See also United States v. Street,* 548 F.3d 618, 629 (8th Cir. 2001). For these reasons, the improper admission of the gang evidence was not a harmless error.

Appellate Case: 08-3172    Page: 62    Date Filed: 03/23/2009 Entry ID: 3530381

**IV. THE TRIAL COURT ERRED IN FAILING TO DISMISS JUROR MESSNER ON THE SECOND DAY OF TRIAL AND AGAIN AT THE END OF THE EVIDENCE, IN THAT THE JUROR REPORTED ON THE SECOND DAY OF TRIAL THAT HE DID NOT BELIEVE HE COULD BE IMPARTIAL, BUT WAS KEPT ON THE JURY AND WAS NOT REPLACED AT THE END OF TRIAL, ALL IN VIOLATION OF THE SIXTH AMENDMENT RIGHT TO TRIAL BY A FAIR AND IMPARTIAL FACT FINDER**

**A.     Introduction and Standard of Review**

On the second day of trial, Juror Messner indicated to the court "I feel I can't be impartial" and that "I–I just went home and thought about this for a long time, and I don't think I can be an impartial juror." Tr. at 94-95. The court advised the juror that those were not good enough answers, and that he was going to have to sit and hear the evidence, and that the court would ask him again at the end of the trial. Tr. at 95. The court assured the parties that the matter would be revisited when all the evidence was in. Tr. at 96. The defense requested the juror be dismissed from the jury panel based on his comments. Tr. at 97. The court denied the request and the juror remained on the jury. Tr. at 97.

At the end of trial, the court again questioned the juror. Mr. Messner at this time indicated that he was "very impartial" and that he thought he could be fair to both sides. Tr. at 1001-02. He indicated that he had no concern about retiring to deliberate. Tr. at 1002.

Counsel renewed the request to remove the juror from the panel. Tr. at 1005-

55

06. Although the juror at the end of the trial indicated he could be fair, it was noted that he sat through some portion of the trial with a concern about impartiality. Tr. at 1006. Counsel also noted that an alternate juror was available. Tr. at 1006. It was observed that Mr. Messner had not raised concerns during voir dire and his concerns came to light on the second day of trial after voir dire, opening statements and several witnesses had testified. Tr. at 1007. The court overruled the request to remove the juror and allowed him to deliberate to verdict. Tr. at 1007.

The court has discretion in addressing whether to excuse a juror for cause and substitute an alternate. *See United States v. Campbell,* 845 F.2d 782, 785 (8th Cir. 1988), *cert. denied,* 488 U.S. 965 (1988). Rulings on the qualifications of jurors will not be disturbed "absent a clear showing of abuse of the discretion vested in the district court." *Campbell,* 845 F.2d at 785; *United States v. Gianakos,* 415 F.3d 912, 922 (8th Cir. 2005), *cert. denied,* 546 U.S. 1045 (2005).

## B.    Discussion

The Sixth Amendment guarantees every criminal defendant the right to a trial by an impartial jury. *Gianakos,* 415 F.3d at 922; *see also Smith v. Phillips,* 455 U.S. 209, 217 (1982) (due process guarantees trial by jury capable and willing to decide the case solely on the evidence before it); *Johnson v. Armontrout,* 961 F.2d 748, 751-52 (8th Cir. 1992). The Sixth Amendment guarantee is not fulfilled if any member of

56

the jury was biased. *Johnson,* 961 F.2d at 751; *see also United States v. Gonzalez,* 214 F.3d 1109, 1112 (9th Cir. 2000). If a juror was actually biased, the conviction must be set aside. *Johnson,* 961 F.2d at 754.

When matters come to the attention of the trial judge after trial has commenced which may affect the impartiality on the part of a juror, the matter commands "careful consideration." *Untied States v. Rowell,* 512 F.2d 766, 768 (8th Cir. 1975), *cert. denied,* 423 U.S. 844 (1975); *see also Gianakos,* 415 F.3d at 921 ("A legitimate concern that a juror's impartiality is suspect cannot be ignored."). Any taint of partiality must be removed in those circumstances. *Rowell,* 512 F.2d at 768. Any doubts regarding juror bias must be resolved against the juror. *See Gonzalez,* 214 F.3d at 1114. When a juror is unable to state that he will serve fairly and impartially, a court can have no confidence that the juror will be able to render a fair and impartial verdict. *Id.; see also Thompson v. Altheimer & Gray,* 248 F.3d 621, 627 (7th Cir. 2001).

A court has discretion to question a juror whose qualifications have been called into doubt during trial in order to resolve such matters as they arise and to "ensure an impartial and competent jury." *Campbell,* 845 F.2d at 785; *see also United States v. Duke,* 255 F.3d 656, 659-60 (8th Cir. 2001), *cert. denied,* 534 U.S. 1022 (2001). Rule 24(c) of the Federal Rules of Criminal Procedure provides discretion to use alternate

57

jurors to replace jurors who "become or are found to be unable or disqualified to perform their duties."

Mr. Messner twice advised the court that he did not believe he could be an impartial juror. He did not waiver in his belief. He did not offer qualified responses that he could set aside his personal beliefs to be fair. The record does not contain any assurances that his concerns were "shakable" or that he could serve unclouded by concerns of partiality. *See also Thompson,* 248 F.3d at 627. Because the court was on notice that the juror's impartiality was questionable, case law directs that the matter must command "careful consideration," that the concern cannot be ignored, and that any possible taint of partiality should be removed by the court. *See Rowell,* 512 F.2d at 768; *Gianakos,* 415 F.3d at 921.

