**IN THE
UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

No. 08-3172 / 08-3246

**UNITED STATES OF AMERICA,**

Appellee,

v.

**MICHAEL L. DALE,**

and

**DYSHAWN JOHNSON,**

Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI, WESTERN DIVISION
HONORABLE DEAN WHIPPLE, SENIOR DISTRICT JUDGE

**BRIEF FOR THE UNITED STATES**

MATT J. WHITWORTH
  Acting United States Attorney

KATHLEEN D. MAHONEY
  Assistant United States Attorney

GREGG R. COONROD
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East 9th Street, Fifth Floor
Kansas City, Missouri  64106
Telephone: (816) 426-3122

*Attorneys for Appellee*

## <u>SUMMARY OF THE CASE</u>

The appellants, Michael L. Dale (a/k/a "Gin") and Dyshawn Johnson (a/k/a "Chopper") were convicted by a jury of conspiracy to distribute five kilograms or more of cocaine and two counts of knowingly using a firearm during and in relation to a drug trafficking offense, and in so doing, committing first-degree murder. Dale and Johnson each were sentenced to three consecutive life sentences by the district court.

Dale claims his tape-recorded statement to Anthony Smith, a confidential informant, should have been suppressed by the district court, and both Dale and Johnson assert that the district court abused its discretion by denying their motions to sever, and by denying various requests for a mistrial. They also both claim that testimony regarding gangs was improperly admitted, and that the district court abused its discretion in retaining a juror. Johnson claims the district court erred in limiting his cross-examination of two witnesses, and also challenges the sufficiency of the evidence to support his convictions. Finally, Johnson claims the district court erred in imposing his Guidelines sentence of life imprisonment on Count One.

Johnson and Dale each has requested 20 minutes for oral argument. The Government would request an amount of time equal to the total granted to both appellants.

-i-

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF THE FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . 38

ARGUMENTS

    I.    The district court correctly denied Dale's motion to suppress his tape-recorded statement to an informant, since the statement was voluntary and did not violate Dale's Sixth Amendment right to counsel.. . . . . . . . . . . . . . . . . . . . . 40

    II.    The district court did not err by acquiescing to Johnson's request that the court present to the jury redacted versions of Dale's admissions to an informant, since (1) a defendant may not complain about an error that he invited; (2) the redactions were not improperly made; and (3) the recorded statement was "non-testimonial," so there was no requirement that it be redacted at all . . . . . . . . . . . . . . . . . . . . 53

    III.    The district court properly denied the motions to sever, as Dale and Johnson were charged together in the drug conspiracy and charged together in murdering Anthony Rios and Olivia Raya. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Appellate Case: 08-3172    Page: 3    Date Filed: 06/09/2009 Entry ID: 3555529

IV.   The district court properly denied the various motions for mistrial requested by Dale and Johnson, since the errors complained of either were not error at all, or were cured by the district court's remedial actions. . . . . . . . . . . . . . . . . . . . . 74

V.    The district court did not abuse its discretion in retaining a juror who, although he questioned his impartiality early in the trial, later stated before deliberations began that he "absolutely" could be fair and impartial. . . . . . . . . . . . . . . . 91

VI.   The district court did not abuse its discretion in limiting Johnson's cross-examination of two government witnesses, because the limits placed upon Johnson's cross-examination were reasonable, and Johnson was able to establish through other means the witnesses' hopes for leniency. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

VII.  Johnson's three convictions were supported by sufficient evidence, because at least eight witnesses testified to his involvement in a drug conspiracy, and because Johnson admitted his involvement in the murders, admissions that were corroborated by phone records, a statement of the victim, and his possession soon after the murders of two kilograms of cocaine that were packaged just like Rios packaged his drugs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

VIII. The district court did not clearly err in calculating the drug amounts attributable to Johnson, since the accuracy of those drug weights was supported by at least seven witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . 117

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

-iii-

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bourjaily v. United States*, 483 U.S. 171 (1987). . . . . . . . . . . . . . . . . . . . . 65

*Brady v. Maryland*, 373 U.S. 83 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Brown v. United States*, 411 U.S. 223 (1973). . . . . . . . . . . . . . . . . . . . . . . 60

*Bruton v. United States*, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . 49, 54, 64

*Collins v. Harker Heights*, 503 U.S. 115 (1992). . . . . . . . . . . . . . . . . . 39, 47

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998). . . . . . . . . . . . . . 39, 47

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . 51, 52

*Davis v. Washington*, 547 U.S. 813 (2006). . . . . . . . . . . . . . . . . . . . . . . 2, 53

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986). . . . . . . . . . . . . . . . . . 90, 91

*Dennis v. United States*, 339 U.S. 162 (1950). . . . . . . . . . . . . . . . . . . . . . 88

*Gray v. Maryland*, 523 U.S. 185 (1998). . . . . . . . . . . . . . . . . . . . . . . . 54, 55

*Hudson v. Michigan*, 547 U.S. 586, 126 S. Ct. 2159,
165 L. Ed. 2d 56 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Kyle v. Whitely*, 514 U.S. 419 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Lewis v. United States*, 385 U.S. 206 (1966). . . . . . . . . . . . . . . . . . . . . . . 41

*McNeil v. Wisconsin*, 501 U.S. 171 (1991). . . . . . . . . . . . . . . . . . . . . . . . 37

*Moran v. Burbine*, 475 U.S. 412 (1986). . . . . . . . . . . . . . . . . . . . 2, 37, 38

Appellate Case: 08-3172    Page: 5    Date Filed: 06/09/2009 Entry ID: 3555529

*Pa. Board of Prob. & Parole v. Scott*, 524 U.S. 357,
118 S. Ct. 2014, 141 L. Ed. 2d 344 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Richardson v. Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . . . . 54

*Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456 (2007). . . . . . . . . . . 108

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006).. . . . . . . . . . . . . . . 2, 42,45

*United States v. Abdi*, 463 F.3d 547 (6th Cir. 2006).. . . . . . . . . . . . . . . . . 44

*United States v. Aldridge*, 413 F.3d 829 (8th Cir. 2005). . . . . . . . . 4, 90, 93

*United States v. Arias*, 252 F.3d 973 (8th Cir. 2001). . . . . . . . . . . . . . . . . 66

*United States v. Baker*, 98 F.3d 330 (8th Cir. 1996).. . . . . . . . . . . . . . . . . 70

*United States v. Becker*, 534 F.3d 952 (8th Cir. 2008). . . . . . . . . . 5, 96, 97

*United States v. Beckman*, 222 F.3d 512 (8th Cir. 2000). . . . . . . . . . . . . . 65

*United States v. Bolden*, 545 F.3d 609 (8th Cir.2008). . . . . . . . . . . . . 75, 76

*United States v. Booker*, 542 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . 104

*United States v. Boone*, 437 F.3d 829 (8th Cir. 2006). . . . . . . . 3, 47, 66, 67

*United States v. Brown*, 110 F.3d 605 (8th Cir. 1997). . . . . . . . . . . . . . . . 90

*United States v. Burnette*, 518 F.3d 942 (8th Cir. 2008). . . . . . . . . . . . 5, 104

*United States v. Cadwell*, 864 F.2d 71 (8th Cir. 1988).. . . . . . . . . . . . . . . 67

*United States v. Calandra*, 414 U.S. 338,
94 S. Ct. 613, 38 L. Ed. 2d 561 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Carter*, 481 F.3d 601 (8th Cir. 2007). . . . . . . . . . . . . . . . 96

Appellate Case: 08-3172    Page: 6    Date Filed: 06/09/2009 Entry ID: 3555529

*United States v. Castro-Gaxiola*, 479 F.3d 579 (8th Cir. 2007). . . . . . . . . . 96

*United States v. Coleman*, 349 F.3d 1077 (8th Cir. 2003). . . . . . .   49, 60, 67

*United States v. Cruz*, 285 F.3d 692 (8th Cir. 2002). . . . . . . . . . . . . . . . . 96

*United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995). . . . . . . . . . . . . . 64

*United States v. Davis*, 534 F.3d 903 (8th Cir. 2008). . . . . . . . . . . . . . . . 81

*United States v. Delpit*, 94 F.3d 1134 (8th Cir. 1996). . . . . . . . . . . . . . . 64

*United States v. Edwards*, 159 F.3d 1117 (8th Cir. 1998), *cert. denied*, 528 U.S. 825 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 60

*United States v. Feliz*, 467 F.3d 227 (2d Cir. 2006). . . . . . . . . . . . . . . 53, 55

*United States v. Flores*, 362 F.3d 1030 (8th Cir. 2004). . . . . . . . . . . . 62, 67

*United States v. Frazier*, 280 F.3d 835 (8th Cir. 2002). . . . . . . . . . . . . . 65

*United States v. Gianakos*, 415 F.3d 912 (8th Cir. 2005). . . . . . . . . . . . 4, 87

*United States v. Gonzalez*, 272 Fed.Appx. 117, 2008 WL 925379 (2nd Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Gouveia*, 467 U.S. 180 (1984). . . . . . . . . . . . . . . . . . . . 37

*United States v. Graham*, Numbers Cr. 08-50079-01, Cr. 08-50079-02, 2008 WL 5424142 (D. S.D. Dec. 27, 2008). . . . . . . . . . . . . . . . . . . . . . . . . 58

*United States v. Grego*, 724 F.2d 701 (8th Cir. 1984). . . . . . . . . . . . . . . 38

*United States v. Guarino*, 517 F.3d 1067 (8th Cir. 2008). . . . . . . . . . . . 105

*United States v. Hance*, 501 F.3d 900 (8th Cir. 2007). . . . . . . . . . . . . . . 83

*United States v. Hardin*, 209 F.3d 652 (7th Cir. 2000). . . . . . . .   3, 73, 74, 79

Appellate Case: 08-3172     Page: 7     Date Filed: 06/09/2009 Entry ID: 3555529

*United States v. Harper*, 466 F.3d 634 (8th Cir. 2006). . . . . . . . . . . . . 75, 78

*United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005). . . . . . . . . . . . . 2, 59

*United States v. Hessman*, 369 F.3d 1016 (8th Cir. 2004). . . . . . . . . 36, 37

*United States v. Hines*, 387 F.3d 690 (8th Cir. 2004). . . . . . . . . . . . . . . . 36

*United States v. Hollins*, 432 F.3d 809 (8th Cir. 2005). . . . . . . . . . . . . . 70

*United States v. Ingle*, 157 F.3d 1147 (8th Cir. 1998). . . . . . . . . . . . . 37, 47

*United States v. Jimenez*, 509 F.3d 682 (5th Cir. 2007). . . . . . . . . 49, 51, 60

*United States v. Jones*, 563 F.3d 725 (8th Cir. 2009). . . . . . . . . . . . . . . . 108

*United States v. Kamerud*, 326 F.3d 1008 (8th Cir. 2003). . . . . . . . . . . . . 97

*United States v. Killingsworth*, 413 F.3d 760 (8th Cir. 2005)) (internal citations omitted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*United States v. Lee*, 374 F.3d 637 (8th Cir. 2004). . . . . . . . . . . . . . . . . . 53

*United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Lightfoot*, 483 F.3d 876 (8th Cir. 2007). . . . . . . 4, 92, 93, 94

*United States v. Lincoln*, 413 F.3d 716 (8th Cir. 2005). . . . . . . . . . . . . . 109

*United States v. Littrell*, 439 F.3d 875 (8th Cir.2006). . . . . . . . . . . . . . . 81

*United States v. Looking Cloud*, 419 F.3d 781 (8th Cir. 2005). 5, 48, 99, 100

*United States v. Lussier*, 423 F.3d 838 (8th Cir. 2005). . . . . . . . . . . . . 4, 88

*United States v. Mansaw*, 714 F.2d 785 (8th Cir. 1983). . . . . . . . . . . . . . 63

Appellate Case: 08-3172    Page: 8    Date Filed: 06/09/2009 Entry ID: 3555529

*United States v. McCracken*, 110 F.3d 535 (8th Cir. 1997) . . . . . . . . . . . . . 96

*United States v. Melina*, 101 F.3d 567 (8th Cir. 1996) . . . . . . . . . . . . . . . . 63

*United States v. Michelson*, 378 F.3d 810 (8th Cir.1994) . . . 62, 67, 82, 104

*United States v. Oleson*, 310 F.3d 1085 (8th Cir. 2002) . . . . . . . . . . . . . . 96

*United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002) . . . . . . . . . . . . . . 43, 44

*United States v. Pardue*, 983 F.2d 843 (8th Cir. 1993) . . . . . . . . . . . . . . 47

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000) . . . . . . . . . . . . . . . . 84

*United States v. Pecina*, 956 F.2d 186 (8th Cir. 1992) . . . . . . . . . . . . . . . 67

*United States v. Pherigo*, 327 F.3d 690 (8th Cir. 2003) . . . . . . . . . . . . . . 62

*United States v. Pizano*, 421 F.3d 707 (8th Cir. 2005) . . . . . . . . . . . . . . . 97

*United States v. Plancarte-Vazquez*, 450 F.3d 848 (8th Cir. 2006) . . . . 5, 108

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) . . . . . . . . 4, 91, 92, 94

*United States v. Robinson*, 110 F.3d 1320 (8th Cir. 1997) . . . . . . . . . . . . . 84

*United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) . . . . . . . . . . . . . . . . 59

*United States v. Shivers*, 66 F.3d 938 (8th Cir. 1995) . . . . . . . . . . . . . . . 63

*United States v. Smith*, 487 F.3d 618 (8th Cir. 2007) . . . . . . . . 3, 70, 71, 73

*United States v. Thompson*, 533 F.3d 964 (8th Cir. 2008) . . . . . . . . . . . . . 70

*United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008) . . . . . 2, 55, 56, 57

*United States v. Underwood*, 446 F.3d 1340 (11th Cir. 2006) . . . . . . . . . . 58

Appellate Case: 08-3172    Page: 9    Date Filed: 06/09/2009 Entry ID: 3555529

*United States v. Urghart*, 469 F.3d 745 (8th Cir. 2006). . . . . . . . . .  3, 75, 78

*United States v. Vinton*, 429 F.3d 811 (8th Cir. 2005). . . . . . . . . . . . . . . . 97

*United States v. Watson*, 525 F.3d 583 (7th Cir. 2008). . . . . . . . . . . . 58, 59

*United States v. Weleford*, 356 F.3d 932 (8th Cir. 2004). . . . . . . . . . . . . . 37

*United States v. Wilcox*, 50 F.3d 600 (8th Cir. 1995). . . . . . . . . . .  4, 85, 88

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). . . . . . . . . . . . 53, 55

*United States v. Wright*, 641 F.2d 602 (8th Cir. 1981). . . . . . . . . . . . . . . 41

*United States v. Young*, 533 F.3d 453 (6th Cir. 2008). . . . . . . . . . . . . 44, 45

*United States v. Ziesman*, 409 F.3d 941 (8th Cir. 2005). . . . . . . . . . . . . 3, 83

*Zafiro v. United States*, 506 U.S. 534 (1993). . . . . . . . . . . . . . .  3, 63, 64, 68

## FEDERAL STATUTES

21 U.S.C. §§ 841(a)(1),þ(b)(1þ(A). . . . . . . . . . . . . . . . . . . . . . . . . .  6, 8, 105

18 U.S.C. § 3553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

18 U.S.C. §§ 924(c)(1),þ(j)(1þ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

Fed. R. Evid. 602, 802. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Fed. R. Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Fed. R. Evid. 804(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Appellate Case: 08-3172    Page: 10    Date Filed: 06/09/2009 Entry ID: 3555529

# IN THE
## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Nos. 08-3172 / 08-3246

## UNITED STATES OF AMERICA,

Appellee,

v.

## MICHAEL L. DALE,

## and

## DYSHAWN JOHNSON,

Appellants.

Appeal from the United States District Court for the
Western District of Missouri, Western Division
Honorable Dean Whipple, Senior District Judge

## STATEMENT OF THE ISSUES

## I.

Whether the district court correctly denied Dale's motion to suppress

his tape-recorded statement to an informant, where the statement was

voluntary and did not violate Dale's Sixth Amendment right to counsel.

-1-

Appellate Case: 08-3172     Page: 11     Date Filed: 06/09/2009 Entry ID: 3555529

**<u>Cases</u>**

*Moran v. Burbine*, 475 U.S. 412 (1986)

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006)

**II.**

Whether the district court erred by acquiescing to Johnson's request that the court present to the jury redacted versions of Dale's admissions to an informant, where (1) a defendant may not complain about an error that he invited; (2) the redactions were not improperly made; and (3) the recorded statement was "non-testimonial," so there was no requirement that it be redacted at all.

**<u>Cases</u>**

*Davis v. Washington*, 547 U.S. 813 (2006)

*United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008)

*United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005)

**III.**

Whether the district court abused its discretion in denying the severance motions filed by Dale and Johnson, where Dale and Johnson were charged co-conspirators and cannot demonstrate clear or substantial

-2-

prejudice from a joint trial, and where the jury was properly instructed to consider evidence separately against each defendant.

## Cases

*Zafiro v. United States*, 506 U.S. 534 (1993)

*United States v. Boone*, 437 F.3d 829 (8th Cir. 2006)

## IV.

Whether the district court properly denied the various motions for mistrial requested by Dale and Johnson, where the errors complained of either were not error at all, or were cured by the district court's remedial actions.