The court should have removed Mr. Messner and appointed an alternate to serve on the jury. This was the only procedure to guarantee the defendant's Sixth Amendment right to an impartial jury.[8] This case is distinguishable from *United*

---

[8] After the voir dire examination, the court indicated that it did not believe Mr. Messner. Tr. at 96. It is respectfully submitted that the court had no legitimate basis to disbelieve the juror. Once he expressed concerns about partiality, the proper approach would be to remove the juror for cause and replace him with an alternate. Even if the court was justified in not believing the juror, a dishonest juror should not continue to serve on the jury. The juror either had legitimate concerns about his ability to be impartial or he was not being truthful to the court. In either event, he should have been excused for cause and replaced by an alternate.

Appellate Case: 08-3172    Page: 66    Date Filed: 03/23/2009 Entry ID: 3530381

*States v. Evans,* 272 F.3d 1069 (8ᵗʰ Cir. 2001). In *Evans,* a juror on day four of trial discussed misconduct of other jurors and gave equivocal answers concerning her ability to be fair. The juror answered that "to the best of my ability" she would reserve making a decision on guilt or innocence until all evidence is done and "I'll do my best" when asked if she had any concerns or qualms about being able to maintain an open mind through the rest of the evidence. *Evans,* 272 F.3d at 1078. The appellate court held that the decision to accept the juror's assurances of impartiality was within the trial court's discretion. *Id.* at 1080. Unlike the juror in *Evans,* Mr. Messner on day two never equivocated and never gave any assurance that he could be impartial.

It is of no significance that Mr. Messner at the end of trial expressed his opinion that he could be impartial and fair to both sides. A defendant is guaranteed the right to trial by an impartial jury throughout the entire proceeding. Clearly, Mr. Messner sat through some portion of trial with concerns that he could not be impartial. Further, his comments at the end of trial may have been influenced by the prior voir dire examination wherein the court advised Mr. Messner that his comments "were not good enough" and that he was going to be required to remain as a juror. *See also Rowell,* 512 F.2d at 769 (although the taint of partiality must be removed, the court must exercise great care in order to avoid compounding the problem). Here,

59

the taint of partiality was not removed and the court's criticism of Mr. Messner likely impacted his responses at the end of trial. Again, the only approach to fully protect the defendant's right to trial by an impartial jury would have been to replace Mr. Messner with an available alternate juror.

Any error that constitutes a structural defect in the constitution of the trial mechanism defies harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279 (1991). The presence of a biased jury constitutes a fundamental, structural defect that affects the entire conduct of the trial. *Gray v. Mississippi,* 481 U.S. 648, 668 (1987) (because the impartiality of the adjudicator goes to the very integrity of the legal system, the *Chapman* harmless-error standard cannot apply); *Edwards v. Balisok,* 520 U.S. 641, 647 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside no matter how strong the evidence against him."); *Johnson,* 961 F.2d at 756. With respect to an impartial fact-finder, the Supreme Court has stated:

> We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' The right to an impartial adjudicator, be it judge or jury, is such a right.

*Gray,* 481 U.S. at 668 (citation omitted).

The error concerning Juror Messner is a structural error that infringed the defendant's Sixth Amendment rights. This error is not subject to harmless error

60

analysis.  The court abused its discretion by failing to dismiss the juror on the second day of trial.  This Court should reverse the convictions and remand the matter for a new trial.

## CONCLUSION

WHEREFORE, for each and all of the reasons set forth herein, Mr. Dale prays that this Honorable Court reverse his convictions and remand the case to the district court for a new trial.

Respectfully submitted,

GADDY GEIGER & BROWN PC

By: _____

W. BRIAN GADDY            #42701
2345 Grand Blvd., Ste. 675
Kansas City, MO  64108
Tel:   (816) 221-8989
Fax:   (816) 221-8988
Email:        bgaddy@ggbtrial.com
***Counsel for Appellant Dale***

61

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that two true and correct copies of the above

and foregoing, along with an electronic copy on disk, were sent by United States

Mail, First Class Postage prepaid, on the 20th day of March, 2009, to:

Gregg Coonrod
Kate Mahoney
Assistant United States Attorneys
United States Attorney's Office
400 E. 9th St., 5th Fl.
Kansas City, MO 64106
***Attorneys for the United States***

_____
***Attorney for Appellant Dale***

Appellate Case: 08-3172     Page: 70     Date Filed: 03/23/2009 Entry ID: 3530381

## CERTIFICATE OF COMPLIANCE

I hereby certify that the Appellant's brief in the above-captioned matter complies with Eighth Circuit Rule 28A(d), was prepared using Corel WordPerfect X3, printed in Times New Roman proportionally spaced type font at 14 point. I further certify that the brief contains 13,733 words as calculated by Word Perfect software, excluding the summary statement with respect to oral argument, the table of contents, the table of authorities, and certificates of counsel. I further certify that the computer CD was new out of the box and that, after the brief was copied thereon, the CD was scanned for viruses and no viruses were detected on said CD.

_____

***Attorney for Appellant Dale***

Appellate Case: 08-3172     Page: 71     Date Filed: 03/23/2009 Entry ID: 3530381

**ADDENDUM**

**TABLE OF CONTENTS**

Judgment and Commitment Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

Report and Recommendation Regarding Suppression . . . . . . . . . . . . . . . . . . A7

Appellate Case: 08-3172    Page: 72    Date Filed: 03/23/2009 Entry ID: 3530381