## Cases

*United States v. Smith*, 487 F.3d 618 (8th Cir. 2007)

*United States v. Urghart*, 469 F.3d 745 (8th Cir. 2006)

*United States v. Ziesman*, 409 F.3d 941 (8th Cir. 2005)

*United States v. Hardin*, 209 F.3d 652 (7th Cir. 2000)

## V.

Appellate Case: 08-3172    Page: 13    Date Filed: 06/09/2009 Entry ID: 3555529

Whether the district court abused its discretion by retaining a juror who, although he questioned his impartiality early in the trial, later stated before deliberations began that he "absolutely" could be fair and impartial.

### Cases

*United States v. Lussier*, 423 F.3d 838 (8th Cir. 2005)

*United States v. Gianakos*, 415 F.3d 912 (8th Cir. 2005)

*United States v. Wilcox*, 50 F.3d 600 (8th Cir. 1995)

### VI.

Whether the district court abused its discretion in limiting Johnson's cross-examination of two government witnesses, where the limits placed upon Johnson's cross-examination were reasonable, and where Johnson was able to establish through other means the witnesses' hopes for leniency.

### Cases

*United States v. Lightfoot*, 483 F.3d 876 (8th Cir. 2007)

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005)

*United States v. Aldridge*, 413 F.3d 829 (8th Cir. 2005)

### VII.

Whether Johnson's three convictions were supported by sufficient evidence, where at least eight witnesses testified to his involvement in a

Appellate Case: 08-3172   Page: 14   Date Filed: 06/09/2009 Entry ID: 3555529

drug conspiracy, and where Johnson admitted his involvement in the murders, admissions that were corroborated by phone records, a statement of the victim, and his possession soon after the murders of two kilograms of cocaine that were packaged just like Rios packaged his drugs.

## Cases

*United States v. Looking Cloud*, 419 F.3d 781 (8th Cir. 2005)

*United States v. Becker*, 534 F.3d 952 (8th Cir. 2008)

### VIII.

Whether the district court clearly erred in calculating the drug amounts attributable to Johnson, where the accuracy of those drug weights was supported by at least seven witnesses.

## Cases

*United States v. Plancarte-Vazquez*, 450 F.3d 848 (8th Cir. 2006)

*United States v. Burnette*, 518 F.3d 942 (8th Cir. 2008)

-5-

## STATEMENT OF THE CASE

### A.   *Procedural History*

On February 28, 2006, a federal grand jury empaneled in the Western District of Missouri returned a four-count indictment charging the appellants, Michael L. Dale and Dyshawn Johnson in three of the counts: Count One – conspiracy to distribute 5 kilograms of cocaine and 50 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846; and Counts Two and Three – use of a firearm in furtherance of drug trafficking and in so doing, committing first-degree murder, in violation of 18 U.S.C. §§ 924(c)(1), (j)(1), and (2).  (D.E.1.)[1]

A co-defendant, Bryant Burton, was charged in Count One with Dale and Johnson, and additionally in Count Four with possession of a firearm by a convicted felon. Burton pled guilty before trial pursuant to a cooperation agreement and testified for the Government at trial.

The appellants' jury trial began November 26, 2007.  Following a six-day joint trial, the jury found Dale and Johnson guilty as charged on all three counts.  (D.E. 225.)

---

[1]D.E." refers to the pleadings, orders, and other documents as chronicled on the district court's docket sheet.

Appellate Case: 08-3172    Page: 16    Date Filed: 06/09/2009 Entry ID: 3555529

### B. _Dale's 2005 Case_

Dale had faced previous federal charges in the Western District of Missouri, in Case No. 05-00195-01-CR-W-HFS (hereinafter referred to as the "2005 drug case"). Dale was arrested for distribution of cocaine base and charged by criminal complaint on April 22, 2005, and was thereafter ordered to be detained without bond; he has thus been in federal custody since April 22, 2005. Dale retained Daniel J. Ross to represent him. (R&R 2.)[2]

On August 16, 2005, Government counsel sent a proposed proffer letter (commonly referred to as a _Kastigar_ letter) and a proposed plea agreement to defense counsel. However, no proffer session ever took place and the parties never entered into a written plea agreement. (R&R 2-3.)

On September 29, 2005, the grand jury returned a superseding indictment in the 2005 drug case, charging Dale with five counts. Count One charged Dale with a conspiracy to distribute cocaine and cocaine base; Counts Two and Three charged Dale with distribution of cocaine base; Count Four charged Dale with unlawful possession of a firearm by a convicted felon; and Count Five sought criminal forfeiture.

---

[2]"R&R" refers to the magistrate judge's report and recommendation on Dale's motion to suppress.

Appellate Case: 08-3172    Page: 17    Date Filed: 06/09/2009 Entry ID: 3555529

On January 27, 2006, Dale appeared before the Honorable Howard J. Sachs, Senior United States District Judge, and entered a plea of guilty to Counts One and Four of the superseding indictment, without a written plea agreement. On September 26, 2006, Judge Sachs sentenced Dale in the 2005 drug case to the statutory minimum sentence of 20 years[3] on Count One, to run concurrently with a ten-year sentence on Count Four. Dale did not appeal those convictions.

## C. _Dale's Motion to Suppress his Tape-Recorded Statement_

The murders of Rios and Raya remained unsolved for two and a half years. In July 2005, police approached Anthony Smith, who was serving a federal sentence, and asked if he had information relating to the murders of Rios and Raya. (Tr. 266, 446.)[4] Smith was in prison in Nebraska at the time of the murders; he was released in the summer of 2003. (Tr. 438.) When he was released from prison, Smith saw Dale, whom he had known for 18 years. (Tr. 438-39.) At that time, Dale told Smith about the murders: Dale had gone there to buy drugs, had shot "the Mexicans," and took "two and a half kees." (Tr. 439-40, 447.) Dale also told Smith that Johnson was

---

[3]Dale had a prior felony drug conviction, so his mandatory minimum sentence was enhanced pursuant to 21 U.S.C. §§ 841(b)(1)(A) and 851.

[4]"Tr." refers to the 1,019-page trial transcript.

Appellate Case: 08-3172    Page: 18    Date Filed: 06/09/2009 Entry ID: 3555529

involved in the robbery and murders, but that information was not presented to the jury.

On August 30, 2005, Smith agreed to have recording equipment placed on him and talk to Dale while they were in a transportation van that took federal prisoners from the federal courthouse in Kansas City to the Bates County Jail. (Tr. 489-90.) Dale made several admissions on the tape implicating both himself and Johnson in the murders and robbery.

As noted above, on August 30, 2005, Dale was charged only in the 2005 drug case – with drug and gun charges for conduct that occurred in April of 2005. He was not charged with the murders of Rios and Raya until February 28, 2006.

Although a proposed proffer letter and plea agreement were sent to defense counsel in August 2005, neither document was ever agreed upon by the parties, and no proffer interview was ever conducted with Dale. Likewise, the parties never entered into the proposed written plea agreement.

After the August 30, 2005, tape recording was transcribed, the United States Attorney's Office appointed taint counsel to listen to the tape recording and read the transcribed statement, and then to redact any statements made by Dale that could potentially relate to his pending 2005

Appellate Case: 08-3172    Page: 19    Date Filed: 06/09/2009 Entry ID: 3555529

drug case.  Until the suppression hearing was held on September 11, 2007

(long after Dale was sentenced on his 2005 drug case), Assistant U.S.

Attorney Kate Mahoney did not read the un-redacted transcript, nor did she

listen to the un-redacted tape recording.

Dale moved to suppress the recorded statement,[5] arguing that the

statement was acquired in violation of his Fifth Amendment right to due

process, his Sixth Amendment right to counsel, and that the statements were

made involuntarily in violation of the Fifth Amendment.  (D.E. 111.)

The suppression hearing began on September 11, 2007, before the

Honorable Sarah W. Hays, a United States magistrate judge.  The

Government planned to call three witnesses at this hearing: (1) FBI Special

Agent Robert Plant; (2) FBI Special Agent Don Lee; and (3) Corporal Steve

Poulter of the Bates County Sheriff's Department.

Magistrate Judge Hays took judicial notice of her files in both Dale's

2005 drug case and in Dale's murder case.  (Supp. Tr. I at 3-5.)[6]  While Dale

did not raise the issue in his motion to suppress, Judge Hays wondered why

---

[5]The Government presented five witnesses at trial who testified that Dale
had admitted murdering Rios and Raya, however, Dale moved to suppress only
the tape-recorded statement made to Anthony Smith.

[6]"Supp. Tr. I" refers to the transcript of the first suppression hearing,
held September 11, 2007, by page number.

-10-

Dale was transported from Bates County to the federal courthouse, since his originally scheduled pretrial conference had been cancelled. Therefore, the second part of the hearing was set over to September 27, 2007. On that date, two witnesses testified in addition to those originally scheduled: (4) Deputy Mark Schnieders of the United States Marshal's Office; and (5) Smith, the jailhouse informant.

Smith testified that he did not threaten, coerce, or physically intimidate Dale on August 30, 2005, or at any other time. (Supp. Tr. II at 55-56; R&R 6.)[7] In fact, the evidence showed that Dale was both taller and heavier than Anthony Smith; Dale was 5'10", 210 pounds, while Smith was 5'6", 140 pounds. (Supp. Tr. I at 12; R&R 6.) Smith also testified that the statements Dale made in the transcribed recordings were consistent with what Dale had told him previously, when they were both out of custody and on the street. (Supp. Tr. II at 59; R&R 6.)

Additionally, Corporal Poulter drove the Bates County van that transported Dale and Smith on August 30, 2005, and Agent Lee rode along in the van. Both Corporal Poulter and Agent Lee testified that there was no altercation between the prisoners, no raised voices, and that they heard no

_____

[7]"Supp. Tr. II" refers to the transcript of the second suppression hearing, held on September 27, 2007.

-11-

threats or coercion. (Supp. Tr. I at 42, 48-49; R&R 4-5.) Corporal Poulter testified that the prisoners were transported as they always are, in the same handcuffs and shackles in which they appear in court. The recorded conversation and transcript of the statements Dale sought to suppress showed no threats, coercion, or intimidation of Dale. (R&R 14.)

In response to Magistrate Judge Hays' concern for the reason Dale was brought to the federal courthouse, Deputy Schneiders, who was in charge of transportation in August 2005, testified that when a scheduled pretrial conference is cancelled because a change of plea has been set, the defense attorney will often request that the defendant be transported to the courthouse anyway for an attorney meeting, and that documents indicated Dale was brought to the courthouse for an attorney meeting August 30, 2005. (Supp. Tr. II at 21-22.) He further testified that the cell block log indicated that Dale actually did meet with his attorney on August 30, 2005. (Supp. Tr. II at 24.) The prisoner call-up sheet, a request for prisoners which is faxed daily to the various facilities holding federal prisoners, also indicated that Smith was brought to the courthouse for an initial appearance, although he did not have a court appearance. (Supp. Tr. II at 36-37; R&R 5.)

Appellate Case: 08-3172     Page: 22     Date Filed: 06/09/2009 Entry ID: 3555529

During the second portion of the hearing, the issue of the magistrate court's detention order arose – Deputy Schneiders testified that there generally is a provision that indicates that a prisoner awaiting trial is to be held separately from sentenced prisoners, "to the extent practicable." (Supp. Tr. II at 41, 48-49.) However, Deputy Schneiders also testified that with over 700 prisoners in the marshal's custody, it is almost an impossibility to separate those prisoners. (Supp. Tr. II at 49.)

In her report and recommendation, Judge Hays found that Dale's statement to Smith had been voluntary, and that there was no violation of Dale's Sixth Amendment rights, because he was represented on a separate case. (R&R 9, 14.) Although Judge Hays found that there was a violation of her detention order that prisoners awaiting trial be kept separate, to the extent practicable, from sentenced prisoners, she recommended the denial of Dale's motion to suppress. (R&R 13, 14.) The district court adopted her report and recommendation. (D.E. 212.)

After a six-day jury trial in which the Government presented 35 witnesses, the jury convicted Dale and Johnson on all three counts as charged. (D.E. 225-31.) On September 9, 2008, the district court sentenced Dale and Johnson each to three consecutive life sentences. (D.E. 295, 302.)

-13-

Johnson filed a timely notice of appeal on September 17, 2008.  (D.E. 296.)

Dale filed a timely notice of appeal on September 18, 2008.  (D.E. 297.)

Appellate Case: 08-3172    Page: 24    Date Filed: 06/09/2009 Entry ID: 3555529

# STATEMENT OF THE FACTS

## A.    *Crime Scene of the Murders of Anthony Rios and Olivia Raya*

On December 21, 2002, at about 7:57 p.m., Francisco Rios, the grandfather of Anthony Rios, went to the home of Anthony Rios and Olivia Raya at 5115 Hardesty, Kansas City, Missouri, to check on them because neither he nor his wife had seen Rios or Raya all day.  (Tr. 37-38.) Francisco Rios, who lived next door, went through the back door, which was unlocked, and found both victims shot to death.  Raya was sitting on a living room couch where she had been writing out thank-you cards for graduation gifts (she had graduated from Rockhurst University about one week before she was killed), with a pen still in her left hand.  (Tr. 67, 206.) Anthony Rios, who was also known as "Snap" or "Snapper," was found on his back on the kitchen floor.  (Tr. 38, 68.)

While searching the crime scene, detectives found several bricks of marijuana and two bricks of cocaine in the basement, on the kitchen floor, and hidden in kitchen cabinets.  (Tr. 72-74.)  Several witnesses testified that Anthony Rios was a drug dealer.  (Tr. 188, 205, 510.)  However, Raya worked full-time for Blue Cross, and had gone to Rockhurst University part-time.  (Tr. 374-75.)

-15-

## B.     *Dr. Thomas Young*

Dr. Thomas Young, the Jackson County Medical Examiner, performed autopsies on both Rios and Raya.  He determined that Anthony Rios had sustained two gunshot wounds to his head, and one to his right hand.  (Tr. 125.)  One gunshot wound entered the right side of his head. (Tr. 124.)  The gunshot wound to Rios's right hand passed through his hand, and was consistent with Rios putting his hand up in front of him as he was shot.  (Tr. 128-29.)  The final gunshot wound entered Rios the left side of his nose, and passed thorough his head.  (Tr. 125.)

Dr. Young found gunpowder stippling in all three of Rios's gunshot wounds.  (Tr. 126, 128.)  Gunpowder stippling is caused by burning gunpowder particles emitted from the gun at the same time as the bullet, so that if the gun is fired sufficiently close to the skin, the gunpowder will cause little dot-like injuries to the skin, indicating that the gun was within three feet of the skin at the time of the shooting.  (Tr. 125, 128.)  Either of the two gunshot wounds to Rios's head would have been fatal.  (Tr. 130-31.)

Raya also suffered three gunshot wounds to her head, her shoulder, and her right thigh.  (Tr. 132.)  The gunshot wounds to her head and

-16-

shoulder also contained stippling, indicating that the gun had been fired within three feet of her.  (Tr. 132, 137.)  Raya had gunpowder stippling covering the backs of both of her hands, which was consistent with her holding both hands up in front of her as she was being shot.  (Tr. 141.) Additionally, the stippling surrounding the gunshot wound to Raya's head was of a different color than that of the gunshot wound to her neck, indicating she had been shot first in the neck, and some time later, in the head.  (Tr. 134, 135.)

Dr. Young testified that the findings at autopsy were consistent with the victims being killed 24 hours before they were found at 8 p.m. on December 21(which would place the time of death as approximately 8 p.m. December 20, 2002).  (Tr. 149, 155.)  However, Dr. Young testified that the findings at autopsy were not consistent with the victims being killed six hours before they were found (which would be approximately 2:00 p.m. on December 21, 2002).  (Tr. 155.)

## C.   *Kevin Winer*

Kevin Winer, a blood spatter expert with the Kansas City, Missouri Police Department Crime Laboratory, testified that based upon the blood spatter evidence from the crime scene, Rios was shot while standing, and

-17-

again while on the floor.  (Tr. 165, 169.)  He further testified that Raya was shot while sitting on the couch, and again while she was falling over, or after falling over, on the couch.  (Tr. 170, 172.)

### D.  *Paul Lupercio*

The last anyone saw or talked to the victims with the possible exception of the murderers, was Friday evening, December 20, 2002, at about 7:30 p.m.  At that time, Paul Lupercio stopped by the victims' home to arrange a drug deal with Rios.  (Tr. 205.)  Lupercio testified that he always called before going to Rios's house to conduct a drug deal.  (Tr. 205.)  Lupercio testified that Raya was sitting on the couch at the time, writing out graduation thank-you cards, and that she gave him a card while he was at the house, which was entered into evidence as an exhibit.  (Tr. 206-207.)

Lupercio gave Rios $20,000 cash for a kilogram of cocaine, which he was going to stop by to pick up later that evening.  (Tr. 208.)  However, Rios never answered his phone later that night or called him back, which Lupercio testified was unusual for Rios.  (Tr. 209-210.)  Lupercio testified that while he was at the house that night, Rios asked Lupercio if he thought

-18-

Johnson and Bryant Burton could be trusted, to which Lupercio answered,

"no."  (Tr. 225.)

Appellate Case: 08-3172    Page: 29    Date Filed: 06/09/2009 Entry ID: 3555529

### E. **_Sylvia Raya_**

Sylvia Raya testified that her daughter, Olivia Raya, had plans to go Christmas shopping with her and Olivia's two sisters at 8 a.m. on Saturday morning, December 21, 2002. (Tr. 375.) Raya did not show up either for breakfast or to go shopping later that morning; nor did she answer her phone, despite repeated calls. Mrs. Raya testified this was very much unlike her. (Tr. 377-78.)

### F. **_Detective Mike Jones_**

Police obtained telephone records for the two phones used by Rios. (Tr. 263-64.) One of the phones was subscribed to under the name Brian Escareno, but the parties stipulated that it belonged to Rios, and was found in his home. (Tr. 263-64, 868.) Those phone records showed that the last call made or received by Rios was to Dyshawn Johnson, at 7:21 p.m. on December 20, 2002. (Tr. 269, 875.)

Johnson was arrested February 12, 2003, in North Kansas City, Missouri. After his arrest, Detective Mike Jones interviewed Johnson at the North Kansas City Police Department police station. (Tr. 267-68.) Detective Jones first asked Johnson if he knew Rios, which he admitted he did. (Tr. 268.) He then informed Johnson that the phone records showed he

-20-

was the last person to talk to Rios before he was killed. Johnson responded that "he had talked to a lot of people and they ended up dead after talking to him." (Tr. 269.)

## G.    *North Kansas City Arrest of Johnson*

On February 12, 2003, North Kansas City police officers stopped Johnson for speeding while he was driving a Yukon Denali. (Tr. 235, 238.) He was then found to be driving with a revoked license, at which time he was arrested. (Tr. 238.) Police searched Johnson and his Yukon Denali incident to arrest, and recovered: $2,355 in United States currency from Johnson's pants pocket; $3,500 in United States currency from his left shoe; a Cartier watch valued at $6,000 by Johnson; a diamond ring valued at $4,500 by Johnson; a silver cross with a chain valued at $10,000 by Johnson; a diamond earring valued at $4,000 by Johnson; a small amount of marijuana; several money order receipts totaling $14,700; and a Southwest Airlines travel receipt in Johnson's name purchased December 20, 2002, with $595.00 cash, for travel from Kansas City to Los Angeles on December 21, 2002. (Tr. 243-45, 251-54.)

-21-

### H. *Postal Inspector Charles Puett*

Charles Puett, a United States Postal Inspector, analyzed the money order receipts recovered from Johnson's Yukon Denali and testified that Johnson's purchases of the $14,700 in money orders were illegally structured. Inspector Puett explained that on any given business day, an individual can purchase up to $3,000 in postal money orders before being required to complete a money order transaction report. (Tr. 629.) He testified that Johnson purchased the $14,700 in money orders over about a three-week period, from January 5, 2003, through January 29, 2003. (Tr. 634.) Inspector Puett testified that the money orders were in unusually large denominations, and that they were in round numbers, for example, $500, $1,000. (Tr. 634-35.)

Inspector Puett testified that if $3000 or more in money orders are purchased in any given day, then the customer has to fill out a money order transaction report. (Tr. 629.) Inspector Puett noted that on more than one occasion, Johnson had purchased money orders at different post offices on the same day. (Tr. 635-36.) For example, on January 29, 2003, Johnson purchased 13 money orders worth a total of $8,000; he purchased $2000 per post office, at four different post offices. (Tr. 638-39.) Inspector Puett

-22-

testified that purchasing $8,000 worth of money orders on the same day without filling out the proper reports was a federal crime. (Tr. 644.)

## I.   *Search Warrant on Johnson's Home*

On April 22, 2003, Kansas City, Missouri police obtained and served a search warrant on one of Johnson's houses, located at 2415 East 75th Street, in Kansas City, Missouri. Johnson was not home at the time of the warrant; however his son Dyshawn Johnson, Jr., was there, along with a woman named Ms. Scott.

Police recovered from that search: (1) a receipt for a 1999 Yukon Denali in the amount of $49,287.00; (2) a receipt for a 2002 Yukon Denali in the amount of $48,819.00; (3) digital scales; (4) kilo wrappers and packaging tape containing cocaine residue; (5) two permits to transfer .40-caliber Glock firearms; (6) a Glock magazine loaded with ten rounds of .40-caliber ammunition; (7) a box containing three rounds of .40-caliber Smith and Wesson ammunition; (8) a box containing 48 rounds of .32-caliber ammunition; (9) a box containing 50 rounds of .9-millimeter ammunition; (10) a box containing 20 rounds of .40-caliber ammunition; (11) paperwork addressed to Johnson at 2415 East 75th Street; and (12) three pairs of Diesel shoes. (Tr. 305-20.)

-23-

## J.    *Carl Carlson*

Carl Carlson, a supervisor at the Kansas City, Missouri Police Crime Laboratory, testified that all bullets recovered from the victims and the crime scene were fired from the same revolver. (Tr. 351.) Mr. Carlson explained that revolvers do not eject spent cartridge casings, also known as shell casings. (Tr. 352-53.) He also testified that he had examined the shoe prints left at the crime scene and determined that they were made by Diesel brand shoes. He said the Diesel brand shoes recovered from Johnson's house could have made the shoe impressions, but so could any pair of Diesel brand shoes. (Tr. 358-59.)

## K.    *Anthony Smith*

Smith testified at trial that he had known Dale for 18 years and that in 2003, Dale told Smith he had murdered "the Mexicans." In 2005, while Smith was incarcerated in federal prison for a felon-in-possession case, law enforcement officers asked Smith what he knew about the murders, and he agreed to cooperate and revealed those admissions.[8] (Tr. 439, 446.) Smith

---

[8]Through his cooperation, Smith also revealed to police another murder Dale admitted he had committed – the murder of Torrez Rodriguez in 2003. Smith told police that Dale and another man named Archie Mathews hid in some bushes outside a club in Kansas City, Missouri, and that Dale shot a man at least 50 times, as a 'trademark' to let the police know he is serious. Dale (continued...)

-24-

believed Dale would talk about the murders again, and agreed to wear recording equipment on August 30, 2005. (Tr. 489.) Smith also testified that he accompanied Dale to a drug deal with Johnson, in which Dale was picking up powder cocaine from Johnson. (Tr. 443-45.)

The Government argued before and during trial that the statements Dale made to Smith and others were co-conspirator statements, and therefore admissible without redaction as non-testimonial statements. However, on the third day of trial, the district court ordered that the tape recording and transcript be redacted to remove Johnson's name. (Tr. 407.)

Prior to trial, the Government had provided proposed redactions to Johnson's defense counsel. Johnson's counsel raised no objections to the form of the redactions before the tape was played to the jury, before the transcript was shown to the jury, or indeed, at any time during trial. In fact,

--------------------

[8](...continued)
said Mitchell Powell ("Fuzzy") was the driver for Dale and Mathews. Upon reviewing their records, police found an unsolved homicide in which Torrez Rodriguez was shot 36 times outside of a club at 39th and Jackson, Kansas City, Missouri, on September 14, 2003. Powell, after being charged with a drug conspiracy in the Western District of Missouri, confessed to being the driver for this murder, and confirmed Dale's and Mathews' involvement. All three men were charged with murder in Jackson County, Missouri; those cases are still pending. The Government agreed before trial not to present evidence of the Rodriguez murder to the jury in this case. (D.E. 103.)

Appellate Case: 08-3172    Page: 35    Date Filed: 06/09/2009  Entry ID: 3555529

Mr. Handfield argued to the court, "our position is that the government has already made and prepared a redacted tape that excludes Mr. Johnson's main reference to him. That is the tape that we think should be played, Your Honor, if it's going to be admitted, period. Your Honor, that's the tape that should be played." (Tr. 399.) At Johnson's counsel's request, Judge Whipple instructed the jury as follows:

> Ladies and gentlemen of the jury, the attorneys have requested
> that I further advise you that this tape is introduced for you to
> consider in the case against the defendant Michael Dale only,
> not against Defendant Johnson.

(Tr. 499-500.)

### L.   *Terry Taylor*

Terry Taylor testified that he had a prior conviction in 1997 for possession of cocaine, and was currently serving a federal sentence of ten years for sale of cocaine. (Tr. 541-42.) Taylor further testified that he was hoping for a downward departure on that sentence, based upon his cooperation and testimony in this case. (Tr. 542, 564, 584.)

Taylor testified that in 2002, he had asked Chopper (Johnson)where he could buy crack cocaine, and that Chopper introduced him to Gin (Dale). (Tr. 546.) Taylor testified that he bought two ounces of crack cocaine twice

-26-

a week from Dale for eight to nine months. (Tr. 548.) Taylor testified that Dale's source of cocaine was Johnson. (Tr. 550.)

Taylor testified that Dale told him he had robbed Mexicans of dope and money. (Tr. 557.) Dale told Taylor that he demanded that the male Mexican give him all the money and dope, after which Dale shot him. (Tr. 558.) Taylor said Dale told him he also shot the female, who was on the couch messing with some cards. (Tr. 558-59.)

During his cross-examination of Taylor, Johnson's counsel asked if Taylor was interviewed on December 22, 2005, in reference to a particular shooting incident that took place. (Tr. 569.) At that point, the Government objected, and informed the court out of the hearing of the jury that the interview involved a separate murder investigation of Dale (the Rodriguez murder). (Tr. 569.) Johnson's counsel told the court that he wanted to "show how the detectives brought out and showed him, and this is an example where they didn't believe his story." (Tr. 569.)

The court ruled that Johnson's counsel could not question Taylor about the interview, but that if Johnson wanted to show that Taylor had lied to police in the past, he could call the officer as a witness, and "get the same evidence in by a more assured way, a safer way." (Tr. 578.) Johnson's

-27-

counsel responded, "As long as the Court will allow Mr. Dyshawn Johnson through the government bringing in either one of those (officers), I have no problem with that." (Tr. 579.)

As a result of the court's ruling, the Government located Detective Everett Babcock of the Kansas City, Missouri Police Department and produced him for Johnson to call as a witness in order to impeach Taylor. Additionally, the Government allowed Johnson to call him out of turn. (Tr. 792-93.) Detective Babcock testified that he had interviewed Terry Taylor in regards to an unrelated crime, and that he confronted Taylor about inconsistencies in his story. (Tr. 795.) Detective Babcock said that after he confronted Taylor with the inconsistencies, that Taylor retracted a portion of what he said, but still tried to maintain his story. (Tr. 796.)

## M.  *Charles Levingston*

Charles Levingston also testified that he had bought cocaine from Dale in 2002. He estimated he bought nine ounces of cocaine every two weeks, for a total of approximately 10 to 15 kilograms cocaine. (Tr. 594, 597.) Levingston testified that Dale was supplied drugs by Johnson. (Tr. 600.)

-28-

Levingston also testified that Dale told him he put in a 'lick' (robbery of drugs and money) of a Mexican with someone.  (Tr. 609-10.)  Dale told Levingston that he had worn "burners" (gloves) and that he was surprised Snaps (Rios) had let him in with his burners on.  (Tr. 611.)  Dale told Levingston that Rios had led them into the kitchen, and that Dale "put even numbers in him through his coat."  (Tr. 611.)  Dale said he then killed the woman too, and that he had used a revolver.  (Tr. 611-12.)

### N.  *Mitchell Powell*

Mitchell Powell (a/k/a "Fuzzy") testified that he had a prior conviction in 1991 for possession of a controlled substance, and a conviction for drug trafficking in the second degree from 2005.  Powell stated he had pled guilty to the federal charge of conspiracy to distribute 50 grams or more cocaine base, pursuant to a cooperation agreement with the Government.  (Tr. 649.)  Powell acknowledged that he faced a minimum sentence of 20 years for the conspiracy conviction, but that he was hoping the Government would file a motion for downward departure.  (Tr. 649-50, 660-61, 667-68.)

Powell also testified that he dealt drugs with Dale, from 2003 to 2004.  (Tr. 651.)  Powell testified that when his normal supplier was out of

Appellate Case: 08-3172     Page: 39     Date Filed: 06/09/2009 Entry ID: 3555529

cocaine, that Dale would arrange for Powell to buy cocaine from Johnson. (Tr. 651.) Powell testified that he bought powder cocaine from Johnson approximately once a month, in increments of 2¼ ounces, 4½ ounces, and nine ounces. (Tr. 655, 656.) Powell explained that he cooked the powder cocaine into crack cocaine for both himself and Dale. (Tr. 655-56.)

Powell testified that he had known Rios and that one day he said to Dale, "I hear one of your boys did Snaps," *i.e.*, Rios. (Tr. 657.) Dale responded that he had done it. (Tr. 657.) Powell testified that Dale did not go into too much detail, but said that he shot Rios first and then shot the girl, who was doing homework or something. (Tr. 658.) Dale told Powell that they stole drugs, but left some behind. (Tr. 658.)

After establishing that Johnson faced a 20-year sentence and hoped for a downward departure as a result of his cooperation, Johnson's counsel asked, "Now in addition to the other benefits that you would hope and expect, you presently have pending a first-degree murder – " (Tr. 668.) The Government objected to defense counsel's attempt to impeach Powell with an arrest. (Tr. 668-69.) The district court ruled that Johnson could not impeach the witness with an arrest, but only as to whether he had a plea deal. (Tr. 669.) The court then stated that Johnson was getting into a

-30-

collateral matter, and that he would not allow Johnson's counsel to inquire. (Tr. 671.) Johnson's counsel did not request to make an offer of proof outside the hearing of the jury with Powell. (Tr. 673.)

## O.   *Bryant Burton*

Bryant Burton (a/k/a "Paint") testified pursuant to a cooperation agreement with the Government after pleading guilty to Count One, the cocaine conspiracy. Burton testified that he knew Johnson, whom he referred to as "Chopper," growing up in Los Angeles, and that he and Johnson moved to Kansas City in 1993 in order to sell drugs, because the profit was higher in Kansas City. (Tr. 752, 754.)

Burton testified that in 2002, he bought two to three kilograms cocaine per month from Rios, and that Burton also dealt drugs with Johnson. (Tr. 760.) Burton further testified that Dale and Johnson "was hustling together," which was selling cocaine. (Tr. 761-62.)

Burton testified that he was in California when Rios and Raya were killed, and that he heard about the murders from "White Mike" (Michael Matthews). (Tr. 762-63.) Burton testified that shortly after the murders, Johnson had some cocaine he wanted to sell, and that Burton sold the cocaine to "E-Baby" (Eric Noel). (Tr. 763.)

-31-

Burton also testified that in the spring of 2004, during the charged drug conspiracy in Count One, he ran into Dale at a club and they had a conversation about the Mexicans. (Tr. 764-65.) Dale told Burton that "the Mexican was slippin'." (Tr. 765.) Dale also told Burton that "That's how the game go. No different from me and you. Somebody catch you slippin', that's how they gonna do you." (Tr. 766.)

Burton also testified that he called Johnson and asked him about Rios' murder. (Tr. 768.) Johnson told Burton that he took somebody over to Snapper's house to purchase some cocaine, and "about the time he looked up, the motherfucker went crazy and got to shootin.'" (Tr. 768.) Burton testified that he was mad and frustrated, and asked Johnson why would he take somebody over there. (Tr. 768.) Johnson said, "Man you just need to calm down. You know how it go. That's how the game go." (Tr. 768-69.)

## P.    *Eric Noel*

Noel, who also was known as "E-Baby," testified that he bought approximately ten kilograms of cocaine a month from Johnson. (Tr. 702-04.) Noel also said he bought cocaine from Rios, but that Rios cut the dope, so it was of lesser quality. (Tr. 705.) Noel testified that Rios "had a real unique way he used to rewrap the package as if the package was not

-32-

tampered with, with a nice grade of tape." (Tr. 706.)  Noel testified that

shortly after Rios died, Burton sold him two kilograms of cocaine for

$40,000, and that the way the cocaine was taped and wrapped, reminded

him of Rios, "the color of it and the way he wrapped it."  (Tr. 707.)

### Q.    *Michael Matthews*

Matthews, who was also known as "White Mike," testified that Rios

was a good friend, and that he bought drugs from Rios.  (Tr. 510.)

Matthews testified that when he arranged a drug deal with Rios, a phone

call always preceded the deal – either he called Rios or Rios called him and

told him to come get the drugs.  (Tr. 510-11.)  Rios informed Matthews that

he had sold cocaine to both Burton and Johnson.  (Tr. 513.)  Matthews

found out that Rios had been murdered the night of December 21, 2002, and

that same night he talked to Burton, who was in California, about the

murders.  (Tr. 518-19.)

### R.    *Henry Abrought*

Henry Abrought (a/k/a "Honeyman") testified that from 2002 to 2004,

he bought cocaine from Burton and Johnson.  (Tr. 682.)  Abrought testified

that he met them at a house at 75th and Prospect in Kansas City in order to

buy the cocaine.  (Tr. 684.)  Abrought estimated that he bought four to nine

Appellate Case: 08-3172     Page: 43     Date Filed: 06/09/2009 Entry ID: 3555529

ounces of powder cocaine approximately once a week from Burton and

Johnson.  (Tr. 685.)

Appellate Case: 08-3172    Page: 44    Date Filed: 06/09/2009 Entry ID: 3555529

**S.**     ***Jonni Curry***

Jonni Curry testified that she received no benefit from the Government for her testimony, and had no convictions. (Tr. 806.) Ms. Curry testified that she knew Johnson, and that Johnson sold drugs for a living, although he told people that he rehabbed houses. (Tr. 807.) Ms. Curry testified that in 2002, she was having financial problems, and Johnson offered to pay her money if she would allow him to store some things at her house in Kansas City, Missouri. (Tr. 809.)

Johnson provided cash to Ms. Curry for her rent and other expenses. (Tr. 809-10.) In exchange, Johnson stored marijuana, cocaine, ecstasy, weapons, cash, and narcotics packaging equipment at her house. (Tr. 810-11, 823.) Ms. Curry testified that Johnson would weigh out cocaine at her house and put it into bags, and that he also cooked powder cocaine into crack, and that Burton assisted Johnson in counting and packaging drugs at her house. (Tr. 812, 816.)

Johnson had Ms. Curry take cash to the bank and trade $20 bills for $100 bills. (Tr. 814-15.) She bought plastic bags at Johnson's request, approximately eight to ten times. (Tr. 816.) Her utility bills were in

Appellate Case: 08-3172     Page: 45     Date Filed: 06/09/2009 Entry ID: 3555529

Johnson's name – copies of those bills were placed into evidence at trial. (Tr. 819-20.)

**T.** __Lori Nelson__

Lori Nelson, financial analyst for the United States Attorney's Office, testified that she examined business records and found that Burton and Johnson registered the business "Yo Neighborhood Records" as co-owners in May 1996, and that they incorporated that business in 1997. (Tr. 831-32.) Ms. Nelson also testified that for the years 2002, 2003, and 2004, Johnson had no reported income. (Tr. 837.)

**U.** __Special Agent Robert Plant__

FBI Special Agent Robert Plant testified regarding the phone records of Rios, Johnson, and Dale. The records indicated that on December 20, 2002, Johnson called Rios six times, and Rios called Johnson five times. (Tr. 875.) The last call Rios made or received was a call to Johnson at 7:21 p.m. on December 20, 2002. (Tr. 875-76.) Agent Plant testified that Johnson and Dale called each other six times December 20, 2002, but there was a gap in their calls that evening, from 6:57 p.m. to 8:13 p.m. (Tr. 878-79.)

Appellate Case: 08-3172    Page: 46    Date Filed: 06/09/2009 Entry ID: 3555529

Agent Plant also obtained Southwest Airlines flight information for Bryant Burton, showing that he left Kansas City and traveled to Los Angeles on December 19, 2002, and returned to Kansas City on December 25, 2002.  (Tr. 880-81.)

Appellate Case: 08-3172     Page: 47     Date Filed: 06/09/2009 Entry ID: 3555529

# SUMMARY OF THE ARGUMENTS

Dale claims his tape-recorded statement to Anthony Smith should have been suppressed by the district court, but the uncontradicted evidence shows Dale made the statement freely and voluntarily, with no violation of his constitutional rights. Johnson claims that Dale's tape-recorded statement was improperly redacted, which violated his Sixth Amendment confrontation rights. However, the statement was redacted with neutral pronouns, and in any case was non-testimonial, so it need not have been redacted at all.

Both Dale and Johnson claim the district court abused its discretion in denying their motions to sever; however they have demonstrated no prejudice from their joint trial, given that all statements made by either defendant were non-testimonial, and so could have been admitted without redaction.

Both Dale and Johnson also claim their various motions for mistrial should have been granted, but the district court, in the best position to judge the effect of the evidence or argument, considered and denied their requests. Both Dale and Johnson also claim the district court abused its discretion in

-38-

retaining a juror. However, the juror stated he could be "very impartial," so the district court did not err by allowing him to deliberate.

Johnson claims the district court erred in limiting his cross-examination of two witnesses, but since he was allowed to impeach the witnesses through other means, the limitation was not error. Johnson also claims that insufficient evidence supported the jury's guilty verdicts. On the contrary, numerous witnesses testified to Johnson's involvement in the cocaine conspiracy in Count One, and that testimony was corroborated by physical evidence and his unexplained income. Johnson made admissions to an informant and police which support his convictions for Count Two and Three; those uncontradicted admissions were corroborated by phone records and circumstantial evidence.

Finally, Johnson claims the district court erred in imposing his Guidelines sentence of life imprisonment on Count One. That sentence, however, was supported by evidence at trial as well as Johnson's criminal history, and thus was properly determined and reasonable.

Appellate Case: 08-3172    Page: 49    Date Filed: 06/09/2009 Entry ID: 3555529

# ARGUMENTS

## I.

**The district court correctly denied Dale's motion to suppress his tape-recorded statement to an informant, since the statement was voluntary and did not violate Dale's Sixth Amendment right to counsel.**

In his first point, Dale claims the district court erred in denying his motion to suppress the tape-recorded statement he made to a government informant, on the theory that it violated his Sixth Amendment and substantive due process rights.

Dale's statement, however, was freely and voluntarily made, and was made to a confidential informant when Dale was represented by counsel on a separate case, which is not a Sixth Amendment violation. Consequently, as Dale more or less conceded at the suppression hearing – asking the court to "extend the law" to cover his argument – there was simply no legal or constitutional basis for suppressing Dale's voluntary, inculpatory statement.

## A. *Standard of Review*

When reviewing a ruling on a motion to suppress evidence, this Court reviews a district court's factual findings for clear error and reviews *de novo* the ultimate question of whether there has been a constitutional violation. *United States v. Hines*, 387 F.3d 690, 694 (8th Cir. 2004); *United States v.*

-40-

*Hessman*, 369 F.3d 1016, 1019 (8th Cir. 2004). This Court will affirm the district court's order denying a motion to suppress evidence unless the decision is: (1) unsupported by substantial evidence; (2) is based on an erroneous view of the applicable law; or (3) leaves this Court with a firm and definite conviction that a mistake has been made. *Hines*, *id.*; *United States v. Weleford*, 356 F. 3d 932, 935 (8th Cir. 2004).

**B.**      ***Discussion***

      *1.*      *Sixth Amendment Right to Counsel*

Dale argues his Sixth Amendment right to the assistance of counsel was violated when authorities placed recording equipment on Smith while Dale was represented by Daniel Ross in Dale's 2005 drug case. However, the Sixth Amendment right to counsel does not attach unless and until charges on the subject of the interrogation have been filed. *United States v. Ingle*, 157 F.3d 1147, 1151 (8th Cir. 1998) (citing *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). The Supreme Court has made clear that the Sixth Amendment right to counsel is "offense specific" and "cannot be invoked once for all future prosecutions." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Accordingly, an accused may be interrogated about unrelated, uncharged offenses to which the right of counsel has not yet

-41-

attached. *Moran v. Burbine*, 475 U.S. 412, 431 (1986). "Such statements, even though deliberately elicited by government agents after indictment and in the absence of counsel, may form the basis for a separate indictment and may be offered to prove such additional charges." *United States v. Grego*, 724 F.2d 701, 703 (8th Cir. 1984) (recordings admissible where they were made before defendant was indicted for offense to which the statement related).

Dale argues that the proposed proffer letter implicated Dale's Sixth Amendment right to counsel, because Mr. Ross would represent Dale on any other matters involved in the proffer session. This argument fails because: (1) no proffer session ever occurred; (2) neither party agreed to the terms of the proffer letter; and (3) most importantly, Dale was not charged with the murders until approximately six months after the recorded statement was made.

Additionally, Dale's argument is contrary to established law; indeed, at the suppression hearing, Dale's counsel acknowledged as much and asked the court to "consider perhaps extending the law in that regard." (Supp. Tr. I at 5.) The Sixth Amendment right to counsel "becomes applicable only when the government's role shifts from investigation to accusation." *Moran*

-42-

Appellate Case: 08-3172     Page: 52     Date Filed: 06/09/2009 Entry ID: 3555529

*v. Burbine*, 475 U.S. 412, 430 (1986). Because Dale had not been indicted for the murders of Anthony Rios and Olivia Raya at the time the tape-recording took place, his

his Sixth Amendment rights with respect to those crimes could not have been violated.

2.      *Substantive Due Process*

Dale originally argued in his motion to suppress his statement that his due process rights were violated by Anthony Smith's "pretrial confrontation" while Dale was represented by counsel in another case. Dale now claims that his tape-recorded statement should be suppressed because the Government's conduct was so outrageous that it violated his substantive due process rights. (D.E. 111; Dale Brf. 35.)

The substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128 (1992)).

Dale claims that the Government's placement of himself and his longtime friend Anthony Smith in the same van together for transport to and

-43-

from the federal courthouse was outrageous, arbitrary, oppressive, and shocks the conscience. He did not raise this claim before the district court in his motion to suppress, but rather questioned a witness about it for the first time on the second day of the suppression hearing. (Supp. Tr. II at 41.) Thus, the Government was not prepared meet allegations that it had violated the court's detention order and falsified documents.[9]

The document which contained a false statement was a prisoner call-up sheet, which the marshal sends daily by facsimile transmission to the various facilities housing federal prisoners, so that the facilities know which prisoners are to be brought to the courthouse.[10] It is probably a stretch to call the fax a document -- it is not something prepared for court, presented to the court, or preserved for any official purpose. In fact, the general accuracy of daily call-up sheets was not litigated, nor was any evidence presented as to the reason that this particular call-up sheet was inaccurate,

---

[9]The Government noted in supplemental briefing on the suppression issue that it had not been prepared to present evidence that it had violated the court's detention order and submitted an inaccurate call-up sheet to the Bates County jail, and requested a chance to present evidence on those issues if the court was inclined to grant Dale's motion. (D.E. 141.) Once the court recommended denial of the motion, the matter became moot.

[10]A faxed copy of the call-up sheet is attached as page__ of the appendix.

-44-

because again, Dale did not raise the issue before the second portion of the suppression hearing. If the call-up sheet was "deliberately falsified," as Dale repeatedly states in his brief, it might have been so that Dale himself did not know that the Government planned to record his statements.

Government agents are permitted to use subterfuge and "to conceal the identity of its agents" in the investigation of crime. *United States v. Wright*, 641 F.2d 602, 604-05 (8th Cir. 1981) (quoting *Lewis v. United States*, 385 U.S. 206, 426 (1966)). The planned recording of Dale was an undercover operation, and even if there was a deliberate misrepresentation on the call-up sheet, it would be permissible, and possibly necessary, to protect Smith from Dale, a man reported to have committed three murders.

Dale's other claim of outrageous government conduct is the violation of that portion of the magistrate court's detention order stating that sentenced prisoners be kept separate from those awaiting trial, "to the extent practicable." Smith was a sentenced prisoner while Dale was at that time awaiting trial; however the detention order itself is conditional. As Deputy Schnieders testified, with over 700 prisoners in the custody of the United States Marshal, it is virtually impossible if not actually impossible, to keep sentenced prisoners separate from those awaiting trial. (Supp. Tr. II at 49.)

-45-

As an example, from September 26, 2006, until November 26, 2007, Dale was both a sentenced prisoner as well as a prisoner awaiting trial, and so no matter who he was housed with, or transported with, there would be a technical violation of detention orders. Further, Smith testified at trial that he and Dale were cell mates in Bates County. (Tr. 457.) Thus, their trip together in the van was no different than their being housed together, neither of which affected Dale's constitutional rights. Again, the Government did not present evidence on this issue, as it was not raised in Dale's motion to suppress, nor expressed as a concern until the middle of the second day of the suppression hearing.

However, even were there a violation of the conditional detention order, the Supreme Court has held that the exclusionary rule should be applied primarily to deter constitutional violations. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006). In *Sanchez-Llamas*, the defendant cited a violation by police of Article 36 of the Vienna Convention (the right to consular notification for foreign nationals who have been arrested), as grounds that his statement should be suppressed. *Id.* at 340.

The Supreme Court denied his claim, noting that statutory violations must implicate important Fourth and Fifth Amendment interests in order to

-46-

be the subject of the exclusionary rule.  *Id.* at 348.  The Court found that the right to consular notification is at best remotely connected to the gathering of evidence, and has nothing to do with searches or interrogations.  *Id.* at 349.  In fact, the Court noted that Article 36 does not guarantee defendants any assistance at all, but merely secures the right of foreign nationals to have their consulate informed of their arrest or detention.  *Id.*

The Court analyzed the reasons the exclusionary rule is applied to Fourth and Fifth Amendment violations, and found those reasons absent from the consular notification context.  *Id.*  The Court noted that coerced confessions are suppressed because the coercion itself is wrong and because such confessions tend to be unreliable.  *Id.*  Suppression is applied to unreasonable searches on the theory that without a strong deterrent, the Fourth Amendment might be too easily disregarded by law enforcement.  *Id.*  However, the Court found that the failure to inform a defendant of his consular rights was unlikely to produce an unreliable confession and held suppression to be a vastly disproportionate remedy for an Article 36 violation.  *Id.  See also United States v. Ortiz*, 315 F.3d 873 (8th Cir. 2002), in which this Court anticipated the Supreme Court's ruling in *Sanchez-Llamas*, holding that even if there were a violation of Vienna Convention

-47-

notification rights, and even if the Convention created an individually enforceable right, it would not follow that a defendant's statement taken in violation of the treaty should be excluded merely because the Convention was violated. *Id.* at 886.

Likewise in this case, a violation of a pre-trial detention order regarding the separation of prisoners does not implicate an important Fourth or Fifth Amendment right. Also, the request to keep prisoners separated is remotely, if at all, connected to the gathering of evidence, and has nothing to do with searches or interrogations. And, like Article 36, the detention order does not guarantee defendants any assistance or remedy for a violation.

Numerous cases hold that, in cases involving statutory violations, exclusion is generally disfavored as a remedy, and the evidence will be admitted unless the statute expressly authorizes or requires its exclusion. *United States v. Young*, 533 F.3d 453, 462 (6th Cir. 2008). In *Young*, the Sixth Circuit reversed the district court's exclusion of a late-discovered government witness. In explaining, its reasons for the reversal, the court began by stressing that the exclusion of evidence based on a statutory

-48-

violation is generally impermissible unless the statute itself directs or

authorizes such exclusion:

> As a general matter, where a statute does not specifically provide for the exclusion of evidence in the event of a violation, federal courts disfavor exclusion as a judicially-fashioned remedy. *See United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006) ("[T]here is no exclusionary rule generally applicable to statutory violations." (collecting cases)). Sound policy supports its disfavor, and the Supreme Court has "repeatedly emphasized that the [exclusionary] rule's 'costly toll' upon truth-seeking and law enforcement objectives presents a high obstacle for those urging application of the rule." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 364-65, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998); *see also Hudson v. Michigan*, 547 U.S. 586, 591, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) ("Suppression of evidence ... has always been our last resort, not our first impulse."). Given exclusion's high cost, federal courts invoke it only where its " 'remedial objectives are thought most efficaciously served.'" *United States v. Leon*, 468 U.S. 897, 908, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974)). "[D]eter[ring] constitutional violations" best serves exclusion's remedial objectives. *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 126 S.Ct. 2669, 2680, 165 L.Ed.2d 557 (2006) (noting a particular emphasis on Fourth Amendment violations). Indeed, the few suppression cases focused on statutory violations "implicated important  Fourth and Fifth Amendment interests." *Id.* at 2681.

*Young*, 533 F.3d at 462.

In this case, of course, the Government was not accused of violating a

statute, a federal rule of criminal law or procedure, or even a local district

court rule.  Rather, the rule at issue was a standard conditional detention

order, an order that does not call for, or even support, the suppression of

-49-

Dale's otherwise voluntary statement. Dale's statement was not just

voluntary; it virtually boasted about the murder of two people (Dale's

statements in italics):

> *"But this murder it get beat, cuz. You don't have no murder
> weapon. You don't have no witness. You ain't got no DNA."*

 (Gov. Appx. 32.)

> *"But the thing about it . . . I'm a ghost, blood. I ain't called
> this dude that don't know me."*

(Gov. Appx. 36.)

> *"They'll run off there (sic) lie, Cuz. Can't leave no witness,
> witnesses alive. They'll make it, they'll prep 'em".*

Smith: "Mmm. hmm."

Dale: *"That's why the case is so beautiful and they hate it."*

(Gov. Appx. 38.)

> *"When the bitch heard the noise. Pop! Pop!"*

Smith: "Mmm. hmm."

Dale: *"She played it off."*

(Gov. Appx. 66.)

> *"The way we came in I would've never let a nigger come in my
> house like I looked."*

(Gov. Appx. 68.)

> *"You have no business letting nobody in your house."*

-50-

(Gov. Appx. 69.)

The magistrate judge agreed that the statement was voluntary, finding no evidence that Smith threatened or intimidated Dale to get him to talk in the van, and that statement itself gave no indication that Dale felt intimidated by Smith or by his surroundings. (R&R 14.) "The fact that the government encouraged the conversation, and [Dale's] attempt to pass off his incriminating statements as "jailhouse bluster," do not establish the kind of coercive police activity that renders a confession involuntary." *Ingle* 157 F.3d at 1150. (R&R 14.) Significantly, Dale does not even argue his statement was involuntary.

A violation of the detention order that sentenced prisoners be kept separate, to the extent practicable, from unsentenced prisoners, does not operate to make Dale's statements involuntary, nor does it endow Dale with an additional constitutional right. Nor would an error in the marshal's call-up sheet indicating that Smith was to be brought to court for an initial appearance. Even put in its worst light, this Government conduct falls far short of "only the most egregious official conduct" which violates a defendant's constitutional rights. *Lewis*, 523 U.S. at 846 (citing *Harker Heights*, 503 U.S. at 129). It does not fall "within the 'narrow band' of the

-51-

'most intolerable government conduct'" that violates substantive due process rights. *United States v. Boone*, 437 F.3d 829, 841 (8th Cir. 2006) (quoting *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993)).

The district court did not, for any of the reasons Dale now advances, err in refusing to suppress his voluntary, inculpatory statements.

Appellate Case: 08-3172   Page: 62   Date Filed: 06/09/2009 Entry ID: 3555529

## II.

**The district court did not err by acquiescing to Johnson's request that the court present redacted versions of Dale's admissions to an informant, since (1) a defendant may not complain about an error that he invited; (2) the redactions were not improperly made; and (3) the recorded statement was "non-testimonial," so there was no requirement that it be redacted at all.**

In his first point, Johnson claims the district court plainly erred by not declaring a mistrial when the redacted statement Dale made to Smith was presented to the jury. In fact, Johnson's counsel had urged the playing of the redacted statement and only raised a claim of error after the guilty verdicts, in his motion for new trial. The redactions were unnecessary, since the statements were not testimonial, and in any case, complied with Eighth Circuit law by using a neutral pronoun; thus Johnson's argument fails.

### A.    *Standard of Review*

The proposed redactions were provided to Johnson before trial, and he did not object at any time during the trial. In fact, he urged the district court to present the redacted statement, arguing that it was not admissible as a statement of a  co-conspirator. Normally, where a defendant fails to object to the presentation of evidence, the admission of the evidence will be reviewed for plain error. *United States v. Looking Cloud*, 419 F.3d 781, 785

-53-

(8th Cir. 2005). However, since Johnson's attorney actively joined in the presentation of that evidence, by urging the admission of the redacted tape-recording, any error was invited, and cannot provide Johnson with a basis for reversing his conviction. *United States v. Jimenez*, 509 F.3d 682, 691 (5th Cir. 2007).

**B.** **_Discussion_**

Johnson now argues that Dale's tape-recorded statement was not redacted to comply with *Bruton v. United States*, 391 U.S. 123, 126 (1968). Although Dale made admissions to four other men who testified at trial, Johnson does not argue that the admission of those redacted statements were erroneous. In redacting Dale's statement, the Government followed this Court's case law suggesting the use of a neutral pronoun. But even if there was some error in making the redactions, Dale's statement to Smith was non-testimonial and need not have been redacted at all; accordingly Johnson was not prejudiced.

Johnson suggests the use of a neutral pronoun in the transcript of the statement was so obvious a redaction as to lead the jury to defendant Johnson. However, the use of a neutral pronoun (*i.e.*, "another person" or "someone") is the favored method of redaction. *United States v. Coleman*,

-54-

349 F.3d 1077, 1086 (8th Cir. 2003). "We conclude the district court's decision to admit nontestifying defendant admissions, redacted as to codefendants by the use of pronouns and other neutral words, and accompanied by appropriate limiting instructions, was consistent with this court's decisions . . ." *United States v. Edwards*, 159 F.3d 1117, 1126 (8th Cir. 1998), *cert. denied*, 528 U.S. 825 (1999).

Johnson is correct in pointing out that his name was deleted out of the audio recording. No instructions for redacting an audio statement can be found in this Court's jurisprudence, and in the absence of any objection or suggestions for alternate methods of redaction, the method used – deleting Johnson's name – appears to have been an acceptable, and, in fact, the only feasible method of redaction.

Additionally, the jury was instructed to consider the statement against only Dale. At Johnson's request, Judge Whipple instructed the jury as follows:

> Ladies and gentlemen of the jury, the attorneys have requested that I further advise you that this tape is introduced for you to consider in the case against the defendant Michael Dale only, not against Defendant Johnson.

(Tr. 500.)

-55-

Johnson also complains about the number of redactions (30) that were made to the transcript. (Johnson Brf. 26.) However, the transcript of the recording was 76 pages long, with 22 lines per page and lasted for more than one hour and 11 minutes. (Govt. Appx. —.) Placed in that context, the number of redactions was not substantial.

Moreover, not only did Johnson fail to object to the redactions or suggest any changes, he requested that the redacted statement be played to the jury. He told the court:

> [O]ur position is that the Government has already made and prepared a redacted tape that excludes Mr. Johnson's main reference to him. That is the tape that we think should be played, Your Honor, if it's going to be admitted, period. Your Honor, that's the tape that should be played.

(Tr. 399.)

Accordingly, even if there were error in redaction, it was invited error about which Johnson may not now complain. *Jimenez*, 509 F.3d at 691.

1. *The Confrontation Clause does not apply to non-testimonial statements*

The Government contends that Dale's tape-recorded statement to Smith was non-testimonial and need not have been redacted at all; accordingly Johnson was not prejudiced by any improper redactions. The Supreme Court declared in *Crawford v. Washington*, 541 U.S. 36 (2004),

-56-

that the Confrontation Clause prohibits the admission into evidence of out-of-court "testimonial" statements against a criminal defendant, unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. Specifically, *Crawford* concluded that the Confrontation Clause applies to witnesses against the accused – in other words, those who bear testimony. *Id*. at 51 (citation omitted). The *Crawford* decision continued:

> "Testimony," in turn, is typically "[a] a solemn declaration or affirmation made for the purpose of establishing or proving some fact." [2 N. Webster, An American Dictionary of the English Language (1828).] An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Id*. *Crawford* pointedly analyzed police interrogations and determined that "statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." *Id*. at 52. However, in defining what constituted a "testimonial" statement, *Crawford* did not confine its definition to police interrogations. Rather,

> [v]arious formulations of this core class of "testimonial statements exist: "ex parte in-court testimony or its functional equivalent –  that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar statements that declarants would reasonably expect to be used prosecutorially" . . . "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or [formal]

-57-

confessions . . .;" *statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial*," . . . These formulations all share a common nucleus and then define the [Confrontation] Clause's coverage around it.

541 U.S. at 52 (internal citations omitted; emphasis added).

The Supreme Court has held that the Confrontation Clause does not apply to *non-testimonial* out-of-court statements. *Davis v. Washington*, 547 U.S. 813 (2006). In *Davis*, the Court expressly determined that the Sixth Amendment right to confrontation only extends to "testimonial" statements – statements made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial, like a formal police interrogation – "or, put differently, the Confrontation Clause simply has no application to nontestimonial statements." *United States v. Feliz*, 467 F.3d 227, 231 (2d Cir. 2006) (citing *Davis*, 547 U.S. 824); *see also United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007) (Confrontation Clause poses no bar to the admission of out-of-court statements by a defendant admitting his role in a triple murder). The circumstances surrounding non-testimonial hearsay "do not raise the same confrontation concerns as the introduction of witness statements

-58-

previously made in court proceedings or during police interrogations."
*United States v. Lee*, 374 F.3d 637, 645 (8th Cir. 2004).

In *Bruton*, the Supreme Court held that Bruton's *confrontation rights* were violated by the introduction into evidence of the post-arrest confession *made to police* by his non-testifying co-defendant that implicated Bruton by name in the commission of the crime. Because the co-defendant's confession to police explicitly named him, the Court deemed it to be so "powerfully incriminating" as to Bruton that it was unlikely that the jury would have been able to follow the trial court's limiting instruction. *Id.*, 391 U.S. at 135-36.

Subsequently, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court considered whether a defendant's right of confrontation had been violated by the admission of a co-defendant's confession *to police* from which all reference to the defendant had been deleted, but nonetheless contextually implicated her in the crime when linked with the other evidence in the case. The Supreme Court, however, expressly rejected the theory of contextual implication, recognizing the important distinction between confessions which explicitly incriminate the defendant and those

-59-

which become incriminating only when linked to other evidence introduced at trial. *Richardson*, 481 U.S. at 208.

The Supreme Court revisited the *Bruton* confrontation issue in *Gray v. Maryland*, 523 U.S. 185 (1998), where a co-defendant's confession *to police* was redacted to replace the defendant's name with either a blank space or the word "deleted." Recognizing that it would likely be obvious to a jury that the blank space in the co-defendant's confession referred to the defendant, even without looking to any other evidence in the case, the Court determined that there was a Confrontation Clause violation and reversed the conviction. *Gray*, 523 U.S. at 195.

*Bruton*, *Richardson*, and *Gray* indicate that a co-defendant's "testimonial" statement should be redacted to omit the defendant's identity, without obviously informing the jury that the statement has been altered, even if the jury might infer from other evidence that the defendant is implicated by the co-defendant's statement. *Gray*, 523 U.S. at 195.

However, after *Crawford* and *Davis*, "the inquiry under the Confrontation Clause is whether the statement at issue is testimonial. If so, the Confrontation Clause requirements of unavailability and prior cross-examination apply. If not, the Confrontation Clause poses no bar to the

-60-

statement's admission." *Williams*, 506 F.3d at 156 (quoting *Feliz*, 467 F.3d at 232); *United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008) ("As *Crawford* and later Supreme Court cases make clear, a statement must be 'testimonial' to be excludable under the Confrontation Clause"); *see* Tom Lininger, *Reconceptualizing Confrontation After Davis*, 85 Tex.L.Rev. 271, 280 (2006) ("The *Davis* Court indicated plainly that the protections of the Confrontation Clause are limited to testimonial hearsay.")

In *United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008), Dr. Adaobi Udeozor was convicted for conspiracy to hold another in involuntary servitude and for harboring a juvenile. On appeal, she complained that the district court improperly admitted recorded telephone conversations between her co-conspirator husband and the victim in violation of the Confrontation Clause. *Id*. Her husband had fled the country, and was not available at trial. The trial court admitted the recorded conversations – to which Udeozor had not been a party – into evidence against her because the statements made by her husband were against his penal interest and therefore qualified as an exception to the hearsay rule under Fed. R. Evid. 804(b)(3). The district court admitted the recorded conversations even though the defense argued that the victim recorded the conversations at the

-61-

Government's behest.  The Fourth Circuit affirmed the conviction,

explaining:

> The Sixth Amendment is not structured as a set of investigatory restraints upon the government.  Rather it confers a set of critical trial and pretrial rights.  The conferral of any right, however, is bounded by the text and terms of the grant. *Crawford*'s conception of the right to confront one's accusers – broad and generous as it is – is not so untethered from the Sixth Amendment text that it would wholly disable an opposing party from presenting otherwise admissible, nontestimonial evidence. *The intent of the police officers or investigators is relevant to the determination of whether a statement is "testimonial" only if it is first the case that a person in the position of the declarant reasonably would have expected that his statements would be used prosecutorially.*

*Udeozor*, 515 F.3d at 270 (emphasis added).

Out-of-court statements cannot be deemed "testimonial" in the

absence of any expectations on the part of the declarant that his statements

will be used later at trial.  The Fourth Circuit specifically reasoned that:

> [the husband's] recorded statements are not "testimonial" for purposes of the Confrontation Clause.  This is true for several reasons.  First, [the husband's] statements on the tapes do not fall within any of the explicit examples of testimonial statements set forth in *Crawford* or *Davis*.  His statements were made not as part of prior testimony at a preliminary hearing, before a grand jury, or at a former trial, nor were they made during police interrogation.  Neither were [the husband's] statements, as in *Davis*, taken by police at the scene of a crime in the absence of an ongoing emergency.

-62-

> Second, [the husband's] statements are not testimonial because, objectively viewed, no reasonable person in [the husband's] position would have expected his statements to be used later at trial . . . in fact, he expected just the opposite . . . [he] made numerous statements to the victim that were contrary to his own penal interests, including admissions that he had hit the victim, had engaged in sexual intercourse with her, and had smuggled her into the United States illegally. Moreover, he made the victim promise that she would keep their conversation between the two of them. These statements would not have been made by a reasonable person who believed his statements would be used in a later criminal prosecution.

*Udeozor*, 515 F.3d at 269.

The Court of Appeals experienced little difficulty in dispatching Udeozor's Confrontation Clause argument and held her husband's out-of-court statements captured in the recordings to be fully admissible.

In an unreported case from the District of South Dakota, a district judge examining this issue held that although the Eighth Circuit has not addressed this precise issue, it would follow other circuits and hold that statements unwittingly made by a co-defendant to cooperating witnesses are not testimonial and thus do not trigger the protections of the Confrontation Clause under *Bruton*. *United States v. Graham*, Nos. Cr. 08-50079-01, Cr. 08-50079-02, 2008 WL 5424142 at *10-11 (D.S.D. Dec. 27, 2008).

-63-

In *Graham*, the defendant charged with murder moved for severance on the ground that his confrontation rights under the Sixth Amendment would be violated by a joint trial because statements of his co-defendant were inculpatory toward Graham. *Id.* at \*3. The district court engaged in an analysis of *Crawford* and *Bruton*, and then looked at four other circuits that had directly addressed the issue of whether a statement made by a defendant unwittingly to a government informant is "testimonial." *Id.* at \*10. The court found that "[a]ll four courts have held that such statements are *not* testimonial." *Id.* (citing *United States v. Watson*, 525 F.3d 583, 589 (7th Cir. 2008); *United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006); *United States v. Hendricks*, 395 F.3d 173, 182-84 (3d Cir. 2005); *United States v. Saget*, 377 F.3d 223, 229-30 (2d Cir. 2004)).

The Third Circuit, in *Hendricks*, considered the issue of whether a confidential informant, acting on behalf of the Government, elicits a testimonial statement from the defendant that can be used in prosecution, even when the informant later becomes unavailable for trial. *Hendricks*, 395 F.3d at 182-83. The court held that whether the statement is testimonial is to be judged from the standpoint of the declarant (the defendant), and not from the standpoint of the informant, and so the surreptitious recordings

-64-

were admissible. *Id.* at 183-84. *See also Watson*, 525 F.3d at 589 (holding that defendant's private, secretly recorded statement to an informant was non-testimonial and thus not subject to the Confrontation Clause).

In short, if an out-of-court statement does not meet the definition of "testimonial" hearsay, the Confrontation Clause inquiry ends, *Bruton* has no application, so that the statement need not have been redacted at all, making any errors in redaction harmless.

Moreover, as earlier emphasized, Johnson's attorney urged the court to present Dale's statement in the exact form that it was given to the jury. (Tr. 399.) Assuming, solely for the sake of argument, that the redactions were improper or incomplete, any error was invited, and precludes relief, under any standard of review. *Jimenez*, 509 F.3d at 691.

Lastly, even if the statement had been testimonial, and required redaction, and even if Johnson's attorney had not invited the supposed error, *Bruton* error is subject to a harmless-error analysis. *Coleman*, 349 F.3d at 1086 (citing *Edwards*, 159 F.3d at 1128). *Bruton* error will not require reversal if it is merely cumulative to other "largely uncontroverted evidence properly before the jury." *Coleman*, 349 F.3d at 1086 (quoting *Brown v. United States*, 411 U.S. 223, 231 (1973)).

-65-

In this case, Dale's redacted references to Johnson's involvement in the murders were corroborated by (1) Johnson's confession to Bryant Burton; (2) telephone records showing numerous calls between Johnson and Rios the day of the murders; (3) evidence that Johnson was the last person to talk to Rios over the phone; (4) Johnson's statement to police that "a lot" of people die immediately after talking to him; (5) evidence that he changed his flight from Kansas City to Los Angeles the day before the murders; (6) his illegal purchase of just under $15,000 in money orders upon his return to Kansas City; (7) his possession of approximately $5,000 cash soon after the murders; (8) his possession of three pairs of the same type of shoes one of the killers wore; and (9) other circumstantial evidence presented by the Government.

Consequently, since the evidence against Johnson was strong and largely uncontroverted, any potential *Bruton* error would be harmless beyond a reasonable doubt. However, since, in this case, there was no requirement that the statement be redacted, and since Johnson's attorney urged that the statement be presented to the jury in its redacted form, Johnson has no cause for complaint.

Appellate Case: 08-3172    Page: 76    Date Filed: 06/09/2009 Entry ID: 3555529

# III.

**The district court did not abuse its discretion in denying the severance motions filed by Dale and Johnson, because Dale and Johnson were charged co-conspirators and can demonstrate no clear or substantial prejudice from a joint trial, and because the jury was properly instructed to consider evidence separately against each defendant.**

In Dale's second point and Johnson's third point, they both claim that the district court abused its discretion by denying their motions to sever. However, since Dale and Johnson were charged co-conspirators and can demonstrate no clear or substantial prejudice from a joint trial, they were properly tried together.

## A.    *Standard of Review*

A denial of a motion to sever will not be reversed "unless the appellant demonstrates an abuse of discretion resulting in clear prejudice." *United States v. Flores*, 362 F.3d 1030, 1039 (8th Cir. 2004) (citing *United States v. Pherigo*, 327 F.3d 690, 693 (8th Cir. 2003). Because defendants who are jointly indicted on similar evidence from the same or related events should normally be tried together, to warrant severance a defendant must show "real prejudice," that is, something more than the mere fact that he would have had a better chance for acquittal had he been tried separately. *United States v. Michelson*, 378 F.3d 810, 817-18 (8th Cir.1994).

-67-

## B.   *Discussion*

Rule 14 of the Federal Rules of Criminal Procedure, governs the severance of both defendants and offenses in a single indictment.[11] A motion for severance is addressed to the discretion of the trial court. *Zafiro v. United States*, 506 U.S. 534, 541 (1993); *United States v. Shivers*, 66 F.3d 938, 939 (8th Cir. 1995).  The Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 538.

In order to prevail on a severance motion, a defendant must show not simply prejudice but "clear" or "substantial" prejudice.  *United States v. Mansaw*, 714 F.2d 785, 790 (8th Cir. 1983); *United States v. Melina*,

_____

[11]Rule 14.  Relief from Prejudicial Joinder

> If it appears that a defendant or the government is prejudiced by a joinder of offense or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.  In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

-68-

101 F.3d 567, 571 (8th Cir. 1996). Severance will not be granted by a mere showing that a particular defendant may have a better chance of acquittal if severed. *Zafiro*, 506 U.S. at 539; *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996). A joint trial "gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome." *United States v. Darden*, 70 F.3d 1507, 1527-28 (8th Cir. 1995). Additionally, joint trials serve the interests of justice by avoiding "the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537.

Dale cites one claim of prejudice from the district court's denial of his motion to sever: Johnson's redacted admission to Burton that he participated in the murders of Rios and Raya. Johnson cites three general areas of prejudice: Dale's redacted admissions to Smith and Burton; limits on cross-examination of two witnesses (addressed in Argument VI of this brief); and spillover prejudice. All claims fall short of the "clear" prejudice required for severance.

The third co-defendant in this case, Bryant Burton, pled guilty and testified about conversations he had with both Dale and Johnson in which both admitted their involvement in the murders of Rios and Raya. Dale claims the redacted admission of Johnson's statement violated Dale's Sixth

-69-

Amendment right to confrontation as outlined in *Bruton v. United States*, 391 U.S. 123 (1968), which created grounds for severance. Johnson also claims the redacted admissions Dale made to Smith and Burton compromised his Sixth Amendment confrontation rights. The Government noted in Argument II of this brief, that statements made by Dale and Johnson to confidential informants were not testimonial and accordingly, their admission, with or without redaction, did not violate the Confrontation Clause.

Although the district court ruled otherwise, the statements Johnson and Dale made to Burton constituted co-conspirator statements made in furtherance of a conspiracy pursuant to Fed. R. Evid. 801(d)(2)(E), and therefore admissible without redaction. *United States v. Beckman*, 222 F.3d 512, 522 (8th Cir. 2000). The elements the Government must prove by a preponderance of the evidence to establish co-conspirator statements are: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and, (3) the statements were made in the course and furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171 (1987); *United States v. Frazier*, 280 F.3d 835, 848 (8th Cir. 2002). As a non-testimonial statement, co-conspirator statements present no Confrontation Clause

-70-

violation. *Bourjaily*, 483 U.S. at 176; *United States v. Beckman*, 222 F.3d at 522 n. 7.

The Government proved that Dale and Johnson participated together in a cocaine distribution conspiracy from early 2002 to August 31, 2004, and that the statements were made in the course and furtherance of the conspiracy. Burton, along with Johnson, had been supplied drugs by Rios. During the conspiracy time frame, when he inquired about what had happened to his source, Dale explained that Johnson had set up the robbery of Rios. Burton then went to Johnson to find out Johnson's role in the murder and distribution of drugs taken in the murders. Johnson confirmed Dale's statements and told him that was the way the game was played. Both men's statements to Burton identified what happened to Burton's source of narcotics, and informed Burton of the nature of the violent drug conspiracy. As such, both defendants' statements were admissible as co-conspirator statements. *See Davis*, 457 F.3d at 825 (co-conspirators' statements that discuss the supply source for the illegal drugs or identify a co-conspirator's role in the conspiracy are considered statements made "in furtherance" of the conspiracy) (quoting *United States v. Arias*, 252 F.3d 973, 977 (8th Cir. 2001)).

-71-

Appellate Case: 08-3172    Page: 81    Date Filed: 06/09/2009 Entry ID: 3555529

Johnson also asserts prejudice from the admission of the tape-recorded evidence that did not apply to him.  This claim is "insufficient on its face to warrant severance."  *United States v. Boone*, 437 F.3d 829, 838 (8th Cir. 2006) (citing *United States v. Pecina*, 956 F.2d 186, 188 (8th Cir. 1992) ("disparity in the weight of the evidence" does not require severance)).  "There is no requirement in a joint trial the "the quantum of evidence of each defendant's culpability be equal,"" *Flores*, 362 F.3d at 1042 (quoting *United States v. Cadwell*, 864 F.2d 71, 73-74 (8th Cir. 1988)).  "Where multiple defendants are tried together, the risk of undue prejudice is best cured through cautionary instructions to the jury."  *Boone*, 437 F.3d at 838 (citing *United States v. Mickelson*, 378 F.3d 810, 817 (8th Cir. 2004)).  The district court instructed the jury to give separate consideration to the evidence about each defendant, and before the tape was played to the jury, instructed the jury to consider it against Michael Dale only.  (Instruction 24; Tr. 500.)

Even if the admissions were not testimonial, and were not properly redacted, their admission would be harmless error.  *United States v. Coleman*, 349 F.3d 1077, 1086 (8th Cir. 2003).  Dale admitted his involvement in murdering Rios and Raya to five separate witnesses: (1)

-72-

Anthony Smith; (2) Terry Taylor; (3) Charles Levingston; (4) Mitchell Powell; and (5) Bryant Burton. As noted in Argument II of the Government's brief above, any error in redaction would also be harmless as to Johnson.

Neither Dale nor Johnson has demonstrated that any specific trial right was compromised or that the joint trial prevented the jury from making a reliable judgment regarding their guilt. *See Zafiro*, 506 U.S. at 538. Having alleged prejudice in conclusory terms and failed to carry their "heavy" burden, the claims of error by both Dale and Johnson fail.

Appellate Case: 08-3172    Page: 83    Date Filed: 06/09/2009 Entry ID: 3555529

## IV.

**The district court properly denied the various motions for mistrial requested by Dale and Johnson, since the errors complained of either were not error at all, or were cured by the district court's remedial actions.**

Johnson made six requests for mistrial during the trial which he now raises on appeal, based on the following grounds: (1) a statement from an FBI agent that he was assigned to the gang task force (Tr. 400, 402); (2) an officer's statement that seized Hydroshock ammunition had been outlawed (Tr.413-15); (3) the appearance of the name "DeShawn" in the transcript of the tape recording (Tr.533-35); (4) the testimony of Henry Abrought that he bought drugs from Johnson from 2002 to 2005, which went past the conspiracy time frame (Tr.686-87); (5) Jonni Currie's testimony that she met Johnson in 1999 and knew that he sold drugs (Tr.807-08); and (6) alleged prosecutorial misconduct in closing argument. (Tr.998, 1000, 1010-12.) Dale joined in the request for mistrial regarding the admission of "gang" evidence, and also appeals the district court's denial of the motions for mistrial.

Other than Dale's argument outlining the objection to the "gang" evidence, Dale and Johnson offer very little argument or authority supporting a reversal based on their mistrial requests. Johnson cites some

-74-

authority suggesting that failure to grant numerous requests for mistrial should be viewed "cumulatively." (Johnson Brf. 51.) However, because these case are distinguishable,[12] Johnson's argument fails.

## A. *Standard of Review*

Generally speaking, a denial of a motion for mistrial is reviewed for abuse of discretion. *United States v. Smith*, 487 F.3d 618, 622 (8th Cir. 2007). "'The prejudicial effect of any improper testimony [or evidence] is determined by examining the context of the error and the strength of the evidence of the defendant's guilt.'" *Id.*; *United States v. Thompson*, 533 F.3d 964, 971 (8th Cir. 2008) (quoting *United States v. Hollins*, 432 F.3d 809, 812 (8th Cir. 2005)).

While the standard of abuse of discretion governs the review of the district court's decision concerning a mistrial request, the lack of a timely objection heightens the standard of review to the more onerous plain error standard. Late objections by Dale and Johnson have triggered the plain

---

[12]*Kyle v. Whitely,* 514 U.S. 419, 421-22 (1995), addressed the "cumulative effect"– prejudice – of multiple *Brady v. Maryland*, 373 U.S. 83 (1963), discovery violations caused by the government not turning over evidence to the defense. The issue was the cumulative effect of the defense's lack of access to the evidence, not the number of mistrial requests involved. *United States v. Baker*, 98 F.3d 330 (8th Cir. 1996), does not appear to be relevant.

Appellate Case: 08-3172     Page: 85     Date Filed: 06/09/2009 Entry ID: 3555529

error standard of review for points three and six. Furthermore, counsel rarely asked for curative action short of a mistrial, and in the one instance that a curative instruction was requested, it was given.[13] Failure to request an admonishment to the jury, a motion to strike, and/or a curative instruction in lieu of the "mistrial-or-nothing" approach, has been held to preclude a ruling in a defendant's favor. *Smith*, 487 F.3d at 622.

**B.** **_Discussion_**

    *1 .*    *"Gang" References*

In pretrial discussions with the district court, counsel for the Government stated,

> [W]e do not plan to put into our case-in-chief at this point evidence of gang membership. That is not part of our evidence. If we believe that somehow through cross-examination or through witness testimony it becomes relevant or we think that it should become admissible, we would ask leave to approach and note that to the Court.

(Tr.15.)

The implication from this discussion was that the Government would not introduce evidence of witness or defendant gang affiliation. There was no promise by the Government or ruling by the court that the word "gang"

———————————

[13]Instruction No. 11.

-76-

or that the name of a gang (*e.g.*, 51st Street) would/could not be mentioned at some point during the trial.

### a.  *Statement of FBI Agent*

On the third day of trial, at the beginning of his testimony, FBI Special Agent Robert Plant was asked where he worked, and he replied, "I'm a special agent assigned to squad one, which is the squad 50 gang task force." (Tr. 391.)  Six questions later, Johnson's attorney asked to approach the bench, and at that point brought up Agent Plant's use of the phrase "gang unit."  Admitting she was surprised by Agent Plant's answer, Kate Mahoney, an Assistant United States Attorney, said she anticipated that Agent Plant would have said "narcotics unit." (Tr.393.)[14]

There was no formal objection at this point from either Dale or Johnson, and AUSA Mahoney was allowed to continue questioning the witness.  Twenty questions later, Dale's counsel asked to approach, at which time there was a discussion about the playing of the Dale audiotape. (Tr. 397.)  Late in that conversation, Dale's counsel asked for a mistrial based upon the gang reference made by Agent Plant, a request in which Johnson

---

[14] Dale's defense counsel also acknowledged that he was surprised by Agent Plant's answer, "I thought he was in the narcotics division, as well." (Tr. 402.)

Appellate Case: 08-3172     Page: 87     Date Filed: 06/09/2009 Entry ID: 3555529

subsequently joined.  (Tr. 400, 402.)  The district court took the mistrial

motion under advisement.  (Tr. 403.)  The remaining testimony by Agent

Plant and other officers focused solely on the drug conspiracy and two

charged murders, with no further mention of the word "gang" or gang

activity.

The prejudicial effect of any improper testimony is determined by

examining the context of the error and the strength of the evidence of the

defendant's guilt.  *Smith*, 487 F.3d at 622.  One such inadvertent reference

to "gang" in an agent's job description as part of a six-day trial with 35

witnesses is a harmless event.  *United States v. Hardin* 209 F.3d 652, 664

(7th Cir. 2000) (holding that nine references to gang affiliations that were

not probative of guilt were harmless due to their scattered nature over the

course of a 12-day trial involving 42 witnesses).  In view of the "significant

evidence presented at trial" against Dale and Johnson, the "single,

non-responsive statement by witness did not mandate a mistrial."  *Smith*,

487 F.3d at 622.

Here the defense specifically rejected the use of a curative instruction,

and instead sought the extreme remedy of a "mistrial-or-nothing."  (Tr. 400.)

Such a drastic solution is disfavored by this Court.  *Id*.

-78-

> b. *Gang reference on the Dale Tape*

Dale also challenges the district court's denial of mistrial for the "gang" reference in Government's Exhibit # 19-A (hereafter "the Dale Tape"), at the six minute, twenty-four second mark when Smith told Dale that police had questioned him and asked about "a hundred . . . names, " which he did not answer.  (Tr. 28, 488.)

> DALE:    What they bringin' up Fuzzy's name for man?
>          What, what they bringing up all those names for?
>
> SMITH:   Shhhh, cuz, I don't even know man.  Fifty First to
>          Four Tre to Deuce Tre to 12th Street. . .  Bloods to
>          Crips. . .  I said man I don't. . .  I said man I've
>          been gone man.  I don't. . .  I don't know these
>          niggers man. Man I only hung with one nigger
>          man, my bro."

(Gov. Appx. 6-7.)

The references were fleeting, innocuous, obscure , and did not link either defendant to a gang; therefore the reference cannot have been prejudicial.  Again, the Government contends this is a harmless event which created no prejudice.  *See Hardin*, 209 F.3d at 664.

> 2. *Ammunition Outlawed*

During the testimony of Brad Evans, a Kansas City police officer, AUSA Mahoney asked the officer to describe physical evidence that had been recovered in a search warrant from Johnson's residence at 2415 East

Appellate Case: 08-3172     Page: 89     Date Filed: 06/09/2009 Entry ID: 3555529

75th Street, Kansas City, Missouri. (Tr. 305-20.) Officer Evans described Government Exhibit 23-T as a bag which contained about 50 rounds of ammunition. Officer Evans identified some of the ammunition as .40-caliber Hydroshock rounds, which he said, "are a certain type of bullet that was actually outlawed for a while because of the damage it's done if it enters the body parts. . . ." (Tr. 314.) At this point Johnson's counsel objected, the district court sustained the objection, and the jury was instructed to disregard that portion of Officer Evans's testimony. (Tr. 314.)

The district court assessed the matter and determined that the above instruction was sufficient to explain the matter and prevent any prejudice. *United States v. Urghart*, 469 F.3d 745, 749 (8th Cir. 2006) (district court is in the best position to craft a remedy, given that less drastic measures other than a mistrial are generally sufficient to alleviate any prejudice). The jury is presumed to follow its instructions. *United States v. Harper*, 466 F.3d 634, 647 (8th Cir. 2006).

    3.       *"DeShawn" in the Dale tape and transcript*

        a.       *Standard of Review*

Because Johnson did not object before, during, or immediately after the Dale tape was played, the admission of the evidence should be reviewed

Appellate Case: 08-3172   Page: 90   Date Filed: 06/09/2009 Entry ID: 3555529

for plain error. *United States v. Bolden*, 545 F.3d 609, 630 (8th Cir.2008) (lack of a "contemporaneous objection" triggers review for plain error). Consequently, to obtain relief, Johnson must show not only that an error occurred, but that it was plain, that it affected his substantial rights, and that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. To show that an error affected his substantial rights, the defendant must demonstrate a reasonable probability that he would have received a more favorable outcome with the error eliminated. *Id.*

      *b.*     *Discussion*

Prior to trial, the Government provided to Johnson the Dale tape with proposed redactions. While there were objections to the general admissibility of the tape, Johnson raised no objections to the form of the redactions before the tape or transcript were presented to the jury. Further, at Johnson's request, Judge Whipple instructed the jury as follows:

> Ladies and gentlemen of the jury, the attorneys have requested that I further advise you that this tape is introduced for you to consider in the case against the defendant Michael Dale only, not against Defendant Johnson.

(Tr. 499-500.)

At about the 55-minute mark of the Dale tape, Smith and Dale discuss the large number of unsolved homicides in Kansas City (55:37) and that

-81-

police were pressing Smith for information (56:24). At the (56:54) mark, Dale says the name "Deshawn" followed by an unintelligible statement referred to in the transcript as "[UI]" and then "the only reason I'm going this route cause I already wash my hands of this fucked up nigger."

The relevant portion of the transcript of the recorded statement reads as follows:

> 00:55:43.8  DALE: How many unsolved up to seventy something. Seventy-eight murders man right now.
>
> 00:55:57.4  SMITH: My lawyer said eighty.
>
> 00:55:58.5  DALE: [UI] ninety.
>
> 00:56:01.4  SMITH: Something happened last night. He said . . . cause he's like it's the detective told me that's it's eighty. He said they crunchin' on hearsay . . . everything. They about to start pickin' the motherfuckers up . . . investigatin' everything. They just kept askin' me [UI] I know you got four years and you know what I'm sayin'. I know that's nothin'. He's like uh do you wanna, you really wanna talk about Mike I said man . . . I said that's my partner man that's all I told him man.
>
> 00:56:38.3  DALE: [UI].
>
> 00:56:40.2  SMITH: Yeah.
>
> 00:56:47.0  DALE: You gotta think about what you ask, cuz. [UI].
>
> 00:56:48.7  SMITH: Huh?

-82-

00:56:49.4  DALE: You gotta think about what you ask.

00:56:51.1  SMITH: Mmm hmm.

00:56:54.6  DALE: DeShawn [UI] the only reason I'm going this route cause I already wash my hands of this fucked up nigger.

00:57:00.4  SMITH: Right.

The following day, the fourth day of trial, Johnson's counsel requested a mistrial because the name "DeShawn" appeared in the transcript that was displayed to the jury.  (Tr. 533.)  The Government took the position that while the name "DeShawn" did appear, the context was unintelligible and that portion of the conversation was neither about the murders nor indicated that the name "DeShawn" referred to Johnson.  (Tr.535.)  The district court determined it was an "incidental comment" and denied the request for a mistrial.  (Tr.534-535.)  Johnson's counsel then asked for an instruction that stated "DeShawn" was "someone other than Johnson" (Tr.536), and authored Instruction No. 11 which was given to the jury at the close of trial, and read as follows:

Instruction No. 11

You have heard a tape recording of a conversation between Anthony Smith and defendant Michael Dale.  During the recording a reference was made to a "DeShawn".  This

-83-

reference to an individual named "DeShawn" is not the
defendant Dyshawn Johnson.

The district court assessed the matter and determined that Instruction

No. 11 was sufficient to explain the matter and prevent any prejudice.

*Urghart*, 469 F.3d at 749.  As a jury is presumed to follow its instructions,

the district court neither abused its discretion nor committed plain error in

denying the motion for mistrial.  *Harper*, 466 F.3d at 647.

 *4.* <u>*Testimony of Henry Abrought*</u>

The indictment charged a conspiracy from January 1, 2002, until

August 31, 2004.  The district court disallowed the Government's proffered

"other crimes" evidence pursuant to Fed. R. Evid. 404(b) as beyond the

scope of the charged time-frame.  (Tr. 6.)

In response to a question about how often he purchased powder

cocaine from Johnson, Henry Abrought answered that the purchases had

occurred once a week from 2002 to 2005.  (Tr.685-86.)  Johnson's counsel

requested a mistrial which was overruled by the district court.  (Tr. 687.)

Gregg Coonrod, an Assistant U.S. Attorney, then followed up with series of

leading questions focused on the specific conspiracy time-frame of 2002 to

2004.  (Tr. 688.)

-84-

Again, a single such inadvertent and innocuous reference to the year 2005 as part of a six-day trial with 35 witnesses is a harmless event. *Hardin*, 209 F.3d at 664. Furthermore, Johnson did not request a curative instruction, and this Court has held that "mistrial-or-nothing" approach may preclude a ruling in his favor. *Smith* at 622.

5.    *Jonni Curry*

Jonni Curry testified how she first met Johnson in 1999, and was asked what she thought he did for a living. Based upon previous statements, Government counsel expected her answer to be that Johnson was in real estate, or that he rehabilitated houses. (Tr. 807-08.) Instead, Curry responded that Johnson was a drug dealer. (Tr. 807.) At this point, Johnson's counsel requested a mistrial stating "the question elicited evidence that has been barred from this court," but gave no further explanation for its concern. (Tr. 808.)[15]

AUSA Mahoney expressed her surprise at Curry's answer, and stated she would move on in her questioning. (Tr. 807-08.) Johnson's counsel did not make a formal objection or request a curative instruction, and the district

_____

[15] In reviewing footnote 88 in Johnson's brief, the Government deduces that the issue being raised on appeal is that Curry referred to a date outside the time frame of the charged conspiracy.

-85-

court denied the motion for mistrial. (Tr. 808.) Curry went on to describe in detail Johnson's actions during the conspiracy time frame.

Given that the evidence of Johnson's guilt on Count One was overwhelming and largely uncontroverted, a single statement by this witness that at some point before the charged conspiracy time frame she thought Johnson was a drug dealer, is not unfairly prejudicial in light of her very specific and incriminating testimony detailing Johnson's extensive drug trafficking activities during the charged conspiracy time frame. *Id.* Once again, Johnson's counsel did not request a curative instruction, which also may preclude a ruling in his favor. *Id.*

6.    *Prosecutor Misconduct; Shifting the Burden*

Johnson contends that the district court erred in not granting a mistrial as a result of a statement made by the Government in its rebuttal argument which Johnson alleges improperly shifted the burden of proof to the defense. However, the prosecution's statement was a direct and proper rebuttal to Johnson's closing argument in which he stated the Government had not produced evidence of the conspiracy.

-86-

a.    _Standard of Review_

District courts have broad discretion to control closing arguments. _United States v. Littrell,_ 439 F.3d 875, 881 (8th Cir.2006).  In Johnson's brief, he suggests that abuse of discretion is the standard of review. However, because Johnson did not make a contemporaneous objection to AUSA Mahoney's statement, the standard of review is plain error, and with reversal only under exceptional circumstances.  _United States v. Davis_, 534 F.3d 903, 914 (8th Cir. 2008).  This court reverses for plain error only if "(1) the court committed an error; (2) the error is clear under current law; and (3) the error affects [the defendant's] substantial rights."  _Davis_ 534 F.3d at 914, (quoting _United States v. Mickelson,_ 378 F.3d 810, 819 (8th Cir. 2004)).  "However, even if there has been plain error affecting the defendant's substantial rights, . . . we reverse for plain error only where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  _Id._

b.    _Discussion_

In closing argument on behalf of Johnson, Mr. Handfield said, "Now, . . . let's talk about Count 1 [the drug conspiracy count] . . . there is not one

Appellate Case: 08-3172    Page: 97    Date Filed: 06/09/2009 Entry ID: 3555529

piece of evidence that has been introduced in this case that establishes or proves Count 1." (Tr. 981.)

In response to Mr. Handfield's argument, AUSA Mahoney argued in rebuttal: "And I have been waiting to hear why Dyshawn Johnson is not a drug dealer, how he is not guilty of Count 1. It is absolutely false that there is no physical evidence." (Tr. 998.) At this point there was no objection from Johnson, and she went on to outline the physical and testimonial evidence supporting Count One. (Tr. 998-99.)

At the conclusion of the rebuttal argument, having made no objections during the rebuttal, Mr. Handfield approached the court and asked for a mistrial alleging that AUSA Mahoney had shifted the burden to the defendant. (Tr. 1000.) In response, AUSA Mahoney stated she was not challenging the defendants to present evidence, but was instead responding to Mr. Handfield's closing argument stating that Johnson was not guilty of Count One but had never explained why he was not guilty. (Tr. 1010.)

In closing argument, a prosecutor is entitled to make a fair response and rebuttal when the defense attacks the Government's case. *United States v. Ziesman*, 409 F.3d 941, 954-955 (8th Cir. 2005). In Johnson's closing statement, Mr. Handfield said "there is not one piece of evidence that has

-88-

Appellate Case: 08-3172    Page: 98    Date Filed: 06/09/2009 Entry ID: 3555529

been introduced in this case that establishes or proves Count 1." The Government was entitled to respond to this statement, and put forward that there was no explanation to support it in the remainder of Johnson's argument. *Id*. Accordingly, the argument was proper, and the district court committed no error, plain or otherwise, in failing to declare a mistrial.

Even were the remark improper, prejudice would need to be demonstrated by considering: (1) the cumulative effect of such misconduct (2) the strength of the properly admitted evidence of defendants' guilt; and (3) the curative actions taken by the trial court. *United States v. Hance,* 501 F.3d 900, 908 (8th Cir. 2007).

First, there was no cumulative effect as AUSA Mahoney made only this single challenged statement. Second, as previously outlined, evidence of the defendants' guilt was substantial. Finally, instructions at the beginning and end of the trial explained that arguments were not evidence,[16] and that the burden was on the Government to prove the defendants guilty beyond a reasonable doubt.[17] Those instructions eliminated any possible prejudice resulting from the Government's argument. *See United States v.*

_____

[16] Instruction No. 2, 7, and 15.

[17] Instruction No. 1 and 25.

Appellate Case: 08-3172     Page: 99     Date Filed: 06/09/2009 Entry ID: 3555529

*Robinson*, 110 F.3d 1320, 1326 (8th Cir. 1997). Absent a showing to the contrary, it is presumed that the jury followed the court's instructions. *See United States v. Paul*, 217 F.3d 989, 996 (8th Cir. 2000).

      7.      <u>*Motions for New Trial*</u>

Finally, most of these claimed errors were raised in Dale's and Johnson's motions for new trial. (D.E. 234, 235.) In consideration of these motions, the district court had the opportunity to assess the entirety of the case and determine whether any or all these issues created sufficient prejudice to warrant a new trial, and as the record reflects, the district court denied the motions for new trial. (D.E. 258, 259.)

Appellate Case: 08-3172    Page: 100    Date Filed: 06/09/2009 Entry ID: 3555529

# V.

**The district court did not abuse its discretion in retaining a juror who, although he questioned his impartiality early in the trial, later told the court before deliberations began that he "absolutely" could be fair and impartial.**

Both Dale and Johnson argue that Juror Messner should have been removed by the court when he told the court he was unsure of his impartiality on the second day of trial. However, the district court did not abuse its discretion by asking Juror Messner to stay on the jury, and then allowing him to deliberate, because at the conclusion of the trial Juror Messner said he could be very impartial in considering the evidence.

## A.    *Standard of Review*

The decision of whether or not to remove a juror is reviewed under an abuse of discretion standard. *United States v. Wilcox*, 50 F.3d 600, 601 (8th Cir. 1995).

## B.    *Discussion*

On the morning of the second day of trial, a juror asked to speak with the district court judge:

> THE COURT:      What's your concern, Mr. Messner?
>
> MR. MESSNER:  I feel I can't be impartial.
>
> THE COURT:      Why would you say that?

-91-

MR. MESSNER:    I - - I just went home and thought about this for a long time, and I don't think I can be an impartial juror.

THE COURT:    Well, that's not a good enough answer. You're going to have to stay and sit and hear the evidence. I'll ask you again at the end of the trial.

MR. MESSNER:    Okay.

THE COURT:    But I would ask you, again, to keep an open mind and listen to the evidence, and then we'll discuss this later, but I don't want to excuse you at this point. Now, because the evidence may be hard and it may be disturbing to you, it shouldn't necessarily take away your impartiality, but I am not going to lecture any further, I'm going to ask you to stay, please.

MR. MESSNER:    Okay.

THE COURT:    All right. Because we only have two alternates, and I'll visit with you later –

MR. MESSNER:    Okay.

THE COURT:    –at the end of the trial. Thank you.

(Tr. 94-95.)

After closing arguments, before deliberation, the district court called

Mr. Messner back and questioned him. (The jury retired to the jury room,

-92-

and the following proceedings were had in the courtroom out of the

presence of the jury.  Mr. Messner present, and counsel and defendants:)

THE COURT:  You had stated that you didn't feel you could be fair.  What's your feeling now?

JUROR:  I'm very impartial.

THE COURT:  Very impartial?

JUROR:  I can be fair to both sides.

THE COURT:  You think you can be fair?

JUROR:  Absolutely.

THE COURT:  So you have no concern about retiring and deliberating?

JUROR:  No.

THE COURT:  Does either side have any concern about that?

MR. COONROD:  Nothing from the government, Your Honor.

THE COURT:  Thank you, Mr. Messner.  I thought you were giving it more thought.  You looked like you were paying attention, and so I'll let you continue to deliberate.  Thank you very much.

(Tr. 1001-02.)

There was no additional questioning of the juror by any party.

-93-

The decision to replace a juror with an alternate juror is committed to the discretion of the trial court. *United States v. Gianakos*, 415 F.3d 912, 922 (8th Cir. 2005). If the record shows a legitimate basis for the district court's decision to retain the juror, there is no abuse of discretion. *Wilcox*, 50 F.3d at 601. Absent a showing of actual bias on the part of a prospective juror, this Court should defer to the discretion of the trial court on a motion for mistrial related to the composition of the jury. *United States v. Lussier*, 423 F.3d 838, 841 (8th Cir. 2005).

Further, unless there is some objective evidence to the contrary, if a juror espouses to be impartial he should be taken at his word. *Dennis v. United States,* 339 U.S. 162, 171 (1950) ("One may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.") Finally, a district court does not abuse its discretion by refusing to excuse a challenged juror after the juror affirmed their impartiality and the judge favorably evaluated their demeanor. *United States v. Gonzalez*, 272 Fed.Appx. 117, 2008 WL 925379 (2nd Cir. 2008).

-94-

Although Mr. Messner wavered at the beginning of the trial, no evidence called his fairness into question. Accordingly, the juror's unchallenged final assertion, accompanied by his demeanor and credibility, was a sufficient basis for his retention. The district court acted properly within its discretion.

Appellate Case: 08-3172    Page: 105    Date Filed: 06/09/2009 Entry ID: 3555529

# VI.

**The district court did not abuse its discretion in limiting Johnson's cross-examination of two government witnesses, because the limits placed upon Johnson's cross-examination were reasonable, and Johnson was able to establish through other means the witnesses' hopes for leniency.**

In his second point, Johnson claims the district court violated his Sixth Amendment right to confront witnesses by limiting his cross-examination of Terry Taylor and Mitchell Powell.  However, since Johnson was able to call a detective to impeach Taylor, and as he was able to establish Powell's hope for leniency, the district court did not abuse its discretion in precluding examination regarding collateral bad acts, and speculative, unspoken agreements between the Government and the witnesses.

## A.  _Standard of Review_

A trial court's decision to limit cross-examination is reviewed for an abuse of discretion.  *United States v. Aldridge*, 413 F.3d 829, 833 (8th Cir. 2005) (citing *United States v. Brown*, 110 F.3d 605, 611 (8th Cir. 1997)).  Appellate review is also subject to harmless error analysis.  *Aldridge*, *supra* (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Appellate Case: 08-3172     Page: 106     Date Filed: 06/09/2009 Entry ID: 3555529

### B.    *Discussion*

Johnson claims the trial court violated his constitutional right to confront and cross-examine witnesses by precluding him from questioning those witnesses about the Torrez Rodriguez murder case in which Michael Dale was charged.  However, Johnson's right to cross-examine witnesses "does not suggest that a judge should be prevented from imposing limits of any sort on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  *Van Arsdall*, 475 U.S. at  679 (1986) (quoted in *United States v. Purkey*, 428 F.3d 738, 753 (8th Cir. 2005)).

Johnson only now complains that the judge told him to impeach Taylor through the detective to whom Taylor made inconsistent statements, rather than confront Taylor directly.  The trial court actually told the Government to produce the detective for the defense to call as a witness. (Johnson Brf. 38-39.)  At trial, Johnson agreed with the court's proposition that he get the same impeachment evidence in through another witness.  "As

-97-

long as the Court will allow Mr. Dyshawn Johnson through the government bringing in either one of those (officers), I have no problem with that." (Tr. 579.)

The trial court does not violate the confrontation clause if the defendant is able to impeach the witness through other means. *Purkey*, 428 F.3d at 753. Since Johnson was able to call another witness to demonstrate that Taylor had been inconsistent in an unrelated investigation, and then changed part of his story, there could be no constitutional violation here. Furthermore, because Johnson did not object to presenting the evidence through another witness, nor pursue an offer of proof with Taylor, it is mere speculation what he would have said. *United States v. Lightfoot*, 483 F.3d 876, 882 (8th Cir. 2007). If he wanted to ask Taylor whether Detective Babcock thought he was lying, such a question would have improperly called for speculation, and sought, through hearsay, Babcock's opinion of Taylor's credibility on a separate matter. Such a line of questioning would not be allowed in any case. Fed. R. Evid. 602, 802.

Johnson argues he should have been allowed to confront Taylor personally about his alleged lies to police in the other murder case, but he provides no evidence that Taylor would have given any different

-98-

information than Detective Babcock.  Since there is little indication that the

examination of Taylor would have yielded anything fruitful for the defense

and as the potential for undue prejudice and jury confusion was substantial,

the district court did not abuse its discretion in precluding Johnson from

pursuing this line of inquiry.  *Lightfoot*, 483 F.3d at 883; *see also Aldridge*,

413 F.3d at 834.

Johnson also claims he should have been allowed to attempt to

impeach  Powell by asking him about a pending case in state court – the

Torrez Rodriguez murder case.  Powell had already testified (three times)

that he had pled guilty to a federal drug conspiracy case, in which he faced a

minimum 20-year sentence, and that he was hoping for a downward

departure on that case.  (Tr. 649-50, 660-61, 667-68.)

Johnson's claim is similar to that made by the defendant in *Lightfoot*,

in which the defense complained that the trial court limited his cross-

examination of two witnesses by not allowing questions regarding an

unrelated homicide in state court.  *Lightfoot*, 483 F.3d at 881.  Like

Johnson, Lightfoot hoped to demonstrate the witness's hope for leniency in

the unrelated murder case.  *Id.* at 882.  Also like Johnson, Lightfoot did not

pursue an offer of proof as to any deal or understanding the witness may

Appellate Case: 08-3172     Page: 109     Date Filed: 06/09/2009 Entry ID: 3555529

have had with the Government about the murders. *Id.* Accordingly, any proof of leniency or hope for leniency Powell may have had is mere speculation. *Id.*

More significantly, Johnson was able to establish Powell's hope for leniency as his motivation for testifying though other means, so there could be no abuse of discretion "in precluding examination regarding collateral and uncharged prior bad acts and speculative, unspoken agreements between the government and the witnesses." *Id. See also Purkey*, 428 F.3d at 753-754; *Aldridge*, 413 F.3d F.3d at 834.

Appellate Case: 08-3172    Page: 110    Date Filed: 06/09/2009 Entry ID: 3555529

## VII.

**Johnson's three convictions were supported by sufficient evidence, because at least eight witnesses testified to his involvement in a drug conspiracy, and because Johnson admitted his involvement in the murders, admissions that were corroborated by phone records, a statement of the victim, and his possession soon after the murders of two kilograms of cocaine that were packaged just like Rios packaged his drugs.**

In his fourth point, Johnson contends that the evidence was insufficient to support his convictions for conspiracy to distribute cocaine, and for knowingly using a firearm in furtherance of a drug trafficking crime, and in so doing, committing first-degree murder. Johnson's motion for judgment of acquittal, however, was properly denied by the district court.

The jury heard credible testimony from numerous witnesses who stated that Johnson and other co-conspirators bought and sold large amounts of cocaine. Johnson's co-defendant, Bryant Burton testified that he dealt drugs with Johnson, and that Johnson admitted the murders of Rios and Raya to him. This testimony was corroborated by phone records, physical evidence recovered from Johnson's house, wire transfers, and a large amount of unexplained income attributed to Johnson. More than ample evidence supports the jury's verdicts, and the convictions should be affirmed.

-101-

## A.    *Standard of Review*

The court reviews *de novo* the sufficiency of the evidence.  The evidence is viewed in the light most favorable to the verdict, conflicts are resolved in favor of the Government, and all reasonable inferences from the jury's verdict are accepted.  *United States v. Castro-Gaxiola*, 479 F.3d 579, 581 (8th Cir. 2007) (citing *United States v. Cruz*, 285 F.3d 692, 697 (8th Cir. 2002)).  As this standard of review is strict, the court does not lightly overturn a jury's verdict.  *Id.*  The verdict is upheld if any interpretation of the evidence could lead a reasonable jury to find the defendant guilty beyond a reasonable doubt.  *Id.*; *United States v. Carter*, 481 F.3d 601, 610 (8th Cir. 2007).

## B.    *Discussion*

### 1.    *Count One*

To support a conspiracy conviction, the Government must show that: (1) a conspiracy existed for an illegal purpose; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly joined in it.  *United States v. Becker*, 534 F.3d 952, 957 (8th Cir. 2008).  Direct or circumstantial evidence may provide the basis for a conspiracy conviction.  *United States*

-102-

Appellate Case: 08-3172     Page: 112     Date Filed: 06/09/2009 Entry ID: 3555529

*v. Oleson*, 310 F.3d 1085, 1089 (8th Cir. 2002); *United States v. McCracken*, 110 F.3d 535, 540 (8th Cir. 1997).

Johnson now concedes that the Government proved that Johnson sold cocaine. (Johnson Brf. 49.) However, he argues that the evidence established only a buyer-seller relationship and not a conspiracy. For this proposition, Johnson cites one case from the Seventh Circuit.

However, evidence of distribution of large amounts of drugs over more than two years will support a conspiracy conviction. *Becker*, 534 F.3d at 957 (citing *United States v. Pizano*, 421 F.3d 707, 719 (8th Cir. 2005)); *see also United States v. Vinton*, 429 F.3d 811, 815-16 (8th Cir. 2005). Where a supplier knows his buyers are redistributing the drugs, the Government has proved the tacit understanding which will support a conspiracy conviction. *United States v. Kamerud,* 326 F.3d 1008, 1012-13 (8th Cir. 2003).

In this case, Taylor and Levingston testified that they bought cocaine on a regular basis from Dale, and that Dale was supplied by Johnson. (Tr.548, 550, 594, 600.) Powell testified that he operated a crack house with Dale, that Johnson supplied Dale, and that when he could not buy from his usual supplier, Dale would act as a go-between and assist Powell in

Appellate Case: 08-3172    Page: 113    Date Filed: 06/09/2009 Entry ID: 3555529

purchasing cocaine from Johnson. (Tr. 651, 655-56.) Burton testified that Johnson and Dale were "hustling together," by which he meant selling drugs together, and that he (Burton) also sold drugs with Johnson. (Tr. 760, 761-62.) Curry testified that Burton assisted Johnson in counting and packaging drugs at her house. (Tr. 816.) Abrought and Noel testified that they brought large quantities of cocaine from Johnson and Burton for years. (Tr. 682, 684, 702-04.)

That testimony was corroborated by police recovery of narcotics packaging equipment and more than a hundred rounds of ammunition from Johnson's house. (Tr. 305-20.) Further, evidence showed Johnson had purchased two vehicles worth approximately $50,000 apiece, carried thousands of dollars in cash on his person, and wore jewelry worth thousands of dollars; all while having no legitimate employment and no reported income. (Tr. 243-45, 251-54, 318-19, 837.) Johnson's conspiracy conviction is well-supported by competent, corroborated evidence and should be affirmed.

### 2. *Counts Two and Three*

The district court properly instructed the jury on the elements to be proved for aiding and abetting first-degree murder: (1) the defendant must

Appellate Case: 08-3172     Page: 114     Date Filed: 06/09/2009 Entry ID: 3555529

have known that the offense of using or carrying a firearm during and in relation to a drug trafficking crime which results in a first degree murder was being committed or going to be committed; and (2) have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of using or carrying a firearm during and in relation to a drug trafficking crime; and (3) have acted with malice aforethought.  *Looking Cloud*, 419 F.3d at 790.

In *Looking Cloud*, the defendant challenged the sufficiency of the evidence for aiding and abetting first-degree murder, and this Court upheld the conviction, which was based largely on circumstantial evidence.  *Id.* at 789.  The Government's evidence established the victim, Aquash, was suspected of being an informant against the American Indian Movement, and that she believed her life was in danger.  *Id.*  A witness testified that the defendant participated with others in carrying Aquash to a car, against her will, where she was driven to a house in Rosebud, South Dakota.  Looking Cloud stayed with the victim in the house while others made a decision as to whether she would be killed.  *Id.* at 789-90.  Looking Cloud made admissions to a friend about the murder: that Aquash cried and begged for her life; that Looking Cloud handed a gun to Graham, a co-conspirator, and

Appellate Case: 08-3172     Page: 115     Date Filed: 06/09/2009 Entry ID: 3555529

stood by as Graham shot Aquash; and that afterward, Looking Cloud helped bury the body. *Id.* at 790.

This Court held that from the evidence, the jury could reasonably infer from Looking Cloud's participation in carrying Aquash out to the car that he knew they were going to kill her. *Id.* Just as Johnson told Burton that the other man had pulled the trigger, Looking Cloud told others that Graham pulled the trigger. *Id.* Nevertheless, this Court found that the jury could at least reasonably believe that Looking Cloud helped force Aquash out of the car and that he assisted in the murder by handing the gun to Graham to shoot and kill Aquash, and held there was sufficient evidence to support the jury's finding that Looking Cloud aided and abetted in the killing of the victim, with malice aforethought, and that the killing was premeditated. *Id.*

In this case, the Government proved that Johnson was in frequent telephone contact with Rios on the date Rios was killed, and that in fact, he was the last person to have talked to Rios on the phone. Several witnesses testified that when doing a drug deal, Rios *always* talked to the person over the phone before having them over to his house.

Appellate Case: 08-3172     Page: 116     Date Filed: 06/09/2009 Entry ID: 3555529

Johnson admitted talking to Rios on December 21, and when confronted with the fact that he was the last person to have talked to Rios, said, "he had talked to a lot of people and they ended up dead after talking to him." (Tr. 269.) Just before Rios was killed, Rios asked Lupercio if he thought he could trust Johnson, to which Lupercio answered, "no." In addition to the phone records, the question Rios asked Lupercio showed that Rios was expecting Johnson that night; which was also confirmed by the lack of forced entry into the home.

Rios was found in the kitchen, where he conducted drug deals, and the evidence proved Rios dealt drugs with Johnson. Because over $20,000 in cash was missing, the motive for killing Rios was robbery, and shortly after the murders, Johnson had over $5,000 of unexplained cash in his possession plus $14,700 in receipts for illegally purchased money orders. Further, Johnson changed his flight time to Los Angeles the following day, December 21, and paid for the ticket in cash.

After Johnson returned to Kansas City in early 2003, he had two kilograms of cocaine, which he gave to Burton to sell to Eric Noel. Noel testified the drugs were packaged in the unique way Rios packaged his drugs.

Appellate Case: 08-3172     Page: 117     Date Filed: 06/09/2009 Entry ID: 3555529

The physical evidence at the scene showed there was no sign of any struggle – indeed, while the victims were each shot multiple times, the only defense they offered was to raise their hands in front of the murder weapon. Raya had time to bleed significantly before being shot again. So while Johnson told Burton that the 'motherfucker went crazy and started shooting," the shooting went on for some time, in two different rooms, each victim shot multiple times. Then the cash and drugs were removed from the house, as one of the killers walked through blood wearing Diesel brand shoes. A few months after the murders, Johnson had not one or two, but three pairs of Diesel shoes, the same type of shoes worn by one of the killers.

Finally, Johnson admitted to Burton, that he took somebody over to Snapper's house to purchase some cocaine, and "about the time he looked up, the motherfucker went crazy and got to shootin'." (Tr. 768.) Burton testified that he was mad and frustrated, and asked Johnson why would he take somebody over there. (Tr. 768.) Johnson said, "Man you just need to calm down. You know how it go. That's how the game go." (Tr. 768-69.) Significantly, Johnson did not express regret about the murders, nor deny his knowing participation.

-108-

Johnson had dealt drugs with Rios for a number of years, and had no need to take a conspirator along if a normal drug deal were contemplated. In this case, Johnson took a conspirator who was wearing gloves and a 'scully' and who was armed. All reasonable inferences support the conclusion that Johnson took Dale over to Rios's house to commit a drug robbery. Even if Johnson was surprised by the first shot fired at Rios, there were several more shots fired at Rios and Raya, and no sign of any resistance by Johnson, nor any statement by Johnson that he tried to stop the shooting or even disagreed with the murders. On the contrary, the evidence showed that Johnson shared in the fruits of the drug robbery, and told Detective Jones that "a lot" of people ended up dead after talking to him.

When robbing a drug house, the robber can not just leave the drug dealer to go free, as he will defend himself and/or retaliate, if he knows his robbers. Since Rios knew Johnson, Rios had to be killed, and because Raya was also a witness, she was killed as well. Sufficient evidence supports Johnson's conviction for aiding and abetting the murders of Rios and Raya: he set up the drug deal over the phone; he gained entry into the house for himself and his co-conspirator; and he shared in the profits of the robbery, telling his best friend, "that's how the game go."

-109-

# VIII.

**The district court did not clearly err in calculating the drug amounts attributable to Johnson, since the accuracy of those drug weights was supported by at least seven witnesses.**

Johnson contends the Government failed to prove the drug amounts in the charged drug conspiracy which supported the district court's sentence on Count One. However, even were Johnson not convicted of two counts of murder, the district court neither abused its discretion nor plainly erred in imposing the sentence on Count One, as the drug weights attributed to Johnson were supported by at least seven witnesses at trial.

## A. *Standard of Review*

In contending the Government failed to prove the drug amount sufficient to warrant the imposed sentence, Johnson alleges a constitutional error by the district court citing *United States v. Booker*, 542 U.S. 220 (2005). However, Johnson misapplies the holding of *Booker*, which does not require a jury to find sentencing factors beyond a reasonable doubt, but rather makes the Sentencing Guidelines advisory. Drug quantity is a finding of fact reviewed for clear error when objected to at sentencing, or plain error if the defendant does not object. *United States v. Burnette*, 518 F.3d 942, 946 (8th Cir. 2008) (citing *Mickelson*, 378 F.3d at 821).

-110-

Because Johnson did not object to the district court's procedure, nor request a further explanation of its findings, this court may conduct a plain error review to determine whether the defendant's substantial rights were affected. *United States v. Guarino*, 517 F.3d 1067, 1068 (8th Cir. 2008).

## B.  *Discussion*

The district court committed no constitutional violation, no procedural error, and imposed a reasonable sentence on Johnson.  Johnson offers very little explanation for his claim, other than to say the drug amounts were improperly calculated by the district court.  (Johnson Brf. 51-52.)

Johnson was convicted of conspiracy to distribute five kilograms of cocaine, which in Johnson's case, carried a mandatory sentencing range of not less than 20 years to a maximum of life imprisonment because of Johnson's prior felony drug conviction, pursuant to 21 U.S.C. §§ 841 (b)(1)(A) and 851.  (Tr. 1013; D.E. 80.)

In its guilty verdict form for Count One, the jury found both defendants responsible for five or more kilograms of cocaine.  (D.E. 226, 229.)  A summary of the evidence summarizing drug amounts follows:

-111-

● While searching the Rios residence after the murders, detectives recovered 6.68 kilograms of marijuana and 1.4 kilograms of cocaine; (Tr.72-74.)

● Dale told Anthony Smith that when he shot "the Mexicans," he took "two and a half kees;" (Tr.439-440, 447.)

● Terry Taylor testified that he bought two ounces of crack cocaine twice a week from Dale for eight to nine months, and that Dale's source of cocaine was Johnson; (Tr.548, 550.)

● Charles Levingston testified that he bought nine ounces of cocaine every two weeks from Dale, for a total of approximately ten to fifteen kilograms cocaine, and that Dale was supplied by Johnson; (Tr.594, 597, 600.)

● Mitchell Powell testified that he dealt drugs with Dale from 2003 to 2004, and that he cooked powder cocaine into crack for both himself and Dale. (Tr. 651, 655-56.) Powell testified that when his normal supplier was out of cocaine, Dale arranged for Powell to buy cocaine from Johnson and that he bought two to nine ounces powder cocaine from Johnson approximately once a month. (Tr. 651, 655, 656.)

Appellate Case: 08-3172    Page: 122    Date Filed: 06/09/2009 Entry ID: 3555529

● Bryant Burton testified that in 2002, he bought two to three kilograms cocaine per month from Anthony Rios, and that he also dealt drugs with Johnson.  (Tr. 760.)

● Eric Noel testified that he bought approximately 10 kilograms of cocaine a month from Johnson for two years.  (Tr. 702-04.)

● Henry Abrought testified that from 2002 to 2004, he bought four to nine ounces of powder cocaine approximately once a week from Burton and Johnson;  (Tr. 682, 685.)

These quantities are more than sufficient to support both the jury verdict of five kilograms or more of cocaine, and the presentence investigation report  calculation of 150 kilograms of cocaine and 1.5 kilograms of cocaine base.  (PSR ¶11.)

At sentencing, Johnson lodged a perfunctory objection to the drug quantities listed in the PSR, acknowledging that the jury verdict supported the drug quantities:

> THE COURT:      It goes on to say that you're objecting to any of the other factual information in paragraph 11.

> MR. HOLMES:     Your Honor, as I stated before, that goes to the ultimate finding of the jury.

The district court did not sustain Johnson's objection.  (Sent. Tr. 6-7.)

Appellate Case: 08-3172     Page: 123     Date Filed: 06/09/2009 Entry ID: 3555529

Johnson claims in his brief that the drug weights should have been found by a jury beyond a reasonable doubt, and that the witnesses were unreliable. (Johnson Brf. 51.) However, it is well-established "that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes. Moreover, '[a] district court's assessment of a witness's credibility is almost never clear error given that court's comparative advantage at evaluating credibility.'" *United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006) (quoting *United States v. Killingsworth*, 413 F.3d 760, 763 (8th Cir. 2005)) (internal citations omitted).

At sentencing, the district court announced it had considered the evidence heard by the jury, the advisory Sentencing Guidelines, and the factors under 18 U.S.C. § 3553. (Sent. Tr. 13, 32, 34.) In a recent decision, *United States v. Jones*, 563 F.3d 725, 729 (8th Cir. 2009), this Court held that the district court need only set forth a "relatively brief" outline of its sentencing analysis it "decides to apply the Guidelines to a particular case." *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 2468 (2007)). Further, the district court's decision to sentence a defendant within

-114-

the Guidelines is afforded a presumption of reasonableness on appeal.

*United States v. Lincoln*, 413 F.3d 716, 717-18 (8th Cir. 2005).

Even if the murder convictions were to be reversed, no resentencing would be necessary, because a life sentence would still be reasonable. More than sufficient evidence supported the district court's finding of 150 kilos of cocaine and 1.5 kilos of cocaine base. Under U.S.S.G. § 2D1.1, these drug amounts trigger a base offense level 38, which combined with Johnson's criminal history of category of V, results in a sentencing range of 360 months' to life imprisonment.[18]

Accordingly, the district court did not clearly nor plainly err, and Johnson's sentence should be affirmed.

---

[18]Although Johnson should also receive a two-level enhancement for possession of a firearm in furtherance of a drug conspiracy pursuant to U.S.S.G. § 2D1.1(b)(1) if his murder convictions were reversed, that additional enhancement would not change his Guidelines range.

-115-

## <u>CONCLUSION</u>

For the reasons presented under Arguments I through VIII of the Government's brief, both Dale's and Johnson's convictions and sentences should be affirmed.

Respectfully submitted,

Matt J. Whitworth
  Acting United States Attorney

By    /s/ Kathleen D. Mahoney

Kathleen D. Mahoney
  Assistant United States Attorney

By    /s/ Kathleen D. Mahoney for

Gregg R. Coonrod
  Assistant United States Attorney

Charles Evans Whittaker Courthouse
  400 East 9th Street, Fifth Floor
  Kansas City, Missouri  64106
  Telephone: (816) 426-3122

*Attorneys for Appellee*

-116-

## CERTIFICATE OF COMPLIANCE

I hereby certify pursuant to Fed. R. App. P. 32(a)(7)(C), that this brief complies with the type-volume limitations in Fed. R. App. P. 32(a)(7)(B) and contains 22,119 words.  The brief was prepared using WordPerfect for Windows, Version X3 software.  In making this certification, I have relied upon the word-count feature of WordPerfect for Windows, Version X3. Furthermore, the enclosed disk has been scanned and been determined to be virus-free in compliance with the Eighth Circuit Rule 28A(c).

/s/ Kathleen D. Mahoney
Kathleen D. Mahoney
Assistant United States Attorney

Appellate Case: 08-3172     Page: 127     Date Filed: 06/09/2009 Entry ID: 3555529

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that two copies of the Government's brief and a virus-free diskette were mailed this 5th day of June, 2009, to:

W. Brian Gaddy                              Alan Fenster & Jerald W. Newton
Gaddy Geiger & Brown, P.C.                  Jerald W. Newton
2345 Grand Blvd., Suite 675                 PO Box 10149
Kansas City, MO 64108                       Sedona, AZ 86339

*Attorney for Michael Dale*                 *Attorneys for Dyshawn Johnson*


 /s/ Kathleen D. Mahoney
Kathleen D. Mahoney
Assistant United States Attorney

-118-

Appellate Case: 08-3172    Page: 128    Date Filed: 06/09/2009 Entry ID: 3555529